**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**
**BEFORE: THE HONORABLE GARY S. KATZMANN JUDGE**

| | |
|---|---|
| CS WIND MALAYSIA SDN. BHD. and CS WIND CORPORATION, | : : : |
| Plaintiffs, | : : |
| v. | : : |
| UNITED STATES, | :    Court No. 24-00150 |
| Defendant, | : : |
| and, | : : |
| WIND TOWER TRADE COALITION, | : : |
| Defendant-Intervenor. | : : |

**ORDER**

Upon consideration of the motion of Plaintiffs, CS Wind Malaysia Sdn. Bhd. ("CS Wind Malaysia") and CS Wind Corporation ("CS Wind Korea") (collectively, "CS Wind" or "Plaintiffs"), for judgment on the agency record pursuant to Rule 56.2 of the Rules of this Court, and all other papers and proceedings herein; it is hereby

**ORDERED** that Plaintiffs' motion is granted; and it is further

**ORDERED** that the final results with respect to Utility Scale Wind Towers from Malaysia: Final Results of Antidumping Duty Administrative Review; 2021-2022, 89 Fed. Reg. 56,735 (Dep't Commerce July 10, 2024), amended by Utility Scale Wind Towers from Malaysia: Amended Final Results of Antidumping Duty Administrative Review; 2021-2022, 89 Fed. Reg. 65,848 (Dep't Commerce Aug. 13, 2024), are hereby remanded to the U.S. Department of

**Court No. 24-00150**

Commerce with instructions to take such further action as required by the Court's decision in this matter.

Date: _____     By: _____
        New York, New York                    Gary S. Katzmann, Judge

**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**
**BEFORE: THE HONORABLE GARY S. KATZMANN JUDGE**

| | |
|---|---|
| CS WIND MALAYSIA SDN. BHD. and CS WIND CORPORATION, | : <br> : <br> : |
| Plaintiffs, | : <br> : |
| v. | : <br> : |
| UNITED STATES, | :    Court No. 24-00150 <br> : |
| Defendant, | : <br> : |
| and, | : <br> : |
| WIND TOWER TRADE COALITION, | : <br> : |
| Defendant-Intervenor. | : <br> : |

**PLAINTIFFS' MOTION FOR JUDGMENT ON THE**
**AGENCY RECORD PURSUANT TO RULE 56.2**

Pursuant to Rule 56.2 of the Rules of the United States Court of International Trade,

Plaintiffs, CS Wind Malaysia Sdn. Bhd. ("CS Wind Malaysia") and CS Wind Corporation ("CS

Wind Korea") (collectively, "CS Wind" or "Plaintiffs") hereby move for judgment on the agency

record with respect to its complaint challenging the final results of the U.S. Department of

Commerce ("Commerce") in Utility Scale Wind Towers from Malaysia:  Final Results of

Antidumping Duty Administrative Review; 2021-2022, 89 Fed. Reg. 56,735 (Dep't Commerce

July 10, 2024) ("Final Results"), and the accompanying Memorandum to Ryan Majerus, Deputy

Assistant Secretary for Policy and Negotiations, re: "Decision Memorandum for the Final

Results of the Administrative Review of the Antidumping Duty Order:  Utility Scale Wind

Towers from Malaysia; 2021-2022" (Dep't Commerce July 2, 2024) ("Final Decision Memo"),

amended by Utility Scale Wind Towers from Malaysia:  Amended Final Results of Antidumping

Duty Administrative Review; 2021-2022, 89 Fed. Reg. 65,848 (Dep't Commerce Aug. 13, 2024).  The Final Results cover the period October 13, 2021, through November 30, 2022.

Plaintiffs respectfully move, pursuant to Rule 56.2, for the reasons explained in the accompanying memorandum, for the Court to hold that the contested portions of the Final Results are unsupported by substantial evidence on the record or are otherwise not in accordance with law.  Plaintiffs further move for the Court to remand this matter to Commerce for disposition consistent with the order and opinion of the Court.

Respectfully submitted,

/s/ Jarrod M. Goldfeder
Jarrod M. Goldfeder
MacKensie R. Sugama

TRADE PACIFIC PLLC
700 Pennsylvania Avenue, SE
Suite 500
Washington, DC  20003
Tel:  (202) 223-3760
jgoldfeder@tradepacificlaw.com

*Counsel to Plaintiffs CS Wind Malaysia Sdn. Bhd.*
Dated:  January 29, 2025              *and CS Wind Corporation*

**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**
**BEFORE: THE HONORABLE GARY S. KATZMANN JUDGE**

| | | |
|---|---|---|
| CS WIND MALAYSIA SDN. BHD. and CS WIND CORPORATION, | : | |
| Plaintiffs, | : | |
| v. | : | |
| UNITED STATES, | : | Court No. 24-00150 |
| Defendant, | : | |
| and, | : | |
| WIND TOWER TRADE COALITION, | : | |
| Defendant-Intervenor. | : | |

## CERTIFICATE OF COMPLIANCE

The undersigned counsel at Trade Pacific PLLC hereby certifies that the Memorandum of Law in Support of Plaintiffs' Motion for Judgment on the Agency Record, dated January 29, 2025, complies with the word-count limitation described in the Standard Chambers Procedures. The memorandum of law contains 6,837 words according to the word-count function of the word-processing software used to prepare the memorandum.

