# IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

**BEFORE:  BEFORE:  THE HONORABLE GARY S. KATZMANN, JUDGE**

| | | |
|---|---|---|
| CS WIND MALAYSIA SDN. BHD., and<br>CS WIND CORPORATION, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| v. | ) | |
| UNITED STATES, | ) | |
| | ) | |
| Defendant, | ) | Court No. 24-00150 |
| | ) | |
| and | ) | |
| | ) | |
| WIND TOWER TRADE COALITION, | ) | |
| | ) | |
| Defendant-Intervenor. | ) | |

## DEFENDANT'S RESPONSE TO PLAINTIFFS' MOTION FOR JUDGMENT ON THE AGENCY RECORD

|  |  |
|---|---|
|  | **YAAKOV M. ROTH**<br>**Acting Assistant Attorney General**<br><br>**PATRICIA M. McCARTHY**<br>**Director**<br><br>**REGINALD T. BLADES, Jr.**<br>**Assistant Director** |
| **OF COUNSEL:**<br><br>**DAVID RICHARDSON**<br>**Senior Counsel**<br>**U.S. Department of Commerce**<br>**Office of Chief Counsel for Trade**<br>**Enforcement and Compliance** | **CLAUDIA BURKE**<br>**Deputy Director**<br>**United States Department of Justice**<br>**Civil Division**<br>**Commercial Litigation Branch**<br>**P.O. Box 480, Ben Franklin Station**<br>**Washington, D.C. 20044**<br>**Tel: (202) 353-9063**<br>**Fax: (202) 305-7644** |
| **May 23, 2025** | *Attorneys for Defendant* |

# TABLE OF CONTENTS

**PAGE**

RULE 56.2 STATEMENT ................................................................................................ 2

    I.    The Administrative Determination Under Review ................................................. 2

    II.    Issues Presented For Review ................................................................................ 2

STATEMENT OF FACTS ............................................................................................... 2

    I.    Statutory Background .......................................................................................... 2

    II.    Administrative Review Proceedings ................................................................... 5

        A.    Shutdown Costs .................................................................................. 5

        B.    Constructed Value Profit ...................................................................... 8

        C.    Preliminary and Final Determinations .................................................. 9

SUMMARY OF ARGUMENT ....................................................................................... 12

ARGUMENT .................................................................................................................. 13

    I.    Standard of Review .......................................................................................... 13

    II.    Commerce's Treatment of Increased Costs as Production Costs Rather than
        Shutdown Costs Is Supported by Substantial Evidence and Otherwise in
        Accordance with Law ....................................................................................... 13

    III.    Commerce's Selection of the Alpine Pipe and Mycron Financial Statements Is
         Supported by Substantial Evidence ................................................................... 16

CONCLUSION ............................................................................................................... 22

## TABLE OF AUTHORITIES

**CASES**                                                                       **PAGES**

*Consol. Edison Co. of N.Y. v. NLRB,*
  305 U.S. 197 (1938) ................................................................................................ 13

*Consolo v. Fed. Mar. Comm'n,*
  383 U.S. 607 (1966) .................................................................................................. 3

*NEXTEEL Co. v. United States,*
  355 F. Supp. 3d 1336 (Ct. Int'l Trade 2019) ................................................. *passim*

*NEXTEEL Co., LTD v. United States,*
  648 F. Supp. 3d 1362 (Ct. Int'l  Trade 2023) ................................................. *passim*

*Thai Plastic Bags Indus. Co. v. United States,*
  746 F.3d 1358 (Fed. Cir. 2014) ................................................................................ 4

*Uttam Galva Steels Ltd. v. United States,*
  997 F.3d 1192 (Fed. Cir. 2021) ................................................................................ 3

**Statutes**

19 U.S.C. § 1516a(b)(1)(B) .................................................................................... 13

19 U.S.C. § 1673 ...................................................................................................... 3

19 U.S.C. §1677 ................................................................................................ *passim*

## Administrative Decisions

*Certain Oil Country Tubular Goods from the Republic of Korea:*
   *Final Determination of Sales at Less Than Fair Value and*
   *Negative Final Determination of Critical Circumstances,*
   79 Fed. Reg. 41,983 (July 18, 2018)................................................................. 18

*Certain Softwood Lumber Products from Canada:*
  *Notice of Final Results of Antidumping Duty Administrative Review,*
  70 Fed. Reg. 73,437 (Dep't Commerce, Dec. 12, 2005) ........................................ 14

*Initiation of Antidumping and Countervailing Duty Administrative Reviews,*
  88 Fed. Reg. 7060 (Dep't of Commerce, February 2, 2023) ...................................... 5

*Notice of Final Determination of Sales at Less Than Fair Value:*
   *Pure Magnesium from Isreal,*
   66 Fed. Reg. 49,349 (September 27, 2001)............................................................ 18

*Notice of Final Determination of Sales at Less Than Fair Value:*
   *Certain Color Television Receivers from Malaysia,*
   69 Fed. Reg. 20592 (April 16 2004) ................................................................... 18

*Utility Scale Wind Towers From Malaysia:*
   *Final Results of Antidumping Duty Administrative Review,*
   89 Fed. Reg. 56,735 (Dep't of Commerce July 10, 2024) ......................................... 2