Respectfully submitted,

/s/ Jarrod M. Goldfeder
Jarrod M. Goldfeder
MacKensie R. Sugama

TRADE PACIFIC PLLC
700 Pennsylvania Avenue, SE
Suite 500
Washington, DC  20003
Tel:  (202) 223-3760

Dated:  January 29, 2025            Counsel to *Plaintiffs*

**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**
**BEFORE: THE HONORABLE GARY S. KATZMANN JUDGE**

|  |  |
|---|---|
| _____ : | |
| CS WIND MALAYSIA SDN. BHD. and : | |
| CS WIND CORPORATION, : | |
| : | |
| Plaintiffs, : | |
| : | |
| v. : | |
| : | |
| UNITED STATES, : | Court No. 24-00150 |
| : | |
| Defendant, : | |
| : | **NON-CONFIDENTIAL** |
| and, : | **VERSION** |
| : | |
| WIND TOWER TRADE COALITION, : | Confidential Information |
| : | has been redacted on |
| Defendant-Intervenor. : | pages 11-12 |
| _____ : | |

**MEMORANDUM OF LAW**
**IN SUPPORT OF PLAINTIFFS' RULE 56.2**
**MOTION FOR JUDGMENT ON THE AGENCY RECORD**

Jarrod M. Goldfeder
MacKensie R. Sugama

TRADE PACIFIC PLLC
700 Pennsylvania Avenue, SE,
Suite 500
Washington, D.C. 20003
(202) 223-3760

Dated: January 29, 2025               *Counsel to Plaintiffs CS Wind Malaysia Sdn. Bhd.*
                                      *and CS Wind Corporation*

## <u>TABLE OF CONTENTS</u>

TABLE OF CONTENTS ......................................................................................................... i

TABLE OF AUTHORITIES .................................................................................................. ii

I.    STATEMENT PURSUANT TO RULE 56.2(C) ...................................................... 1

    A.    Administrative Determination Under Review................................................ 1

    B.    Issues Presented ............................................................................................ 2

    C.    Standard of Review........................................................................................ 2

II.    ARGUMENT ............................................................................................................ 3

    A.    Commerce's Determination to Disallow CS Wind's Shutdown Cost
        Adjustment Was Not Supported by Substantial Evidence and Was Otherwise
        Not in Accordance with Law........................................................................ 3

        1.    Factual Background............................................................................ 4

        2.    Substantial Evidence Supported the Need for an Adjustment to
            Eliminate Conversion Cost Distortions Consistent with Commerce's
            Legal Requirements and Past Practice .................................................... 8

    B.    Commerce's Calculation of CV Profit Using the Financial Data of Producers
        of Dissimilar Merchandise Was Not Supported by Substantial Evidence .... 12

III.    CONCLUSION ......................................................................................................... 20

## TABLE OF AUTHORITIES

**Statutes**

19 U.S.C. § 1516a(b)(1)(B)(i)...................................................................................2

19 U.S.C. §1677b(e)(2)(A) ...............................................................................8, 13

19 U.S.C. § 1677b(e)(2)(B) ....................................................................................14

19 U.S.C. § 1677b(e)(2)(B)(iii) ........................................................................12, 18

19 U.S.C. § 1677b(f)(1)(A)...................................................................................3, 8

19 U.S.C. § 1677b(f)(1)(C).....................................................................................10


**Cases**

AG der Dillinger Hüttenwerke v. United States, 592 F.Supp.3d 1344 (Ct. Int'l Trade 2022) ........8

Asociacion Colombiana de Exportadores de Flores v. United States, 2 CIT 173, 6 F. Supp.2d 865 (1998)...................................................................................3

Burlington Truck Lines, Inc. v. United States, 371 U.S. 156 (1962)................................................3

Ceramica Regiomontana, S.A. v. United States, 10 CIT 399, 636 F. Supp. 961 (1986), aff'd, 810 F.2d 1137 (Fed. Cir. 1987) ........................................................................2

Consolidated Edison Co. of New York v. NLRB, 305 U.S. 197 (1938).........................................3

Consolo v. Fed. Maritime Comm'n, 383 U.S. 607 (1966)................................................................3

NEXTEEL Co., Ltd. v. United States, 648 F.Supp.3d 1362 (Ct. Int'l Trade 2023).....................10

Nucor Corp. v. United States, 32 CIT 1380, 594 F. Supp. 2d 1320 (2008) ...................................3

PAM, S.p.A. v. United States, 582 F.3d 1336 (Fed. Cir. 2009) .....................................................3

Rhone-Poulenc, Inc. v. United States, 20 CIT 573, 927 F. Supp. 451 (1996) ............................3, 8

Universal Camera Corp. v. NLRB, 340 U.S. 474 (1951) ..............................................................3

**Agency Determinations**

Certain Color Television Receivers from Malaysia, 69 Fed. Reg. 51,989 (Dep't of Commerce Apr. 16, 2004)....................................................................................................................14

Certain Steel Nails from the Sultanate of Oman: Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2018-2019, 86 Fed. Reg. 14,309 (Dep't Commerce Mar. 15, 2021)........................................................................................19

Certain Oil Country Tubular Goods from the Republic of Korea: Preliminary Results of Antidumping Duty Administrative Review; 2018-2019, 86 Fed. Reg. 6,868 (Dep't Commerce Jan. 25, 2021)........................................................................................................................19

Certain Softwood Lumber Products from Canada: Notice of Final Results of Antidumping Duty Administrative Review, 70 Fed. Reg. 73,437 (Dep't Commerce Dec. 12, 2005) ..........................9

Mattresses from Indonesia: Final Affirmative Determination of Sales at Less Than Fair Value, 86 Fed. Reg. 15,899 (Dep't Commerce Mar. 25, 2021) ................................................................19

Pure Magnesium from Israel, 66 Fed. Reg. 49,349 (Dep't of Commerce Sept. 27, 2001) ...........14

Utility Scale Wind Towers from Malaysia:  Preliminary Results of Antidumping Duty Administrative Review, 2021–2022, 89 Fed. Reg. 461 (Dep't Commerce Jan. 4, 2024) ...............5

Utility Scale Wind Towers from Malaysia:  Final Results of Antidumping Duty Administrative Review; 2021-2022, 89 Fed. Reg. 56,735 (Dep't Commerce July 10, 2024) ............................1, 6

Utility Scale Wind Towers from Malaysia:  Amended Final Results of Antidumping Duty Administrative Review; 2021-2022, 89 Fed. Reg. 65,848 (Dep't Commerce Aug. 13, 2024) ...1, 6

Utility Scale Wind Towers from the Republic of Korea:  Final Determination of Sales at Less Than Fair value and Final Affirmative Determination of Critical Circumstances, 85 Fed. Reg. 40,243 (Dep't Commerce July 6, 2020)........................................................................................18

Court No. 24-00150                                    NON-CONFIDENTIAL VERSION

## MEMORANDUM IN SUPPORT OF RULE 56.2 MOTION
## FOR JUDGMENT ON THE AGENCY RECORD

Plaintiffs, CS Wind Malaysia Sdn. Bhd. ("CS Wind Malaysia") and CS Wind

Corporation ("CS Wind Korea") (collectively, "CS Wind" or "Plaintiffs"), hereby submit this

Memorandum in Support of their Motion for Judgment on the Agency Record in accordance

with Rule 56.2(c) of the Rules of this Court. For the reasons explained herein, Plaintiffs

respectfully request that the Court reverse the challenged determination of the U.S. Department

of Commerce ("Commerce") and remand with instructions consistent with the Court's findings.