*Utility Scale Wind Towers from Malaysia:*
   *Preliminary Results of Antidumping Duty Administrative Review,*
   89 Fed. Reg. 461 (January 4, 2024) .................................................................. 9

*Utility Scale Wind Towers From Malaysia:*
   *Amended Final Results of Antidumping Duty Administrative Review;*
   89 Fed. Reg. 65849 (August 13, 2024) ............................................................. 12

*Utility Scale Wind Towers From Malaysia:*
   *Amended Final Results of Antidumping Duty Administrative Review;*
   89 Fed. Reg. 65,848 (Dep't of Commerce, August 13, 2024) ................................. 2

## IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE: THE HONORABLE GARY S. KATZMANN, JUDGE

| | |
|---|---|
| _____ ) | |
| CS WIND MALAYSIA SDN. BHD., and ) | |
| CS WIND CORPORATION, ) | |
| ) | |
|     Plaintiffs, ) | |
| ) | |
|     v. ) | |
| ) | |
| UNITED STATES, ) | |
| ) | |
|     Defendant, ) | Consol. Ct. No. 24-00150 |
| ) | |
|     and ) | |
| ) | |
| WIND TOWER TRADE COALITION, ) | |
| ) | |
|     Defendant-Intervenors. ) | |
| _____ ) | |

## DEFENDANT'S RESPONSE TO PLAINTIFFS' MOTION FOR JUDGMENT ON THE AGENCY RECORD

Pursuant to Rule 56.2 of the United States Court of International Trade, defendant, the United States, respectfully responds to the motion for judgment on the administrative record filed by plaintiffs, CS Wind Malaysia Sdn. Bhd. and CS Wind Corporation, (CS Wind). CS Wind challenges the final results of the United States Department of Commerce (Commerce) in the 2021-2022 antidumping duty administrative review of utility scale wind towers (wind towers) from Malaysia. As explained below, CS Wind's motion should be denied because Commerce's determination is supported by substantial evidence and is otherwise in accordance with law.

## RULE 56.2 STATEMENT

### I.    The Administrative Determination Under Review

The administrative determination under review is Commerce's determinations in *Utility Scale Wind Towers From Malaysia: Final Results of Antidumping Duty Administrative Review; 2021-2022*, 89 Fed. Reg. 56,735 (Dep't of Commerce July 10, 2024) (Final Results) (P.R. 177), and the accompanying Issues and Decision Memorandum (IDM) (P.R. 284),[1] and in *Utility Scale Wind Towers From Malaysia: Amended Final Results of Antidumping Duty Administrative Review; 2021-2022*,  89 Fed. Reg. 65,848 (Dep't of Commerce August 13, 2024) (Amended Final Results )(P.R. 186), and the accompanying Issues and Ministerial Error Analysis Memorandum (Ministerial Error Memo) (P.R. 182).  The period of review is October 13, 2021, through November 30, 2022.

### II.    Issues Presented For Review

1.    Whether Commerce's decision not to treat production costs as shutdown costs is supported by substantial evidence and otherwise in accordance with law.

2.    Whether Commerce's selection of the Alpine Pipe and Mycron financial statements as the sources of constructed value profit is supported by substantial evidence and otherwise in accordance with law.

### STATEMENT OF FACTS

### I.    Statutory Background

Commerce must impose antidumping duties on imported goods that are being sold, or are likely to be sold, in the United States at less than fair value (*i.e.*, dumped) in a way that injures a

---

[1] Citations to public documents from the administrative record are identified as "P.R. ___," and citations to confidential record documents are identified as "C.R. ___."

domestic industry in the United States.  19 U.S.C. § 1673.  Dumping occurs when a foreign firm sells a product in the United States at a price lower than the product's normal value.  *Uttam Galva Steels Ltd. v. United States*, 997 F.3d 1192, 1194 (Fed. Cir. 2021).  Commerce determines a respondent's dumping margin by calculating the amount by which the normal value exceeds the United States export price or a constructed export price.  *Id.*

Normal value is generally calculated as "the price at which the foreign like product is first sold . . . for consumption in the exporting country."  19 U.S.C. § 1677b(a)(1)(B)(i).  In calculating normal value, Commerce will disregard sales made at less than the respondent's "cost of production" (such sales are not in the "ordinary course of trade").  19 U.S.C. §§ 1677b(b)(1), 1677(15)(A).  If there are no sales in the exporting country that remain after removing sales below the cost of production, Commerce will base normal value on a constructed value for the subject merchandise.  *Id.* §§ 1677b(a)(4), (b)(1).  Constructed value is essentially the cost of production plus profit.  *See id.* § 1677b(e).  The statute defines the "cost of production" as

> the cost of materials and of fabrication or other processing of any kind employed in producing the foreign like product during a period which would ordinarily permit production of that foreign like product in the ordinary course of business . . .," the actual selling, general, and administrative expenses and packaging for shipment.

19 U.S.C. § 1677b(b)(3).  The statute defines constructed value as the sum of

> . . .the cost of materials and fabrication or other processing of any kind employed in producing the merchandise during a period that would ordinarily permit the production of the merchandise in the ordinary course of trade, . . . the actual amounts incurred or realized  . . . for selling, general and administrative expenses and profits in connection with the production and sale of a foreign like product."