## I.   STATEMENT PURSUANT TO RULE 56.2(C)

### A.   Administrative Determination Under Review

This action is an appeal from Commerce's final results in <u>Utility Scale Wind Towers

from Malaysia: Final Results of Antidumping Duty Administrative Review; 2021-2022</u>, 89 Fed.

Reg. 56,735 (Dep't Commerce July 10, 2024) ("<u>Final Results</u>"), P.R. 177, and Memorandum to

Ryan Majerus, Deputy Assistant Secretary for Policy and Negotiations, re: "Decision

Memorandum for the Final Results of the Administrative Review of the Antidumping Duty

Order: Utility Scale Wind Towers from Malaysia; 2021-2022" (Dep't Commerce July 2, 2024)

("<u>Final Decision Memo</u>"), P.R. 170, amended by <u>Utility Scale Wind Towers from Malaysia:

Amended Final Results of Antidumping Duty Administrative Review; 2021-2022</u>, 89 Fed. Reg.

65,848 (Dep't Commerce Aug. 13, 2024) ("<u>Amended Final Results</u>"), P.R. 186.[1]

---

[1] Documents contained in the administrative record are identified by the name and date of
the documents, followed by the public ("P.R.") and confidential ("C.R.") index numbers
assigned to these documents in the respective administrative record indices that Commerce filed
with the Court on October 16, 2024. <u>See</u> Admin. Rec. (Oct. 16, 2024), ECF No. 23.

### B.    Issues Presented

Plaintiffs seek judgment on the agency record with respect to the following two issues:

1.    Whether Commerce's determination not to apply a conversion cost adjustment to CS Wind's high reported costs of manufacturing ("COM") that would have fully eliminated the inaccuracies and distortions in CS Wind's actual conversion costs—which arose from the cessation of production early in the 13.5-month period of review ("POR")—was unreasonable, unsupported by substantial record evidence, and otherwise not in accordance with Commerce's legal obligation to ensure that the costs used "reasonably reflect" the costs associated with producing the subject merchandise.

2.    Whether Commerce's decision to calculate the constructed value ("CV") profit ratio based on the average of two surrogate Malaysian companies, Mycron Steel Berhad ("Mycron") and Alpine Pipe Manufacturing Sdn Bhd ("Alpine"), despite substantial evidence demonstrating that both companies were not producers of comparable merchandise and represented unsuitable sources for calculating the ratio, was unreasonable and unsupported by substantial record evidence.

### C.    Standard of Review

In reviewing final results in antidumping ("AD") duty administrative reviews, the Court holds as unlawful agency determinations that are not supported by substantial evidence on the record, or otherwise not in accordance with law.  See 19 U.S.C. § 1516a(b)(1)(B)(i).  The Court "will not allow an agency, under the guise of lawful discretion, to contravene or ignore the intent of the legislature or the guiding purpose of the statute."  Ceramica Regiomontana, S.A. v. United States, 10 CIT 399, 405, 636 F. Supp. 961, 966 (1986), aff'd, 810 F.2d 1137 (Fed. Cir. 1987).

The Court has found Commerce's determinations to be unsupported by substantial evidence "where Commerce has relied on inadequate facts or reasoning, or failed to provide an adequate basis for its conclusions." Rhone-Poulenc, Inc. United States, 20 CIT 573, 575, 927 F. Supp. 451, 454 (1996); see also Asociacion Colombiana de Exportadores de Flores v. United States, 2 CIT 173, 184, 6 F. Supp. 2d 865, 880 (1998) (stating that a change in practice requires Commerce to explain the basis for its change and that such basis must be in accordance with law and supported by substantial evidence).

Substantial evidence is "more than a mere scintilla," and is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Consolo v. Fed. Maritime Comm'n, 383 U.S. 607, 619-20 (1966) (quoting Consolidated Edison Co. of New York v. NLRB, 305 U.S. 197, 229 (1938), PAM, S.p.A. v. United States, 582 F.3d 1336, 1339 (Fed. Cir. 2009). In order for a determination to satisfy this standard, "{t}here must be a rational connection between the facts found and the choice made." Burlington Truck Lines, Inc. v. United States, 371 U.S. 156, 168 (1962); Nucor Corp. v. United States, 32 CIT 1380, 594 F. Supp. 2d 1320, 1331-32 (2008). Additionally, "{t}he substantiality of evidence must take into account whatever in the record fairly detracts from its weight." Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951).

## II.    ARGUMENT

### A.    Commerce's Determination to Disallow CS Wind's Shutdown Cost Adjustment Was Not Supported by Substantial Evidence and Was Otherwise Not in Accordance with Law

Commerce's failure to apply a reasonable conversion cost adjustment to CS Wind's aberrational COM significantly distorted, and thus did not "reasonably reflect," the costs associated with the production of wind towers. See 19 U.S.C. § 1677(b)(f)(1)(A). Because CS

Wind had shut down production at the beginning of the POR, Commerce's failure to apply the
conversion cost adjustment to CS Wind's aberrationally high reported COM was unreasonable,
unsupported by substantial record evidence, and otherwise not in accordance with the law.

### 1.    Factual Background

In its initial and supplemental Section D questionnaire responses, CS Wind reported a
cost adjustment in the field "COST_ADJ_SD" to reflect its highly abnormal production costs
during the POR.  See Letter from Trade Pacific PLLC, "CS Wind's Sections B and D
Questionnaire Responses" (May 1, 2023), at D-23 ("Initial Sec. D Resp."), C.R. 25, P.R. 41;
Letter from Trade Pacific PLLC, "CS Wind's Sections B and D Questionnaire Responses for
Sales to Germany" (July 6, 2023) ("Germany Initial Resp."), at D-14–D-15, C.R. 60, P.R. 87;
Letter from Trade Pacific PLLC, "CS Wind's Supplemental Section D Questionnaire Response"
(Aug. 24, 2023) ("Supp Sec. D Resp."), at SD-6 and Exhibit SD-5, C.R. 78-80, P.R. 106.