19 U.S.C. § 1677b(b)(3).

The statute also contains special rules for the calculation of cost of production and constructed value:

> Cost shall normally be calculated based on the records of the exporter or producer of the merchandise, if such records are kept in accordance with the generally accepted accounting principles of the exporting country (or producing country where appropriate) and reasonably reflect the costs associated with the production and sale of the merchandise.

19 U.S.C. § 1677b(f)(1)(A).

When Commerce evaluates a respondent's reported costs, Commerce relies on the company's normal books and records for purposes of calculating the cost of production (and constructed value) if the books and records satisfy two conditions: (1) they are kept in accordance with generally accepted accounting principles (GAAP) in the company's home country, and (2) they reasonably reflect the cost to produce and sell the merchandise. 19 U.S.C. § 1677b(f)(1)(A). When costs reported in a company's books are not reasonable—for example, if cost differences among products do not represent differences in their physical characteristics— Commerce may revise the reported costs. Appx1706. It is thus normal for Commerce to adjust reported costs to address distortions when it encounters cost differences attributable to factors beyond differences in the products' physical characteristics. *See, e.g., Thai Plastic Bags Indus. Co. v. United States*, 746 F.3d 1358, 1366-67 (Fed. Cir. 2014); *NEXTEEL Co. v. United States*, 355 F. Supp. 3d 1336, 1361-62 (Ct. Int'l Trade 2019).

As part of the constructed value calculation, Commerce calculates constructed value profit and selling expenses based on the respondent's own home market and third country sales. Preliminary IDM, at 13; *see also*, 19 U.S.C. §1677b(e)(2)(A). If there are no home market or third country sales, the statute, in relevant part, provides three alternative methods of calculating CV profit, with no particular hierarchy among the alternatives:

(i)      the actual amounts incurred and realized by the specific exporter or producer being examined in the investigation or review . . . for profits, in connection with the production and sale, for consumption in the foreign country, of merchandise that is in the same general category of product as the subject merchandise;

(ii)     the weighted average of the actual amounts incurred and realized by exporters or producers that are subject to the investigation or review (other than the exporter or producer described in clause (i)) . . . for profits, in connection with the production and sale of a foreign like product, in the ordinary course of trade, for consumption the in the foreign country; or

(iii)    the amounts incurred and realized . . . for profits, based on any other reasonable method, except that the amount allowed for profit may not exceed the amount normally realized by the exporters or producers (other than the exporter or producer described in clause (i)) in connection with the sale, for consumption in the foreign country, of merchandise that is in the same general category of products as the subject merchandise (*i.e.*, the "profit cap").

19 U.S.C. Section 1677(b)(e)(2)(B).[2]

## II.    Administrative Review Proceedings

### A.    Shutdown Costs

In February 2023, Commerce initiated the 2021-2022 administrative review of the antidumping duty order covering wind towers from Malaysia. *See Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 88 Fed. Reg. 7060, 7062 (Dep't of Commerce February 2, 2023)(P.R. 12). CS Wind Malaysia Sdn. Bhd. and CS Wind Corporation were the only companies for which a review was requested. *See* P.R. 2, 3, 4.

---

[2] Uruguay Round Agreements Act, Statement of Administrative Action, H.R. Doc. No. 103-316 (1994) (SAA) at 840 ("at the outset, it should be emphasized, consistent with the Antidumping Duty Agreement, new section 773(E)(2)(B) does not establish a hierarchy or preference among these alternative methods. Further, no one approach is necessarily appropriate for use in all cases.").

Commerce issued initial questionnaires to CS Wind asking that CS Wind report their cost of production and constructed value information. P.R. 15. The questionnaire defined cost of production as "the sum of: (1) material, fabrication, and other processing costs, (2) selling, general, and administrative expenses, and (3) the cost of containers and other packaging expenses." *Id*. at I-5. The questionnaire defined constructed value as "the sum of: (1) the cost of materials and fabrication of the subject merchandise, (2) selling, general, and administrative expenses and profit in the foreign market, and (3) the cost of packing for exportation to the United States." *Id*. at I-4; *see also*, D-2.

Specific to the issue here, Commerce requested an "explan[ation] of financial accounting practices regarding . . . plant closure, shut-down (including periods for maintenance and retooling), or restructuring costs (state whether you recognize any expenses during the cost calculation period because of the shut-downs, closures, or restructuring during the previous period . . .[)]." *Id*. at D-5 and D-6.

In response, CS Wind explained that it shut down its plant in 2022, the last shipment was made in July 2022, and that shutdown costs, such as depreciation cost, were allocated to the reported cost of manufacturing. P.R. 41. CS Wind reported that the last production before shutdown occurred in March 2022, and that any production facility fixed costs incurred after that date were not allocated to finished products but were reported separately in the cost database as Fixed Overhead-Shut Down costs. *Id.* at D-23.