As part of its questionnaire responses, CS Wind advised Commerce that CS Wind was
curtailing production and ultimately ceased production altogether in March 2022, which was four
months into the nearly 14-month POR, and thus had no production during most of the POR.  Id.
Through its questionnaire responses, CS Wind demonstrated that because of the abnormal
production status, CS Wind's conversion costs—specifically, labor costs and manufacturing
overhead—were much higher relative to those incurred during normal production times,
including during the period of investigation ("POI") of the underlying proceeding, because of the
reduced production volumes.  See Germany Initial Resp., at D-14.  The COM for wind towers
during this POR thus was significantly distorted by the consequences of the permanent
production shutdown.

For this reason, CS Wind explained that a cost adjustment was necessary because CS
Wind Malaysia's recorded costs did not "reasonably reflect" the costs associated with the

production of wind towers.  See 19 U.S.C. § 1677(b)(f)(1)(A).  To calculate the adjustment, CS

Wind first compared the conversion costs of the same or similar wind tower during the original

investigation POI versus the current administrative review POR, and then derived the difference

of the conversion costs as an adjustment reported in the cost database field "COST_ADJ_SD."

See Germany Initial Resp., at D-14.  CS Wind also reported the actual fixed costs associated

with the shutdown in a separate cost database field "FOH_SD."  See Germany Initial Resp., at

D-15.  Finally, CS Wind further reconciled these conversion costs to its books and records.  See

Supp. Sec. D Resp., at Exhibit SD-5.

On January 4, 2024, Commerce published the preliminary results of the first

administrative review in which it calculated a preliminary AD rate of 25.92 percent *ad valorem*

for Plaintiffs.  See Utility Scale Wind Towers from Malaysia:  Preliminary Results of

Antidumping Duty Administrative Review, 2021–2022, 89 Fed. Reg. 461, 462 (Dep't Commerce

Jan. 4, 2024) ("Preliminary Results"), and accompanying "Decision Memorandum for the

Preliminary Results of the Antidumping Duty Administrative Review of Utility Scale Wind

Towers from Malaysia; 2021-2022" (Dep't Commerce Dec. 28, 2023) ("Prelim. Decision

Memo"), P.R. 147.

In the Preliminary Results, Commerce revised CS Wind's reported COM to exclude an

adjustment that CS Wind reported related to the permanent shutdown of the company's

manufacturing facility near the beginning of the POR.  See Commerce Memorandum, re: "Cost

of Production and Constructed Value Calculation Adjustments for the Preliminary Results – CS

Wind Malaysia" (Dec. 28, 2023) ("Prelim. Cost Calc. Memo"), at 3, C.R. 118, P.R. 152.

Commerce declined to allow the reported shutdown adjustment despite CS Wind's

demonstration throughout its responses that such adjustment is necessary to ensure that gross

distortions in its conversion costs do not lead to inaccurate weighted-average dumping margins.

On February 15, 2024, Plaintiffs submitted a case brief for Commerce's consideration

concerning the above-described calculation issues arising in the <u>Preliminary Results</u>.  <u>See</u> CS

Wind's Case Brief (Feb. 15, 2024), C.R. 120, P.R. 159.  First, CS Wind argued that Commerce

should accept and apply the reported adjustment to CS Wind's conversion costs to eliminate the

inaccuracies and distortions resulting from the fact that CS Wind shut down its facility and

ceased production four months into the 13.5-month POR.  <u>Id.</u>, at 3-8.  CS Wind explained that

the shutdown cost adjustment was necessary to ensure that the COM used in the final AD margin

calculations reasonably reflected the production of the merchandise under consideration, as

required under 19 U.S.C. § 1677b(f)(1)(A).  <u>Id.</u>

On July 10, 2024, Commerce published the <u>Final Results</u> in which it calculated a

weighted-average dumping margin of 18.02 percent *ad valorem* for CS Wind.  <u>See</u> <u>Final Results</u>,

89 Fed. Reg. at 56,735.[2]  Commerce continued to disallow CS Wind's adjustment to conversion

costs, excluded only actual post-shutdown costs incurred during the POR, and revised CS

Wind's general and administrative ("G&A") expense and financial expense ratios to exclude

shutdown costs from the cost of goods sold ("COGS") denominators used in the ratio

calculations.  <u>See</u> <u>Final Decision Memo</u>, at 4-6.

In the <u>Final Results</u>, Commerce acknowledged that "CS Wind also submitted a new cost

field, 'COST_ADJ_SD,' where the company applied a downward adjustment to the costs from

---

[2] On August 13, 2024, Commerce published amended final results in which it corrected the ministerial error alleged by CS Wind in the <u>Final Results</u> concerning a currency conversion error in COGS denominator used in the calculation of the revised financial expense ratio, resulting in an amended weighted-average dumping margin of 17.97 percent *ad valorem* for Plaintiffs.  <u>See</u> <u>Amended Final Results</u>, 89 Fed. Reg. at 65,849.

its normal books and records to eliminate distortions created by abnormally low production volumes during the POR." <u>Final Decision Memo</u>, at 5-6. Commerce, nevertheless, revised CS Wind's reported COM to exclude this reported shutdown adjustment. While acknowledging that CS Wind's factory shutdown was, in fact, "permanent," <u>id.</u>, at 4-5, Commerce disallowed the cost adjustment that would eliminate the cost distortions resulting from the permanent shutdown (reported in the "COST_ADJ_SD" field). <u>Id.</u>, at 6. Instead, Commerce excluded only a small amount of actual post-shutdown costs incurred during the POR (reported in the "FOH_SD" field) and revised the G&A and financial expense rates to exclude such actual post-shutdown costs from the denominators. <u>Id.</u> In doing so, Commerce recognized the potentially distortive effect that a permanent shutdown can have on a respondent's costs:

> From another perspective, Commerce has also explained that there are times when manufacturing firms incur costs as a result of a decision to permanently cease production operations. Commerce has recognized that, prior to the actual sale, manufacturing firms can incur costs to shut down a facility and prepare it for sale. In such instances, Commerce has explained that, because manufacturing firms are in the business of producing and selling commercial goods to customers as opposed to manufacturing and selling entire production facilities, costs and revenues attributable to a shutdown and/or sale of an entire facility are not related to the general operations of a company because, rather than supporting the general operations of a company, the sale is a removal of the production facilities and, thus, represents a significant change in operations. Accordingly, Commerce excludes the costs attributable to a permanent shutdown from the calculation of a respondent's cost of production (COP).