CS Wind updated its response a few months later to include an additional cost adjustment for the shutdown cost field, which reduced CS Wind's reported production costs. C.R. 60 at D-14. CS Wind explained that, because it decreased and then stopped production of wind towers in March 2022, the fixed production costs (labor plus manufacturing overhead) were higher in the

review period than in the investigation. *Id.* As a result, CS Wind now claimed its production

costs should be adjusted downward to account for their increase due to the shutdown. *Id.*

In a second supplemental questionnaire, Commerce asked for more detailed information

about CS Wind's reported shutdown costs, requesting, in part, the following information:

    a.     Provide the [period of review] monthly schedule listing the monthly shut down costs and describing the nature of the shutdown costs you incurred during the [period of review] after production stopped in March of 2022;

    b.     Demonstrate how the shutdown costs you have provided above reconcile to your submitted monthly trial balance;

    c.     Discuss the March 2022 factory shut down (e.g., was the entire factory sold, were certain fixed assets sold, was the factory just idled during the [period of review], etc.) and provide the related dates of any dispositions; and

    d.     State whether CS Wind continued to recognize depreciation expenses on the shut down assets after March 2022 in its normal books and records and was the expense included the reported costs.

    10.     Explain why you believe it is appropriate to report the cost variances as fixed costs in the {shutdown} field and not as variable expenses considering the variances relate to sub-materials, i.e., variable costs.

P.R. 95 at 6-7.

In response, CS Wind reported that, prior to the shutdown, it recorded manufacturing

costs in manufacturing accounts. P.R. 106. CS also reported that it continued to incur fixed

overhead costs from the time of the shutdown to the end of the period of review, and together

with costs related to shipping the remaining products, they were reported as shutdown costs. *Id.*

CS Wind also argued that a downward adjustment to their manufacturing costs was necessary to

account for the rise in costs attributable to the shutdown of its plant. *Id.* The requested

downward adjustment was in an amount equal to the difference between their manufacturing

costs in the investigation proceeding and their manufacturing costs during this review. *Id.*

    **B.**     **Constructed Value Profit**

7

Because CS Wind did not have a viable home or third country market, Commerce had to resort to constructed value for CS Wind's normal value and requested that the parties submit profit and selling expenses from surrogate financial statements. P.R. 116 at 1-2. Commerce listed its requirements:

> Each surrogate financial statement you submit must be complete, including the auditor's report and all financial statement footnotes. Ensure that every page of the financial statement you submit includes a full English translation. For each surrogate financial statement you place on the record, you must also submit a calculation of the CV profit and selling expenses that reconciles to the financial statement. In addition, include a discussion (and provide supporting documentation) as to why the profit/selling expense source reflects comparable merchandise. Further, you must provide the source of each of the financial statements included in your submission and confirm that the source is publicly available.

*Id*.

CS Wind responded that its own financial statement for 2021, which overlapped with the period of review by two months, best represented the company's profit and selling expenses. P.R. 120 at 2-4. But if Commerce decided not to use CS Wind's 2021 statement, CS Wind proposed that Commerce should use financial statements from a large diameter steel pipe manufacturer. *Id*. at 3-4. CS Wind explained that a wind tower manufacturer and a large diameter steel pipe manufacture engaged in the same activities, cutting, bending, beveling, welding, and assembling steel plate into the end products. *Id*.

CS Wind submitted financial statements from four large diameter steel pipe companies:

(1) The 2022 financial statements of a Malaysian company, Engtex Group Berhad (Engtex), that manufactures, among other things, various steel products, including welded pipes used in construction, water and waste industries. P.R. 120 and 121;

(2) The 2021 and 2022 financial statements of a Saudi company, Arabian Pipes Company (Arabian Pipes). P.R. 121-123;

8

     (3) The 2021-2022 financial statements of a French company, Vallourec
     Group (Vallourec). P.R. 123-125; and

     (4) The 2021-2022 financial statements of a Russian company, PAO
     TMK.  P.R. 125-126.

The Coalition also submitted for consideration financial statements from three additional

Malaysian pipe companies:

     (1) The 2021 and 2022 financial statements of Alpine Pipe Manufacturing
     Sdn. Bhd. (Alpine Pipe).  P.R. 127;

     (2) The March to February 2021 and 2022 financial statements for
     Pantech Group Holdings Berhad (Pantach).  P.R. 127-129; and

     (3) The 2022 annual report and financial statements of Mycron Steel
     Berhas (Mycron).  P.R. 129-131.

**C**.    **Preliminary and Final Determinations**

In January 2024, Commerce published its preliminary results.  *Utility Scale Wind Towers*

*from Malaysia: Preliminary Results of Antidumping Duty Administrative Review, 2021-2022*, 89

Fed. Reg. 461 (January 4, 2024) (Preliminary Results) (P.R. 153).

Regarding treatment of CS Wind's shutdown costs, Commerce declined the adjustment

requested by CS Wind because CS Wind had failed to demonstrate or to substantiate that the

difference in production costs between the investigation and the review should be the amount

adjusted to production costs in the review.  Commerce determined that the production costs

incurred and reported in CS Wind's records *at the time of production* should be used, and that

later-in-time changes to CS Wind's overhead costs should not be considered or attributed to

those earlier reported costs.  Therefore, Commerce relied on the production costs in CS Wind's

books and records as originally recorded, without a downward adjustment.  P.R. 147 at 12; *see*

*also* P.R. 152 at 3.