<u>Id.</u>, at 4.

While Commerce excluded the small amount of costs attributable to the shutdown, Commerce did not take the additional and necessary step to adjust costs to eliminate the distortions resulting from the fact that CS Wind had production operations for less than one-third of the POR such that its per-unit conversion costs were abnormally high because they were allocated over abnormally low production volumes. Commerce only noted that it had disallowed

the downward cost adjustment, but it never provided any reasoning as to the basis for its

decision.  Id., at 4-6.  Thus, CS Wind was left to guess as to why Commerce disallowed the

downward cost adjustment following CS Wind's detailed case brief arguments explaining why

such adjustment was necessary to eliminate distortion and inaccuracies in the per-unit conversion

costs.  Having "failed to provide an adequate basis for its conclusions" to deny the downward

cost adjustment, Rhone-Poulenc, 20 CIT at 575, 927 F. Supp. at 454, this Court should find

Commerce's determination to be unsupported by substantial evidence.

> **2.      Substantial Evidence Supported the Need for an Adjustment to
>            Eliminate Conversion Cost Distortions Consistent with Commerce's
>            Legal Requirements and Past Practice**

When a company has no viable home or third-country market for purposes of calculating

normal value, Commerce bases "normal value" on CV under 19 U.S.C. § 1677b(e)(2)(A).  The

statute further provides special rules for the calculation of CV:

> Costs shall **normally** be calculated based on the records of the exporter or
> producer of the merchandise, if such records are kept in accordance with the
> generally accepted accounting principles of the exporting country (or the
> producing country, where appropriate) and **reasonably reflect** the costs
> associated with the production and sale of the merchandise.  **The administering
> authority shall consider all available evidence on the proper allocation of
> costs**, including that which is made available by the exporter or producer on a
> timely basis, if such allocations have been historically used by the exporter or
> producer, in particular for establishing appropriate amortization and depreciation
> periods, and allowances for capital expenditures and other development costs.

19 U.S.C. § 1677b(f)(1)(A) (emphasis added).

Accordingly, while Commerce customarily relies on a company's normal books and

records in considering costs, such costs must reasonably reflect the costs associated with the

production and sale of the subject merchandise.  See, e.g., AG der Dillinger Hüttenwerke v.

United States, 592 F.Supp.3d 1344, 1349 (Ct. Int'l Trade 2022) (emphasizing Commerce's

"obligation" to ensure that the reported cost of production reasonably reflect the cost of

producing the merchandise under consideration.").  In fact, in cases where the costs reported

according to a company's normal books are unreasonable, Commerce has determined to revise

such costs to ensure that the inaccuracies and distortions arising from high conversion costs

recorded in the books and records are eliminated.  To that end, Commerce previously has

contemplated the same scenario affecting CS Wind in which shutdown costs are incurred in a

separate accounting period from the gain or loss from the sale of the production facility.  For

example, Commerce stated that:

> The permanent shut-down and sale of a production facility are directly related.
> Typically, prior to selling a production facility, companies incur costs to shut-
> down the facility and ready it for sale.  Costs may even be incurred in readying a
> facility for sale when a facility is sold outright and will continue to be operated by
> the new owner.  Sometimes the shut-down and sale occur in the same accounting
> period; sometimes they do not.  When both occur within the same accounting
> period, the shut-down costs are typically matched with the gain or loss on the sale
> of the production facility and the net is reported.  When they do not occur in the
> same accounting year, companies normally report the costs immediately through
> an accrual, but report the gain in the subsequent year when the sale takes place.
> **In such a case, if the Department included the shut-down costs as a
> component of the per-unit costs, not only would it result in a significant
> increase to the per-unit cost, but it would not reflect the offsetting revenues
> from the subsequent sale**.

<u>Certain Softwood Lumber Products from Canada: Notice of Final Results of Antidumping Duty</u>

<u>Administrative Review</u>, 70 Fed. Reg. 73,437 (Dep't Commerce Dec. 12, 2005), and

accompanying Issues and Decision Memorandum (Dep't Commerce Dec. 5, 2005), at cmt. 8

(emphasis added).

Commerce thus has acknowledged that distortions can occur if shutdown costs are not

excluded from the reported COM, especially if the sale of the facility had not yet occurred during

the POR, as was the specific circumstance for CS Wind.  Furthermore, Commerce previously has

disallowed shutdown costs to be included in the COM where "unreasonably high costs" would

result from applying such costs to the per-unit production costs of produced merchandise.  <u>See</u>

NEXTEEL Co., Ltd. v. United States, 648 F.Supp.3d 1362, 1367 (Ct. Int'l Trade 2023) (noting

that "a product bearing both direct costs of manufacturing and separate costs associated with

suspension losses will no longer reasonably represent the true cost of production.").

     In a similar vein, the AD statute permits Commerce to make an adjustment for "startup

costs" based on the recognition that, during the initial start-up phase of a new production facility

or a new product, production is not at normal commercial levels, which in turn means that the

unit production costs are higher than would be expected once the company has achieved normal

commercial production levels.  See 19 U.S.C. § 1677b(f)(1)(C).  Commerce has an entire portion

of the Section D Questionnaire dedicated to this issue.  See Letter from Commerce, "Request for

Information" (Mar. 2, 2023), pp. D-8 to D-10, P.R. 15.  The corollary, of course, is the same—if

a company has ceased all production, meaning that its POR production does not reflect normal

commercial levels, then its unit production costs will be distorted and require some form of

adjustment to avoid inaccuracies in the AD duty calculations.

     Commerce inexplicably deviated from its past practice and declined to make a necessary

cost adjustment despite the fact that CS Wind permanently shut down its factory in Malaysia less

than halfway through the POR.  See Supp. Sec. D Resp., at SD-6.  Commerce agreed that CS

Wind's shutdown was permanent.  See Final Decision Memo, at 4-5.  The complete shutdown of

an entire production facility is a significant event that results in high fixed costs and overhead

that cannot be assigned to any particular product because no merchandise was being produced.