Regarding constructed value profit, Commerce explained that because CS Wind had no home market sales and all third country sales were below cost (issues not in dispute here), Commerce could not use the statutorily preferred method of calculating constructed value profit and selling expenses using CS Wind's own data. P.R. 147 at 13. The second alternative, other respondent data, was also not available because no other producers or exporters were individually reviewed in this segment of the proceeding. *Id*. at 13-14. Therefore, Commerce relied on the third statutory alternative, any other reasonable methodology, considering the following 4 factors:

> 1. The similarity between a potential surrogate company's business operations and products and the respondent's business operations and products;
>
> 2. The extent to which a potential surrogate company has sales in the United States and the home market;
>
> 3. The contemporaneity of the surrogate data to the period of investigation or review; and
>
> 4. The similarity of the customer base between a potential surrogate company and the respondent.

*Id*. at 14.

Commerce analyzed the seven financial statements placed on the record by the interested parties. Commerce found that Engtex and Pantech were not suitable sources for profit and selling expenses because Engtex "is a conglomerate consisting of wholesale and distribution, manufacturing, property development, and hospitality services, and principally engaged in investment holding," and Pantech was also a large investment company receiving most of its revenue from trading. *Id.* at 14. Commerce also found that Arabian Pipe, Vallourec, and PAO were not Malaysian companies and, further, that Vallourec was not profitable in 2022 and PAO's financial statement was not contemporaneous with the period of review. *Id*.

To calculate constructed value profit, Commerce selected the Alpine Pipe and Mycron financial statements for several reasons. Commerce found that they both produced comparable merchandise because they were producers of Malaysian steel pipe products. *Id.* And Commerce found the statements to be complete and legible and to contain reasonable profit cap information. *Id.* Both were also contemporaneous, from the same period of review. *Id*. at 14-15. Using the simple average of the Alpine Pipe and Mycron financial statements profit, Commerce calculated a 12.06 percent profit for CS Wind's constructed value. *Id*.

In July 2024, Commerce issued the final results. P.R. 170. Regarding shutdown expenses, Commerce agreed that CS Wind's shutdown costs should not be included in its cost of manufacturing. *Id.* at 5. Commerce also revised the general and administrative (G&A) expenses and financial expense rates to exclude the shutdown costs. *Id*. at 6. But Commerce continued to deny CS Wind's adjustment to production costs, and continued to treat CS Wind's originally-recorded costs as production costs from the company's normal books and records rather than as shutdown costs. *Id*. at 5-6.

Regarding selection of financial statements, Commerce continued to use the Malaysian Alpine Pipe and Mycron audited financial statements as it had in the preliminary results. *Id*. at 7. Commerce found that the average profit incurred by Alpine Pipe and Mycron reflected the experience of Malaysian producers of products comparable to the subject merchandise during the period contemporaneous with the period of review. *Id*.

Commerce issued amended final results shortly after to address a ministerial error allegation. *Utility Scale Wind Towers From Malaysia: Amended Final Results of Antidumping Duty Administrative Review; 2021–2022*, 89 Fed. Reg. 65849 (August 13, 2024).

## SUMMARY OF ARGUMENT

Commerce's decision to treat CS Wind's shutdown costs as shutdown costs and not production costs is supported by substantial evidence. CS Wind recorded its production costs as they occurred, in its regular books and records. Later in the period of review, CS Wind ceased operation of its plant. When Commerce asked about CS Wind's shutdown costs, CS Wind first provided information from its regular books and records, as well as the separate costs associated with shutting down production. Later in the proceedings, CS Wind asked for an adjustment to make up for the fact that, in its view, its production shutdown later in the review period caused an increase to their earlier production costs. Commerce disallowed the requested adjustment because applying the requested adjustgment would not reflect the cost of production of the goods coming off the production line. This decision is supported by CS Wind's own books and records as well as by Commerce's practice.

Commerce's calculation of constructed value profit is also supported by the record. Commerce chose from eight potential financial statements the ones that were the most contemporaneous to the period of review and reflected the sale of comparable merchandise. CS Wind wishes Commerce would have chosen another statement, but the Court reviews not whether there are other or even better options on the record. The Court reviews whether substantial evidence supports the decision to choose the statements that Commerce chose. Commerce's decision satisfies that standard.

## ARGUMENT

### I.     Standard of Review

The Court sustains any determination, finding, or conclusion found by Commerce unless it is unsupported by substantial evidence on the record, or otherwise not in accordance with law.

19 U.S.C. § 1516a(b)(1)(B).  "Substantial evidence" connotes "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consol. Edison Co. of N.Y. v. NLRB,* 305 U.S. 197, 229 (1938).  Substantial evidence may be "less than the weight of the evidence," and the possibility of drawing inconsistent conclusions from the record does not render findings unsupported by substantial evidence.  *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966).

## II. Commerce's Treatment of Increased Costs as Production Costs Rather than Shutdown Costs Is Supported by Substantial Evidence and Otherwise in Accordance with Law

Commerce allowed CS Wind a deduction for shutdown costs incurred after all production had ceased in March 2022.  However, Commerce denied CS Wind a downward adjustment for its production costs, because those costs were *actual* production costs incurred and reported at the time of production and should not be artificially adjusted by subsequently-incurred costs. P.R. 170 at 5-6.  As we demonstrate below, Commerce's decision not to make that adjustment is supported by substantial record evidence and otherwise in accordance with law.