Consequently, those high, abnormal conversion costs are allocated over the per-unit COM for a

limited period when production did occur despite the fact that such costs do not represent actual

costs of production.

NON-CONFIDENTIAL VERSION

As part of CS Wind's normal accounting process, it considered both raw material costs and processing costs when determining the price of each wind tower for its quotation process. See Letter from Trade Pacific PLLC, "Response to the Petitioner's December 7th Comments" (Dec. 15, 2023), at 6, C.R. 107, P.R. 145. CS Wind's processing costs reflected the company's labor costs and manufacturing overhead cost levels, and, at the time of preparing the quote, CS Wind's labor and manufacturing overhead costs are calculated at normal levels. Therefore, when the export price is determined, a normal level of processing costs was considered. But when the wind towers actually were produced and sold, the cost of the product becomes abnormally high because of the sharp decrease in production volumes that resulted from the sudden deterioration in the business environment. When comparing the processing costs in the original investigation POI versus the first administrative review POR, the difference ranged up to [    ] percent. See, e.g., Germany Initial Resp., at Exhibit D-17, C.R. 60, P.R. 87. This processing cost difference caused by the shutdown obviously was not normal, but rather, reflected the result of the sharp decrease in production volume.

In other words, CS Wind's books and records did not reflect normal production in which merchandise is continuously produced throughout the POR, in which case conversion costs reflecting "normal" production volumes could be calculated and applied to the overall COM. During normal production times, CS Wind recorded manufacturing costs, including depreciation and fixed costs, in manufacturing accounts numbered from [                    ]. See Supp Sec. D Resp., at SD-6. These costs were then subsequently transferred to its COGS and inventory accounts, which are recorded in accounts [                    ]. Id. After its shutdown, these COGS and inventory accounts had no value. Id. However, the manufacturing cost accounts, ranging from accounts [                    ], continued to accumulate costs

related to depreciation due to the simple fact that CS Wind still owned the building, equipment, machinery, and vehicles to which depreciation applied even though all production had ceased. Id., at Exhibit SD-5. As shown by the monthly POR schedule of shutdown costs submitted in Exhibit SD-5, CS Wind **only** recorded [                    ] from August 2022 through December 2022. Id. It recorded **no** labor costs, material costs, or any other costs related to the production of the subject merchandise. Id.

Accordingly, it was distortive for Commerce to apply all recorded conversion costs, which were calculated based on production volumes from only the first four months of the POR, to all 13.5 months of the POR. Id. Without having normal production volumes included in its calculation of per-unit conversion costs, and by disallowing the shutdown cost adjustment reported in the field "COST_ADJ_SD," Commerce ultimately relied upon a wildly inflated and distorted per-unit COM cost for CS Wind that did not "reasonably reflect" the costs associated with the production and sale of merchandise. For all these reasons, CS Wind respectfully requests that the Court remand Commerce's methodology for reconsideration to ensure that the conversion costs reasonably and accurately reflect the production of the merchandise during this POR so that Commerce calculates an accurate weighted-average dumping margin for CS Wind.

### B.    Commerce's Calculation of CV Profit Using the Financial Data of Producers of Dissimilar Merchandise Was Not Supported by Substantial Evidence

In the Final Results, and in accordance with 19 U.S.C. § 1677b(e)(2)(B)(iii), Commerce calculated CS Wind's CV profit ratio using the FY 2022 financial statements of two surrogate companies: Mycron and Alpine. However, both companies are not producers of comparable merchandise and, therefore, both represented unsuitable sources to rely upon for calculating the CV profit ratio. By relying upon surrogate sources with dissimilar business operations and sales channels to those of CS Wind, Commerce unreasonably introduced distortions and inaccuracies

into the weighted-average AD duty calculations for CS Wind, and by doing so, ignored other record data that included the financial statements of non-Malaysian producers of comparable merchandise.

In accordance with 19 U.S.C. § 1677b(e)(2)(A) and Commerce's longstanding practice, Commerce's preference is to base CV profit and selling expenses on "the actual amounts incurred and realized by the specific exporter or producer being examined in the investigation or review for selling, general, and administrative expenses, and for profits, in connection with the production and sale of a foreign like product, in the ordinary course of trade, for consumption in the foreign country."  However, Commerce determined that CS Wind Malaysia did not have any sales of the merchandise under consideration in the home market and its foreign market sales to Germany ultimately failed the sales-below-cost test.  See Commerce Letter, "Request for Constructed Value Profit and Selling Expense Comments and Information" (Sept. 26, 2023), P.R. 116; Final Decision Memo, at 7.

Because CS Wind has no viable comparison market, Commerce performed the AD duty margin calculations on a price-to-CV comparison.  See Final Decision Memo, at 7.  If the preferred method of using a company's actual profit based on foreign market sales of the foreign like product is not available, the AD statute directs Commerce to use one of three alternative methods to calculate CV profit and selling expenses:

> (i)     the actual amounts incurred and realized by the specific exporter or producer being examined in the investigation or review for . . . selling expenses and profits, in connection with the production and sale, for consumption in the foreign country, of merchandise that is in the same general category of products as the subject merchandise,

> (ii)    the weighted average of the actual amounts incurred and realized by exporters or producers that are subject to the investigation or review (other than the exporter or producer described in clause (i)) . . . for selling expenses and profits, in connection with the production and sale of a

foreign like product, in the ordinary course of trade, for consumption in the foreign country, or

(iii)    the amounts incurred and realized . . . for selling expense and profits, based on any other reasonable method, except that the amount allowed for profit may not exceed the amount normally realized by exporters or producers (other than the exporter or producer described in clause (i)) in connection with the sale, for consumption in the foreign country, of merchandise that is in the same general category of products as the subject merchandise; (i.e., the "profit cap").