As an initial matter, CS Wind concedes that the costs at issue are actual production costs. CS Wind Brief, at 4.  Therefore, the only issue is whether the actual pre-shutdown production costs should be treated as production costs and included in the cost calculations or adjusted for events postdating their production.  Commerce correctly determined that production costs recorded in CS Wind's books and records and incurred for the products that came off the production line cannot be shutdown costs.  P.R. 170 at 6 ("For the final results, we have continued to disallow CS Wind's downward adjustment . . ."); *see also*, Preliminary Cost Analysis Memo, at 3.

13

Commerce agrees with CS Wind that Commerce should use the cost records that reasonably reflect the actual cost of production and that Commerce can, depending on the facts and circumstances, determine that there are costs that are not reasonably reflective of the actual production costs. However, the law does not allow, and Commerce does not have a practice of making adjustments to actual per-unit costs that reflect the actual cost of production of merchandise coming off an operating line.

CS Wind relies upon two cases for the proposition that Commerce will make the adjustment CS Wind seeks, but neither case suggests that Commerce must take an actual production cost and reduce it for a time when the factory was still in operation. CS Wind fails to identify a single case in which Commerce has done this, and instead recites a generic statement that Commerce will adjust for shutdown costs. CS Wind Br. at 9 ("... if the Department included the shut-down costs as a component of the per-unit costs, not only would it result in a significant increase to the per-unit cost, but it would not reflect the offsetting revenues from the subsequent sale" (quoting *Certain Softwood Lumber Products from Canada: Notice of Final Results of Antidumping Duty Administrative Review*, 70 Fed. Reg. 73,437 (Dep't Commerce Dec. 12, 2005) and accompanying IDM at cmt. 8)). Commerce agrees that shutdown costs should be excluded, and excluded them in this case. However, *production costs* incurred while production is on-going are not shutdown costs but actual production costs that must be included in the cost calculations.

This Court's decision in *NEXTEEL Co., LTD v. United States*, 648 F. Supp. 3d 1362, 1367 (Ct. Int'l Trade 2023), does not support CS Wind's view. In *Nexteel*, the Court determined that the suspension of certain production lines *could* be a production cost or be classified as general and administrative expenses, depending on the length of time. CS Wind fails to

acknowledge that *NEXTEEL* involves costs incurred *after* the lines are suspended and not costs incurred *while* the lines were running. CS Wind Brief, at 9-10. The Court held that treating the post suspension costs as general and administrative expenses was appropriate. The Court did not hold that actual pre-suspension production costs should be removed from or adjusted in the production cost calculations. *NEXTEEL*, at 1367.

Next, CS Wind contends that the statutory adjustment for start-up costs suggests that there should be a similar adjustment for shutdown costs. CS Wind Brief, at 10. Congress created a specific exception for start-up production costs that may be invoked

> . . .only where (I) a producer is using new production facilities or producing a new product that requires substantial additional investment, and (II) production levels are limited by technical factors associated with the initial phase of commercial production.

*See*, 19 U.S.C. § 1677b(f)(1)(C). The statute further provides that the actual start-up costs may be rejected and that Commerce "shall" use the cost at the end of the start-up period for the start-up period production costs. 19 U.S.C. § 1677b(f)(1)(C)(iii). The statute applying to start-up costs does not apply to shutdown costs. If Congress had intended to provide similar application to shutdown costs, Congress would have included a similar section addressing shutdown costs. That is not to say that Commerce cannot adjust for the costs associated with temporary suspensions of production lines or permanent shutdowns whereby there are no products being produced to bear the burden of the underlying costs—those costs would have nothing to do with the actual production of merchandise so they are by definition not production costs.

Finally, CS Wind argues that its books and records do not reflect normal production. CS Wind Brief, at 11-12. However, CS Wind's contemporaneous records show the actual costs that CS Wind incurred in producing products, when production was ongoing. Because they were actual costs, they are not distortive. To the extent CS Wind's shutdown costs did distort its

normal operations, Commerce accounted for those distortions by excluding those shutdown costs.  P.R. 171 at 3.

For these reasons, the Court should sustain Commerce's decision to deny the distortive downward adjustment to the actual production costs that CS Wind actually experienced in producing merchandise, for purposes of COP and CV calculations.

### III.    Commerce's Selection of the Alpine Pipe and Mycron Financial Statements Is Supported by Substantial Evidence

To derive the constructed value profit ratio for CS Wind, Commerce selected the financial statements from two Malaysian steel pipe producers.  P.R. 170, at 6-11.  CS Wind challenges the use of these financial statements because CS Wind would have preferred that Commerce use three different financial statements.  CS Wind Brief at 12-20.  As we demonstrate below, Commerce weighed the record evidence and found that CS Wind's suggested financial statements did not meet the criteria for use and were not superior to those selected by Commerce. P.R. 170 at 7-11.