19 U.S.C. § 1677b(e)(2)(B).

Further, in accordance with Commerce's longstanding practice, it considers the following factors when selecting among proposed surrogate sources for CV profit under the "any other reasonable" method alternative: (1) the similarity between a potential surrogate company's business operations and products and the respondent's business operations and products; (2) the extent to which a potential surrogate company has sales in the United States and the home market; (3) the contemporaneity of the surrogate data to the period of investigation or review; and (4) the similarity of the customer base between a potential surrogate company and the respondent. See Pure Magnesium from Israel, 66 Fed. Reg. 49,349 (Dep't of Commerce Sept. 27, 2001), and accompanying Issues and Decision Memorandum at Cmt. 8; Certain Color Television Receivers from Malaysia, 69 Fed. Reg. 51,989 (Dep't of Commerce Apr. 16, 2004), and accompanying Issues and Decision Memorandum at Cmt. 26.

As an initial matter, Commerce did correctly apply CS Wind Malaysia's actual indirect selling expenses from its third-country sales in Germany to determine the CV selling expense ratio. See Prelim. Decision Memo, at 15. Yet, when calculating a CV profit ratio, Commerce erred in using an average of two sources: the FY 2022 financial statements of Mycron, a Malaysian conglomerate and trading group of steel, and the FY 2022 financial statements of Alpine, a Malaysian producer of welded steel pipe, plates, and sheets. Id., at 7-11. Commerce

reasoned that both companies are "Malaysian producers of hollow structures and steel pipes that are comparable to the subject merchandise" and "are significant producers of merchandise comparable to wind tower sections and their profits are derived predominantly from sales of comparable merchandise in Malaysia." Id., at 11. But contrary to Commerce's determination, substantial evidence demonstrated that both sources failed to meet Commerce's preferred selection criterion concerning "the similarity of the potential surrogate companies' business operations and products to the respondent's business operations and products." Id., at 8.

First, Commerce unreasonably ignored substantial evidence that Mycron did not meet Commerce's established factors for selecting among CV profit sources because it is not a producer of comparable merchandise. Rather than submitting the standalone statements of a large diameter pipe producer, the petitioner provided—and Commerce relied upon—the <u>consolidated</u> statements of a <u>holding company</u>. Id., at 10-11. Mycron's principal activities consist of "investment holding" and the provision of "management services" to its subsidiaries. Id.; see also Letter from Wiley Rein LLP, "Constructed Value Profit and Selling Expense Comments and Information" (Oct. 10, 2023) ("Pet. CV Profit Letter"), at Exhibit NFI-8, P.R. 127-131. Commerce reasoned that this fact was irrelevant because:

> We disagree with CS Wind that Mycron's consolidated financial statements represent a conglomerate principally engaged in investment holdings. Rather, Mycron's consolidated financial statements predominately reflect the results of Mycron's subsidiaries that produce steel products and not the parent company's investment activities. In fact, Mycron's annual report outlines the results for both the parent, i.e., the "Company," which is engaged in investment holding and management services, and the consolidated entity, i.e., the "Group," which includes the results of the subsidiaries engaged in the production of cold rolled steel, steel pipes and tubes, and steel product trading. A review of the "Company" results shows that in its separate company financial statements, the parent only recognized management fees, which were eliminated in the consolidated results for the Group. Thus, the consolidated results reflect only the results of the Mycron steel producers and the Mycron steel trader, which in Mycron's annual report is described as representing only a small portion of the

company's operations.  Based on its segmented information, Mycron's
consolidated financial statements reflect activities of a significant producer of
pipe and tubes that are comparable to wind tower sections.  Consequently, we
disagree that Mycron's consolidated financial statements are unusable.

Final Decision Memo, at 10-11.

However, Commerce misunderstood the record evidence.  Mycron's financial data reflect

the profitability of its three subsidiaries:  (a) Mycron Steel CRC Sdn. Nhd., a cold-rolled coil

company; (b) Melewar Steel Tube Sdn. Bhd., a steel tube and pipe company; and (c) Silver

Victory Sdn. Bhd., a steel products trader.  See Pet. CV Profit Letter, at Exhibit NFI-8.

Mycron's financial statements report that **a majority** of its overall revenue is derived from sales

of cold rolled coils, which is not at all comparable to utility scale wind towers.  Id.  Although

Commerce rejected the financial statements of Engtex Group Berhad because it is a

conglomerate that principally engaged in investment holding, Prelim. Decision Memo, at 14,

Commerce did not extend this same logic to Mycron.  See Final Decision Memo, at 10-11.

While Commerce focused on the fact that Mycron's consolidated results included the data of

subsidiary "steel producers," Commerce overlooked the fact that those subsidiaries produced

merchandise that is not comparable to utility scale wind towers which, in essence, are large

diameter steel pipes.  Thus, Commerce's reasoning was unsupported by substantial evidence.

Second, Commerce similarly and unreasonably ignored substantial evidence showing that

Alpine is not a producer of comparable merchandise.  Id., at 9-10.  Alpine's FY 2022 financial

statements demonstrate that it has both (1) dissimilar business operations and products, and (2)

dissimilar customer bases compared to CS Wind.  Specifically, Alpine derived a significant

portion of revenue from sales to two related companies:  Hiap Teck Hardware Sdn. Bhd. and

Huatraco Scaffold Sdn Bhd.  See Pet. CV Profit Letter, at Exhibit NFI-3.  Specifically, Alpine's

sales to related parties comprised **21% of its total revenue**, i.e., its related sales comprised MYR

151,629,176 of its total revenue of MYR 704,267,480.  Id.  Alpine's total revenue is a significant component of Commerce's CV profit ratio calculation, and therefore significantly inflated the actual profit experience of the company.  See Prelim. Cost Calc. Memo, at Attachment 1.

Notably, Commerce rejected CS Wind Malaysia's own FY 2021 financial statements because CS Wind Malaysia sold the subject merchandise to an affiliated company, CS Wind Korea.  See Final Decision Memo, at 9 ("because all revenues on CS Wind Malaysia's financial statements reflect transactions between affiliated parties, we cannot confirm that they reflect arm's length values").  Yet, Commerce then relied upon a company's financial data despite the fact that affiliated party sales made up a substantial proportion of the overall revenues and "agree{ing} that a predominance of affiliated transactions in a potential source's financial statements may be distortive to the calculation of CV profit."  Id., at 10.  Yet rather than attempt to justify its own internal inconsistencies in its reasoning, Commerce instead deflected by admonishing CS Wind for arguing that CS Wind Malaysia's FY 2021 financial data were a suitable source for CV profit while also acknowledging that Alpine's financial data were "flawed" and "imperfect."  Id.  Commerce cannot support its finding that Alpine's financial data were usable, whereas CS Wind Malaysia's financial data were not, despite suffering from the same supposed "flaws" and "imperfections."