A total of eight financial statements were available on the record for consideration.  First was CS Wind's own 2021 financial statements.  CS Wind also placed on the record four additional financial statements:  Engtex (Malaysia), Arabian Pipes (Saudi Arabia), Vallourec (France), PAO (Russia).  P.R. 120-126.  And the Coalition placed on the record financial statements from three Malaysian companies:  Alpine Pipe, Mycron, and Pantech.  P.R. 128.  CS Wind challenges Commerce's selection of the Alpine Pipe and Mycron financial statements, arguing that its own financial statement or in the alternative the Arabian Pipes and Vallourec financials statements should have been used.  CS Wind Brief, 11-20.  As we demonstrate below, Commerce's decision is supported by substantial record evidence.

If, as in this case, there are no viable home market or third country sales, the statute

provides, in relevant part, three alternative methods of calculating CV profit, with no particular

hierarchy among the alternatives:

> (i)     the actual amounts incurred and realized by the specific
> exporter or producer being examined in the investigation or
> review . . . for profits, in connection with the production
> and sale, for consumption in the foreign country, of
> merchandise that is in the same general category of product
> as the subject merchandise;

> (ii)    the weighted average of the actual amounts incurred and
> realized by exporters or producers that are subject to the
> investigation or review (other than the exporter or producer
> described in clause (i)) . . . for profits, in connection with
> the production and sale of a foreign like product, in the
> ordinary course of trade, for consumption the in the foreign
> country; or

> (iii)   the amounts incurred and realized . . . for profits, based on
> any other reasonable method, except that the amount
> allowed for profit may not exceed the amount normally
> realized by the exporters or producers (other than the
> exporter or producer described in clause (i)) in connection
> with the sale, for consumption in the foreign country, of
> merchandise that is in the same general category of
> products as the subject merchandise (*i.e.*, the "profit cap").

Commerce could not use options (i) and (ii) because CS Wind did not have home market

or usable third country sales and there were no other Malaysian mandatory respondents who

participated in the administrative review.  P.R. 152 at 13-14; P.R. 170 at 8-9.  Moreover,

Commerce found that 100 percent of CS Wind Malaysia's sales were to its affiliate CS Wind

Corporation.  Those sales were also unusable because Commerce could not confirm that they

were made at arms-length.  P.R. 170 at 9.  The only remaining option is clause (iii), any other

reasonable method.  *Id*. at 14; *see also* 19 U.S.C. Section 1677(b)(e)(2)(B)(iii).

The any other reasonable method is, of course, circumscribed by the data available on the record. In this case, the parties submitted eight financial statements for consideration, five Malaysian companies, CS Wind, Alpine Pipe, Mycron, Pantech, and Engtex, the Russian company PAO, the French company Vallourec, and the Saudi company Arabian Pipes. Because CS Wind did not challenge Commerce's decisions not to use the Engtex, Pantech, and PAO financial statements, we will not discuss these companies any further. *See*, CS Wind Brief, at 11-20.

Commerce applied its long-standing practice of applying four criteria to evaluate financial statements: 1) the similarity of the potential surrogate company's business operations and products to respondent's business operations and products; 2) the extent to which the financial data of the surrogate company reflects sales in the home market; 3) the contemporaneity of the data to the period of review; and 4) the similarity of the customer base between a potential surrogate company and the respondent). P.R. 170 at 8.[3]

CS Wind had no home market sales of wind towers in Malaysia. 19 U.S.C. Section 1677(b)(e)(2)(B)(i). *Id.* at 9. Therefore, CS Wind's own financial statements do not reflect sales of the foreign like product in Malaysia and would not reflect a Malaysian market profit on home market sales. *Id.* at 7-8. With regard to contemporaneity, CS Wind's 2021 financial statements

---

[3] *See Notice of Final Determination of Sales at Less Than Fair Value: Pure Magnesium from Isreal*, 66 Fed. Reg. 49,349 (September 27, 2001), and accompanying Issues and Decision Memorandum at Comment 8 (establishing the first three criteria); *see also*, *Notice of Final Determination of Sales at Less Than Fair Value: Certain Color Television Receivers from Malaysia*, 69 Fed. Reg. 20592 (April 16 2004), and accompanying Issues and Decision Memorandum at Comment 26 (establishing the fourth criterion); *see, e.g.*, *Certain Oil Country Tubular Goods from the Republic of Korea: Final Determination of Sales at Less Than Fair Value and Negative Final Determination of Critical Circumstances*, 79 Fed. Reg. 41,983 (July 18, 2014), and accompanying Issues and Decision Memorandum at Comment 1(recent example of application of all four criteria).

cover only the first two months of the period of review.  P.R. 120 at 2-4 and CV-1.  Moreover, all of CS Wind's sales were to its Korean parent company, CS Wind Corporation, and thus reflect affiliated sales that could not be determined to be at arm's length values.  P.R. 170 at 10. Therefore, even though CS Wind had produced the subject merchandise, the statements' other flaws rendered CS Wind's 2021 financial statements unusable.

CS Wind alternatively argued that the Arabian Pipes and Vallourec financial statements should be used because they represent producers of large diameter steel pipes.  But Commerce determined that, because they were not Malaysian companies and did not produce merchandise in the same general category as subject merchandise, other financial statements on the record better met the statutory requirements.  IDM, at 9.