Apart from this issue, Commerce also failed to address the fact that Alpine itself is not a producer of comparable merchandise, but rather, produces very different hallow structural sections ("HSS").  As Commerce acknowledged, Alpine is a producer of "hollow sections that are small in diameter."  Id.  The most recent Australian Antidumping Final Report from 2022 describes Alpine as a "large scale HSS manufacturer," and Alpine's website further shows that it only produced small diameter, hallow steel sections.  See Letter from Trade Pacific PLLC, "CV

Profit and Selling Expense Rebuttal Comments and Information" (Oct. 24, 2023) ("CS Wind CV Reb. Cmts."), at Exhibit CVR-1 (pp. 28), P.R. 136; Pet. CV Profit Letter, at Exhibit NFI-2. Having an exponentially smaller diameter than that used in utility scale wind towers, HSS inherently requires significantly less raw material to construct and can be sold in much higher volumes given their small size, which in turn affects HSS producers' ability to turn a profit. Without question, HSS is not a comparable or similar product to the large diameter steel towers produced by wind tower manufacturers. But by relying on Alpine's financial data, Commerce ignored its own precedent that large scale diameter pipes are comparable merchandise to utility scale wind towers. See Utility Scale Wind Towers from the Republic of Korea:  Final Determination of Sales at Less Than Fair value and Final Affirmative Determination of Critical Circumstances, 85 Fed. Reg. 40,243 (Dep't Commerce July 6, 2020), and accompanying Issues and Decision Memorandum (Dep't Commerce June 29, 2020), at cmt. 8.

For all these reasons, Commerce should not have relied on the financial statements of Alpine or Mycron because record evidence does not support that they are producers of comparable merchandise. Their financial data is wholly unrepresentative to the profit experience of wind tower manufacturers, such as CS Wind. As such, reliance on such surrogate financial information would only lead to inaccurate weighted-average dumping margins.

While Commerce selected among CV profit sources pursuant to the "any reasonable method" alternative under 19 U.S.C. § 1677b(e)(2)(B)(iii), it should have instead considered comparable producers outside of Malaysia. The record in particular contained the complete, contemporaneous FY 2022 financial statements of Arabian Pipes Company ("APC") and the FY 2021 financial statements of Vallourec Group ("Vallourec") to calculate the CV profit ratio. See Letter from Trade Pacific PLLC, "CV Profit and Selling Expense Comments and Information"

(Oct. 10, 2023), at Exhibits CV-3, CV-4, C.R. 91-97, P.R. 120-126.  Both companies are

producers of large structural pipes used in the oil and gas industry, which is comparable

merchandise to utility scale wind towers.  Id.  Commerce rejected these sources because the

companies were located outside of Malaysia.  See also Final Decision Memo, at 9 ("Regarding

CS Wind's alternative CV profit sources, APC and Vallourec, we note that APC's financial

statements reflect a Saudi steel pipe producer and Vallourec's financial statements reflect a

French steel pipe producer.  Thus, neither APC nor Vallourec are Malaysian producers, nor do

they produce the subject merchandise.")

  Yet, in providing this justification, Commerce inexplicably ignored its own practice that

it frequently uses foreign market sources when selecting a CV profit surrogate company.  See,

e.g., Certain Oil Country Tubular Goods from the Republic of Korea: Preliminary Results of

Antidumping Duty Administrative Review; 2018-2019, 86 Fed. Reg. 6,868 (Dep't Commerce

Jan. 25, 2021), and accompanying Preliminary Decision Memorandum (Dep't Commerce Jan.

15, 2021), at 16-17 (using respondent SeAH Steel's third-country market sales of OCTG to

calculate CV profit rate and selling expenses for another Korean respondent); Certain Steel Nails

from the Sultanate of Oman: Final Results of Antidumping Duty Administrative Review and

Final Determination of No Shipments; 2018-2019, 86 Fed. Reg. 14,309 (Dep't Commerce Mar.

15, 2021), and accompanying Issues and Decision Memorandum (Dep't Commerce Feb. 24,

2021), at cmt. 2 (averaging financial ratios from five different companies all located outside the

home market of Oman); Mattresses from Indonesia: Final Affirmative Determination of Sales at

Less Than Fair Value, 86 Fed. Reg. 15,899 (Dep't Commerce Mar. 25, 2021), and

accompanying Issues and Decision Memorandum (Dep't Commerce Mar. 18, 2021), at cmt. 4

(selecting an Indian producer's financial statements to calculate CV profit and selling expenses).

NON-CONFIDENTIAL VERSION

Accordingly, Commerce, as an alternative to CS Wind's own financial experience, could have used the publicly available financial data of APC or Vallourec as the basis for calculating CV profit in the Final Results because both companies' financial data best reflect the profit experience of CS Wind given that: (1) they are producers of large steel pipes, which are comparable to the subject merchandise; (2) their financial statements do not predominantly reflect sales to the U.S. market; and (3) their financial statements are contemporaneous with the POR. Yet, Commerce unreasonably relied upon the financial data of two companies whose operations bore no resemblance to the production of CS Wind Malaysia simply because they were located in Malaysia, which is unreasonable and unsupportable. For all these reasons, Commerce's calculation of plaintiffs' CV profit ratio was unsupported by substantial evidence and not in accordance with the law.

## III.    <u>CONCLUSION</u>

For the foregoing reasons, Plaintiffs respectfully request that the Court grant their Motion for Judgment on the Agency Record and remand this case to Commerce with instructions consistent with the points set forth in this Memorandum.

Respectfully submitted,

/s/ Jarrod M. Goldfeder
Jarrod M. Goldfeder
MacKensie R. Sugama

TRADE PACIFIC PLLC
700 Pennsylvania Avenue, SE, Suite 500
Washington, D.C. 20003
(202) 223-3760

*Counsel to Plaintiffs CS Wind Malaysia Sdn. Bhd. and CS Wind Corporation*

Dated: January 29, 2025