Commerce explained that the financial statements from two Malaysian companies, Alpine Pipe and Mycron better satisfied the statutory criteria.  *Id*. at 9-10.  Although Commerce found that, like Arabian Pipes and Vallourec, neither Alpine Pipe nor Mycron produced the subject merchandise, Commerce also found that Alpine Pipe and Mycron are significant producers of comparable steel products in Malaysia.  *Id.* at 9-10 and 11.

Commerce explained that it had already found Alpine Pipe to be a producer of comparable merchandise, welded steel pipe and sheets and hollow sections, in the prior segment of the proceeding, and its financial statements were used in the investigation preliminary determination.  *Id*., *citing, the Wind Towers from Malaysia LTFV Final Determination IDM*, at Comment 9 (Alpine Pipe's statements were not used in the final determination only because after the preliminary determination the data of another Malaysian producer became available for use.). P.R. 170 at 10; *see also* P.R. 128.  Alpine's financial statement for 2022 lists the principal

activities of "manufacturing and selling of pipes and hollow sections and other steel products." P.R. 127 at 38, Exhibit NFI-3.

When CS Wind argued that Commerce could not use Alpine Pipe because it sold 21 percent of its products to related parties, Commerce acknowledged that sales to affiliates could distort the profit and could be an issue.  P.R. 170, at 10.  However, Commerce also recognized that CS Wind Malaysia's sales—which CS Wind advocating using—were 100 percent to its affiliated parent CS Wind Corporation in Korea.  *Id.*

Regarding Mycron, Commerce determined that the statements reflected the results of its three subsidiaries, not the parent company's investment activities.  *Id.* at 11.  And the three subsidiaries – a cold rolled producer, a steel pipe and tube producer, and to a much smaller extent, a steel trader – all produced comparable merchandise.  *Id.*  From this evidence, as well as detailed sales information, Commerce found that Mycron's statements reflected "significant" activities of pipe and tubes that "are comparable" to wind tower sections.  *Id.*  This record evidence supports Commerce's decision that Mycron is a significant producer of steel tubes and pipes and that management/investment fee activities are not included in the profit that Commerce used.

CS Wind argues that because half of the Alpine Pipe's revenue is derived from cold rolled coil, that eliminates Alpine Pipe's profits from being representative of a Malaysian producer of steel pipes.  CS Wind Brief, at 16.  CS Wind ignores that, although Alpine Pipe receives 57 percent of its revenue from cold rolled coil, more than 39 percent of Alpine Pipe's revenue comes from steel pipe and tube production.

CS Wind then attempts to cast doubt by observing that 21 percent of Alpine Pipe's sales were to related parties.  CS Wind Br. at 16.  Commerce did not ignore that fact.  Commerce

specifically addressed it, stating that affiliated sales can be a concern.  But again, Commerce recognized that CS Wind advocated the use of its own 2021 financial statements that revealed 100 percent of sales to its 100 percent affiliated parent.  P.R. 170 at 10.  If sales to affiliated parties potentially handicap the use of a financial statement, CS Wind's financial statement with 100 percent affiliated sales is inferior to the Alpine Pipe statement, which had only 21 percent of sales among the affiliates.

Because Alpine Pipe is not a producer of large diameter pipes, CS Wind contends that Commerce should not have found the company to produce comparable merchandise and that such a conclusion is inconsistent with Commerce's findings in the investigation proceeding.  CS Wind Brief, at 18 (citing the less than fair value determination).  But in that proceeding Commerce *also found* Alpine Pipe to be a producer of comparable merchandise and used it for the preliminary determination in the investigation of this order until a post-preliminary determination when additional, better data of another Malaysian producer of wind towers became available on the record.  P.R. 170 at 9-10.

Finally, CS Wind argues that Commerce should have relied on Arabian Pipes's and Vallourec's financial statements because they produce large structural pipes, though not subject merchandise.  CS Wind Brief, at 19.  With these suggestions to use statements of companies from Russia and Saudi Arabia, CS Wind ignores the statutory directive to try to fill in the missing profit data with home market or third country market data, so that the profit and costs are reflective of those in the home market or third country market.  19 U.S.C. § 1677b(e)(2)(A).  Consistent with the statute and its precedent, Commerce used financial statements from Malaysian producers of steel pipes and steel products, which are comparable.  To chose the

Russian or Saudi options would have elevated product similarity over origin, which would be contrary to the statute.

## **CONCLUSION**

For these reasons, we respectfully request the Court sustain Commerce's final results.

Respectfully submitted,

YAAKOV M. ROTH
Acting Assistant Attorney General

PATRICIA M. McCARTHY
Director

/s/ Reginald T. Blades, Jr.
REGINALD T. BLADES, Jr.
Assistant Director

OF COUNSEL:

DAVID RICHARDSON
Senior Attorney
U.S. Department of Commerce
Office of Chief Counsel for
Trade Enforcement and Compliance

/s/ Claudia Burke
CLAUDIA BURKE
Deputy Director
U.S. Department of Justice
Civil Division
Commercial Litigation Branch
P.O. Box 480, Ben Franklin Station
Washington, D.C. 20044
(202) 353-9063
Claudia.burke@usdoj.gov

May 23, 2025

*Attorneys for defendants*