Ct. No. 24-00150                                         NON-CONFIDENTIAL VERSION

## IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

CS WIND MALAYSIA SDN. BHD. and
CS WIND CORPORATION,

                    Plaintiffs,

        v.

UNITED STATES,

                    Defendant,

        and

WIND TOWER TRADE COALITION,

                    Defendant-Intervenor.

Before: Hon. Gary S. Katzmann,
        Judge

Court No. 24-00150

<u>NON-CONFIDENTIAL VERSION</u>

Business Proprietary Information
Removed From Pages: 3-6, 9, 16

## <u>DEFENDANT-INTERVENOR WIND TOWER TRADE<br>COALITION'S RESPONSE BRIEF</u>

Alan H. Price, Esq.
Robert E. DeFrancesco, III, Esq.
Laura El-Sabaawi, Esq.
Derick G. Holt, Esq.
Kimberly A. Reynolds, Esq.

WILEY REIN LLP
2050 M Street, NW
Washington, DC 20036
(202) 719-7000

*Counsel for the Wind Tower Trade Coalition*

Dated: June 6, 2025

Ct. No. 24-00150                                    NON- CONFIDENTIAL VERSION

## <u>TABLE OF CONTENTS</u>

Page

I.    INTRODUCTION AND SUMMARY OF ARGUMENTS ..................................................... 1

II.   ISSUES PRESENTED AND SUMMARY OF ARGUMENT ................................................. 1

    A.    Whether Commerce's Determination to Disallow CS Wind's Novel and Unsolicited
Conversion Cost Adjustment Was Supported By Substantial Evidence and Is Otherwise in
Accordance with the Law ............................................................................................................ 1

    B.    Whether Commerce's Methodology for Calculating CV Profit and Selling Expenses Is
Supported by Substantial Evidence and Is Otherwise in Accordance with the Law ................. 2

III.   STATEMENT OF FACTS ............................................................................................... 2

IV.   ARGUMENTS .................................................................................................................... 7

    A.    Commerce's Determination to Deny CS Wind's Novel and Unsolicited Conversion Cost
Adjustment Is Supported By Substantial Evidence And Is Otherwise In Accordance With the
Law 7

        1.    Commerce Provided A Reasonable Explanation for Denying CS Wind's Conversion
Cost Adjustment ....................................................................................................................... 13

        2.    CS Wind Is Asking the Court to Reweigh Evidence ................................................... 17

    B.    Whether Commerce's Methodology for Calculating CV Profit and Selling Expenses Is
Supported by Substantial Evidence and Is Otherwise in Accordance with the Law ............... 19

V.    CONCLUSION .................................................................................................................... 23

Ct. No. 24-00150                                          **NON- CONFIDENTIAL VERSION**

<u>**TABLE OF AUTHORITIES**</u>

**Page(s)**

**Cases**

*Carbon Activated Tianjin Co., Ltd. v. United States*,
    633 F.Supp.3d 1329 (Ct. Int'l Trade 2023) ...............................................................17

*Fujitsu Gen. Ltd. v. United States*,
    88 F.3d 1034 (Fed. Cir. 1996) .................................................................................17

*INS v. Elias Zacarias*,
    502 U.S. 478 (1992) .................................................................................................16

*Jiaxing Bro. Fastener v. United States*,
    822 F.3d 1289 (Fed. Cir. 2016) .................................................................................17

*Matsushita Elec. Indus. Co. v. United States*,
    750 F.2d 927 (Fed. Cir. 1984) .................................................................................16

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Ins. Co.*
    463 U.S. 29 (1983) ...................................................................................................17

*Tian Ziyang Food Co. Ltd. v. United States*,
    918 F.Supp.2d 1345,1354 (Ct. Int'l Trade 2013) .....................................................14

*Timken Co. v. United States*,
    12 CIT 955, 699 F. Supp. 300 (1988) .......................................................................17

**Statutes**

19 U.S.C. § 1677b..........................................................................................2, 7, 10, 19

Tariff Act of 1930 Section 773(f) .........................................................................2, 3, 12, 18

**Administrative Materials**

*Acrylonitrile-Butadiene Rubber from France*,
    87 Fed. Reg. 37,833 (Dep't Commerce June 24, 2022) ...............................10, 11, 12

*Biodiesel from Indonesia*,
    83 Fed. Reg. 8835 (Dep't Commerce Mar. 1, 2018) ...........................................20, 22

*Certain Color Television Receivers from Malaysia*,
    69 Fed. Reg. 20,592 (Dep't Commerce Apr. 16, 2004)..........................................20

Ct. No. 24-00150                                              **NON- CONFIDENTIAL VERSION**

*Certain Frozen Fish Fillets from the Socialist Republic of Vietnam*,
    74 Fed. Reg. 11,349 (Dep't Commerce Mar. 17, 2009) ..................................................20, 22

*Certain Steel Nails from the United Arab Emirates*,
    81 Fed. Reg. 71,482 (Dep't Commerce Oct. 17, 2016) ........................................................20

*Polyester Textured Yarn from Thailand*,
    86 Fed. Reg. 58,883 (Dep't Commerce Oct. 25, 2021) ..........................................................9

*Pure Magnesium from Israel*,
    66 Fed. Reg. 49,349 (Dep't Commerce Sept. 27, 2001)........................................................20

*Utility Scale Wind Towers From Malaysia*,
    89 Fed. Reg. 65,848 (Dep't Commerce Aug. 13, 2024)................................................ *passim*

*Utility Scale Wind Towers from Malaysia*,
    86 Fed. Reg. 27,828 (Dep't Commerce May 24, 2021) ..................................................20, 21

*Utility Scale Wind Towers From the People's Republic of China*,
    77 Fed. Reg. 75,992, 7,5995 (Dep't Commerce Dec. 26, 2012) .............................................9

*Utility Scale Wind Towers from the Socialist Republic of Vietnam*,
    85 Fed. Reg. 40,226, 40,228 (Dep't Commerce July 6, 2020) ...............................................9

NON- CONFIDENTIAL VERSION

## I.    INTRODUCTION AND SUMMARY OF ARGUMENTS

On behalf of the Wind Tower Trade Coalition ("Defendant-Intervenor"), we hereby submit the following brief in response to the January 29, 2025 opening brief of CS Wind Corporation and CS Wind Malaysia ("Plaintiffs" or "CS Wind"). *See* Pls.' Mem. in Supp. of Rule 56.2 Mot. For J. on the Agency R. (Jan. 29, 2025), ECF No. 26 ("Pls. Op. Br."). We further submit this brief in support of the United States' ("Defendant") response brief. Def.'s Resp. to Pl.'s Rule 56.2 Mot. For J. on the Agency R. (May 23, 2025), ECF No. 33 ("Def. Resp. Br.").

## II.    ISSUES PRESENTED AND SUMMARY OF ARGUMENT

### A.    Whether Commerce's Determination to Disallow CS Wind's Novel and Unsolicited Conversion Cost Adjustment Was Supported By Substantial Evidence and Is Otherwise in Accordance with the Law

Yes. In the final results, the Department of Commerce ("Commerce") correctly declined CS Wind's downward "conversion cost adjustment" which applied to costs while the respondent was fully operational and still producing wind towers. Issues and Decision Memorandum accompanying *Utility Scale Wind Towers From Malaysia*, 89 Fed. Reg. 65,848 (Dep't Commerce Aug. 13, 2024) (amended final results of antidumping duty admin. rev.; 2021–2022) ("IDM") P.R. 170 at 5-6. While CS Wind argues that Commerce's denial of its novel and unsolicited conversion cost adjustment was unreasonable, Pls. Op. Br. at 3-4, Commerce correctly deducted *actual* shutdown costs recorded in CS Wind's books and records that reflect the costs incurred after CS Wind ceased production of wind towers in its Malaysian facility, which is consistent with agency practice. Furthermore, the Court should decline CS Wind's invitation to reweigh the evidence as Commerce found that the respondent's conversion cost adjustment did not represent *actual* shutdown costs. Accordingly, Commerce's determination to deny CS Wind's novel and

unsolicited conversion cost adjustment was supported by substantial evidence and is in accordance with the law.

### B. Whether Commerce's Methodology for Calculating CV Profit and Selling Expenses Is Supported by Substantial Evidence and Is Otherwise in Accordance with the Law

Yes, in the final results Commerce correctly used the financial statements of Alpine and Mycron as a basis for constructed value ("CV") profit because the financial statements of these companies were the only useable Malaysian producers of comparable merchandise on the record. IDM at cmt. 2. Specifically, as Commerce explained, there was no basis for Commerce to disregard Mycron and Alpine's financial statements, which are both Malaysian pipe producers, and which are complete, contemporaneous, contain the auditor's report, include all the financial statement footnotes, and are in English. And, contrary to Plaintiffs' claims, CS Wind Malaysia's 2021 financial statement and Plaintiffs' other proposed financial statements, are not appropriate because they are largely not contemporaneous with the period of review ("POR"), unprofitable, and are from non-Malaysian companies. Commerce's decision to use Alpine and Mycron for purposes of its CV profit calculations as the best information available in its final results is supported by substantial evidence and in accordance with law.

## III. STATEMENT OF FACTS

On March 2, 2023, Commerce issued CS Wind initial Section A through D questionnaires. The Section D (cost) questionnaire's standard instructions require the respondent to notify Commerce in advance of submitting its Section D questionnaire response if the respondent plans to depart from its normal accounting system or normal cost allocation methods. Specifically, in Section III of the Department's Section D Questionnaire, Commerce states that per Section 773(f) of the Tariff Act of 1930, *cod.fied as amended at* 19 U.S.C. § 1677b ("the Act"), the starting point

for reporting costs must be the respondent's normal books and records, and provides that if "in preparing the COP and CV calculations {respondent} intend{s} to depart from {the} company's normal accounting system and normal cost allocation methods, {the respondent} must notify Commerce in writing <u>before</u> {} respond{ing} to this section of the questionnaire." *See* Letter from Kabir Archuletta, Program Manager, Off. V., to Trade Pacific PLLC, re: *Administrative Review of the Antidumping Duty Order on Utility Scale Wind Towers from Malaysia: Request for Information* (Mar. 2, 2023) at D-10, P.R. 16-17. *See, e.g.,* Letter from Trade Pacific PLLC to Sec'y Commerce, re: *CS Wind's Sections B and D Questionnaire Responses for Sales to Germany* (July 7, 2023) ("CS Wind's July 6 BDQR") at D-13, P.R. 86-87.  *See also* Section 773(f) of The Act.

On May 1, 2023, CS Wind submitted its Section D questionnaire response. *See* Letter from Trade Pacific Law PLLC to Sec'y Commerce, re: *Utility Scale Wind Towers from Malaysia – CS Wind's Sections B and D Questionnaire Responses* (May 1, 2023) ("CS Wind's May 1 DQR") C.R. 23-29, P.R. 41. This Section D questionnaire contained CS Wind's cost database, which based on its narrative response, was derived from CS Wind's normal cost and financial accounting records. *See id.* at D-21 to D-33. That is, CS Wind did not notify Commerce that it intended to depart from its normal cost and financial accounting methods.  In this same response, CS Wind also stated that it shut down its Malaysia plant in 2022, and that "{s}hutdown costs during the POR, such as depreciation cost, are allocated to {the} reported cost of manufacturing."  *Id.* at D-13; D-23; D-31; D-37, and Exhibit D-1-A.  CS Wind's section D database included a corresponding field for these shutdown costs, as "FOH_SD". *Id.* at D-1-A.  According to CS Wind, fixed costs were still incurred in the production facility *following* the shutdown, so the respondent reported the costs associated with the shutdown (*i.e.*, [          ] MYR) in the "FOH_SD" field.  *Id.* at D-23 and Exhibit D-1-A.  These shutdown costs were not allocated to the finished products. *Id.*  As CS Wind

later explained, these shutdown costs were reported in CS Wind Malaysia's audited financial statements, which it demonstrated through tying the actual POR shutdown costs to CS Wind Malaysia's monthly trial balances. Letter from Trade Pacific PLLC to Sec'y Commerce, re: *Utility Scale Wind Towers from Malaysia – CS Wind's Supplemental Section D Questionnaire Response* (Aug. 24, 2023) ("CS Wind's Supp. DQR") at SD-6 and Exhibit SD-5, C.R. 78-82, P.R. 106. Specifically,

> During the normal course of production, i.e., prior to the shutdown, manufacturing costs were captured in the manufacturing accounts numbered from [                ]. Subsequently, the manufacturing costs were transferred to the COGS and inventory of manufactured products, which are recorded in accounts [                              ]. From January to March 2022, the total sum of these accounts was zero. However, after the production shutdown, there are no longer any manufactured products, but fixed costs are still incurred.

> As a result, several accounts, including manufacturing accounts [                ], have no value. In contrast, several of the depreciation accounts, from [                    ], as well as accounts related to shipping the remaining products, are reported as shutdown costs. The sum of the expenses in each account from April 2022 to the end of the POR were reported as shutdown costs.

*Id.* at SD-6.

Then, on June 8, 2023, Commerce notified CS Wind that the agency had selected Germany as the appropriate comparison market, and requested that CS Wind submit a revised Section D questionnaire "with respect to {CS Wind's} period of review sales to Germany. Letter from Kabir Archuletta, Program Manager, Off. V., Enf't & Compl., to Trade Pacific PLLC, re: *Administrative Review of the Antidumping Duty Order on Utility Scale Wind Towers from Malaysia: Request for Information* (June 8, 2023) at 1, P.R. 72. On July 6, 2023, CS Wind submitted its revised Section D questionnaire response. *See* CS Wind's July 6 BDQR. However, instead of only updating the questionnaire as needed to reflect the change in comparison market, CS Wind reported an unsolicited and entirely novel downward cost adjustment of more than [                    ] in its

BUSINESS PROPRIETARY INFORMATION
HAS BEEN DELETED

cost database to allegedly adjust for increased "conversion costs" as a result of the shutdown. This adjustment, however, did not reflect actual shutdown costs, had no relation to German sales, and was not consistent with CS Wind's normal accounting methods.  *See* CS Wind's July 6 BDQR at Exhibit D-16; CS Wind's Supp. DQR at Appendix I; IDM at 5.  CS Wind reported this adjustment as field "COST_ADJ_SD" ("conversion cost adjustment") in its revised Section D database.  CS Wind's July 6 BDQR at Exhibit D-16-A.

Specifically, CS Wind adjusted its fixed overhead and labor costs to match the amount of conversion costs reported in the investigation. To explain this [                    ], CS Wind simply stated that as a result of idling its facilities in March 2022, and

> {b}ecause of the *abnormal production status*, the conversion costs of wind towers (i.e., labor costs plus manufacturing overhead) were much higher than those incurred in the original investigation period.  The COP for wind towers during the POR, therefore, was distorted.  As a result, CS Wind made a cost adjustment for the shut down by first comparing the conversion costs of the same or similar wind towers in the {period of investigation ("POI")} versus the POR and then reports the difference of the conversion costs as the cost adjustment.

*Id.* at D-14 (emphasis added).

CS Wind did not notify Commerce that it planned to deviate from its normal cost and financial accounting methodologies prior to reporting this conversion cost adjustment. Other than this adjustment, CS Wind used the same cost database that it reported in its Initial Section D questionnaire response. Moreover, in addition to this conversion cost adjustment, CS Wind continued to report actual shutdown costs in the amount of [         ] MYR in field FOH_SD of its cost database. *Id*. at D-15 and D-16-A.

In its August 25, 2023 supplemental Section D questionnaire response, CS Wind then changed the characterization of its plant from "shutdown" to "idled."  CS Wind's Supp. DQR at SD-7.  Specifically, Plaintiffs certified that "{c}urrently, CS Wind Malaysia's factory is *idle* as it

BUSINESS PROPRIETARY INFORMATION
HAS BEEN DELETED

is [                                              ].” *Id*. (emphasis added). That is, during the

POR through at least August 2023, Plaintiffs characterized their Malaysian facility as idled, rather

than shutdown.  In further responding to Commerce's question on the status of the Malaysian

facility, CS Wind implicitly acknowledged that it maintained production assets in Malaysia by

informing Commerce that CS Wind Malaysia only "sold *some* machinery and equipment to **[**

          **]**.”  *Id*. (emphasis added).

Consistent with CS Wind's characterization of its facility as "idled," Commerce

preliminarily declined to adjust the cost of production calculation to deduct shutdown costs

reported in field "FOH_SD". Preliminary Decision Memorandum accompanying *Utility Scale*

*Wind Towers From Malaysia* (Dep't Commerce Jan. 4, 2024) (prelim. results of antidumping duty

admin. rev., 2021–2022) at 12, P.R. 147. Moreover, in its preliminary results, Commerce

disallowed CS Wind's conversion cost adjustment because the respondent "failed to demonstrate

or substantiate that the adjustments are appropriate." Memorandum from Samuel Shobowale,

Senior Acct., through Heidi Schriefer, Lead Acct., to Taija Slaughter, Dir. Off. of Acct, re:

*Antidumping Duty Administrative Review of Utility Scale Wind Towers from Malaysia: Cost of*

*Production and Constructed Value Calculation Adjustments for the Preliminary Results – CS Wind*

*Malaysia* (Dec. 28, 2023) ("Prelim Cost Analysis") at 3, C.R. 118, P.R. 152.

Following a period of briefing by the parties, Commerce issued its final results on July 2,

2024.  *See* IDM. For purposes of its final results, Commerce determined to treat CS Wind's

Malaysian facility as shut down, rather than idled.  *Id*. at 3-6.

Specifically, Commerce stated that "we have revised our preliminary calculations to treat

CS Wind's factory shutdown as permanent. Therefore, in accordance with Commerce's practice,

we have excluded the shutdown costs from our calculations."  *Id*. at 2.  Commerce explained that

"CS Wind contends that it has permanently shut down its facility and that all costs incurred *after* the shutdown should be excluded from the calculation of COP. We find that the record supports this assertion." *Id.* at 5 (emphasis added) Accordingly, Commerce "excluded the *actual post-shutdown* costs incurred during the POR, which were reported under cost field 'FOH_SD.'" *Id.* at 6 (emphasis added). However, because CS Wind did not "demonstrate or substantiate that the {conversion cost} adjustments are appropriate," Commerce continued to disallow the conversion cost adjustment reported under cost field COST_ADJ_SD. *Id.*; Prelim Cost Analysis at 3. That is, Commerce "continued to disallow CS Wind's downward cost adjustment reported under cost field 'COST_ADJ_SD,' which adjusts for the shutdown costs based on the difference between the POI and POR costs of manufacturing wind towers" and "instead {} excluded the *actual post-shutdown costs* incurred during the POR, which were reported under cost field "FOH_SD." IDM at 6 (emphasis added).

IV.    **ARGUMENTS**

    A.    **Commerce's Determination to Deny CS Wind's Novel and Unsolicited Conversion Cost Adjustment Is Supported By Substantial Evidence And Is Otherwise In Accordance With the Law**

In the final results, Commerce correctly disallowed CS Wind's proposed conversion cost adjustment to the cost of production. IDM at 3-6. As detailed by Defendant, Commerce's determination was lawful and supported by substantial evidence because consistent with 19 U.S.C. § 1677b, Commerce will typically only adjust cost of production when it is based on a respondent's books and records, and CS Wind did not otherwise demonstrate that the conversion cost adjustment was appropriate or reasonable. Def. Resp. Br. at 13-16; IDM at 3-6. We agree. For the reason detailed in Defendant's brief, and as further supported below, the Court should uphold Commerce's

determination to disallow CS Wind's conversion cost adjustment as supported by substantial evidence and in accordance with law.

The crux of this issue is that CS Wind is attempting to frame its proposed conversion cost adjustment as actual shutdown costs. Record evidence demonstrates that this is patently untrue: the conversion cost adjustment has no relation to actual shutdown costs incurred after CS Wind ceased production. The only actual shutdown costs on the record are those reported in cost field "FOH_SD".

The record of the administrative review contains two different sets of alleged "shutdown" costs. First, there are the actual shutdown costs reported in cost field "FOH_SD", which are the overhead costs incurred by CS Wind after ceasing production at the facility and which are recorded in CS Wind Malaysia's books and records. IDM at 6 (citing CS Wind's July 6 BDQR at D-14). Second, there is a conversion cost adjustment reported in cost field "COST_ADJ_SD", which is not related to shutdown costs. Rather the adjustment reported in COST_ADJ_SD adjusts the actual costs reported in its books and records for a period where CS Wind was still manufacturing wind towers in its Malaysia facility by the difference of the "conversion costs of wind towers (*i.e.*, labor cost plus manufacturing overhead)" between the original investigation and the 2021-2022 administrative review. IDM at 6 (citing CS Wind's July 6 BDQR at D-14).

As detailed by Defendant, Commerce, correctly only excluded actual shutdown costs (FOH_SD) from Commerce's dumping calculations (*i.e.* the actual overhead costs incurred after the shutdown that were reported in CS Wind Malaysia's books and records). IDM at 5. And, Commerce correctly disallowed CS Wind's *conversion cost adjustment* reported in field COST_ADJ_SD. IDM at 6. We agree with Defendant that Commerce's practice does not allow the agency to deduct production-related costs incurred while the facility was actually still

operating. Specifically, "*production* costs incurred while production is on-going are not shut down costs but actual production costs that must be included in the cost calculations." Def. Resp. Br. at 14 (emphasis original). Essentially, CS Wind was asking Commerce to provide a [

] adjustment because the company was not operating at the same capacity utilization rates as in a prior year, which is completely unwarranted. Given CS Wind's experience with opening and shutting down facilities in different countries to dodge AD/CVD duties, the respondent is well aware that a manufacturer's capacity utilization rate can fluctuate from year-to-year in the ordinary course of running a production facility. *See e.g.*, *Utility Scale Wind Towers From the People's Republic of China*, 77 Fed. Reg. 75,992, 7,5995 (Dep't Commerce Dec. 26, 2012) (final deter. of sales at less than fair value); *Utility Scale Wind Towers from the Socialist Republic of Vietnam*, 85 Fed. Reg. 40,226, 40,228 (Dep't Commerce July 6, 2020) (final deter. of sales at less than fair value and final affirm. deter. of critical circumstances); *compare* Letter from Trade Pacific PLLC to Sec'y of Commerce, re: *Utility Scale Wind Towers from Malaysia – CS Wind's Section C Questionnaire Response* (Apr. 25, 2023) at Appendix I, p. 58 *id.* (showing that in response to AD/CVDs on Malaysian wind towers CS Wind reduced production from Malaysia (*i.e.*, total sales decreased 77% from 2021 to 2022) and has increased production from CS Wind Turkey (*i.e.*, total sales increased by 66% from 2021 to 2022)), C.R. 15-22, P.R. 39; Letter From Wiley Rein LLP to Sec'y of Commerce, re: *Utility Scale Wind Towers from Malaysia: Pre-Preliminary Results Comments* (Aug. 20, 2024) at 1-3, C.R. 106, P.R. 144. Commerce's normal practice simply does not adjust for production costs based on differences in production volume. *See e.g.*, Issues and Decision Memorandum accompanying *Polyester Textured Yarn from Thailand*, 86 Fed. Reg. 58,883 (Dep't Commerce Oct. 25, 2021) (final affirmative deter. of sales at less than fair value) at cmt. 15 (disallowing the reduction of actual reported costs respondent claimed were

"associated with temporary disruption in production caused by the COVID-19 pandemic" and explaining that the recorded costs were recognized in the respondents books and record Commerce practice does not adjust costs for temporary closures which is not unreasonable because "companies frequently face disruptions in production due to temporary closures for various reasons.")("Polyester Textured Yarn from Thailand").

Defendant is also correct that CS Wind cites no legal authority to support its proposed conversion cost adjustment. Def. Resp. Br. at 14. Indeed, the Department's practice actually demonstrates that such an adjustment is *not* permitted. Specifically, Commerce will typically only adjust cost of production when it is based on a respondent's books and records. 19 U.S.C. § 1677b(f)(1)(A). In very limited circumstances, Commerce may adjust the cost of production for costs that are not recorded in a respondent's books and records when those costs are "extraordinary." *See e.g*, Issues and Decision Memorandum accompanying *Acrylonitrile-Butadiene Rubber from France*, 87 Fed. Reg. 37,833 (Dep't Commerce June 24, 2022) (final affirm. deter. of sales at less than fair value, and final affirm. deter. of critical circumstances, in part) at cmt. 4 ("*Butadiene Rubber from France*") The record does not demonstrate that the conversion cost adjust reflects "extraordinary" costs, but are rather normal costs incurred as a result of a planned shutdown, which are recorded in Plaintiffs' books and records.

Indeed, Commerce has previously found that production costs which may change due to certain events, such as COVID-19, but which are still reported in the respondent's books and records cannot be deducted from production costs. For example, in the recent antidumping duty investigation of *Polyester Textured Yarn from Thailand*, the respondent requested, and Commerce denied, an offset for direct labor and fixed overhead costs during COVID-19. In *Polyester Textured Yarn*, the respondent claimed an offset for direct labor and fixed overhead costs during

the early periods of COVID-19 because the plant was operating at reduced production levels. However, Commerce did not allow the reduction because the costs at issue (direct labor and fixed overhead costs) were incurred and recognized as normal production costs in the respondent's books and records. *See Polyester Textured Yarn from Thailand* at cmt. 15.

A similar adjustment was requested in the investigation of *Acrylonitrile-Butadiene Rubber From France* (2022). Issues and Decision Memorandum accompanying *Acrylonitrile-Butadiene Rubber From France*, 87 Fed. Reg. 37,833 (Dep't Commerce June 24, 2022) (final affirmative deter. of sales at less than fair value, and final affirmative deter. of critical circumstances, in part) at cmt. 4. In this proceeding, the respondent did not allocate volume variances during the second half of the period of investigation because due to COVID, the plant temporarily shut down. *Id.* Respondent argued that these "COVID-19 costs" should be excluded, because the Department will exclude "extraordinary costs" from the cost of manufacturing. *Id.* Commerce did not allow this novel adjustment. Specifically, Commerce did not agree that the reduction was extraordinary, because "the production stoppages were not outside of management's control, but rather, were a production decision." *Id.* Commerce also observed that respondent "made no attempt in reporting its costs to isolate or quantify the impact of disruptions during the first half of the POI on production volumes; instead, it simply excluded in their entirety all volume variances recorded during that time, even for months where the production quantities were on par with or even exceeded those in the 'post-COVID' period." *Id.*

As in *Polyester Textured Yarn from Thailand* and *Acrylonitrile-Butadiene Rubber From France*, Commerce correctly denied CS Wind a conversion cost adjustment when the company was still manufacturing wind towers at its facility in Malaysia. Indeed, in those cases, the respondents had stopped production (although their production assets were still fully operational)

and Commerce denied those respondents adjustments to their production costs. There is absolutely no reason why Commerce would grant CS Wind a conversion cost adjustment for the three months of 2022 when CS Wind was actually producing wind towers and recorded those costs in its books and records.

In sum, Commerce has previously determined that costs which are not recorded in a respondents' books and records, including those associated with reduced capacity utilization or production volumes for certain periods of time during a POR are not considered "extraordinary" and need not be deducted when "production stoppages {are} not outside of management's control, but rather, were a production decision." *Id*. That CS Wind chose to idle its operations in Malaysia (as opposed to selling wind towers produced in Malaysia at fair prices) was a production decision plainly within management's control. CS Wind's POR production costs *reported in its books and records* that reflect the costs of producing wind towers while the facility was running cannot be considered "extraordinary." Thus, the conversion cost adjustment is not lawfully permitted. Accordingly, the Court should find that Commerce correctly calculated the antidumping margin based on CS Wind's actual per unit costs of production, consistent with the respondent's books and records, and thus consistent with section 773(f)(1)(A) of the Act. IDM at 5-6. In doing so, Commerce reasonably found that Plaintiffs "failed to demonstrate or substantiate that the adjustments {were} appropriate", and consistently disallowed the adjustment in both its preliminary and final results. IDM at 6; Prelim Cost Analysis at 3; *see also*, Section 773(f) of the Act ("In general, costs shall normally be calculated based on the records of the exporter or producer of the merchandise, if such records are kept in accordance with the generally accepted accounting principles of the exporting country (or the producing country, where appropriate) and reasonably reflect the costs associated with the production and sale of the merchandise").

NON- CONFIDENTIAL VERSION

      **1.**     **Commerce Provided A Reasonable Explanation for Denying CS Wind's Conversion Cost Adjustment**

CS Wind incorrectly claims that Commerce failed to provide a reasonable basis for denying CS Wind's novel and unsolicited conversion cost adjustment.  Pls. Op. Br. at 8. Rather, examined the record evidence and concluded that the adjustment in "COST_ADJ_SD" merely reflected conversion costs, unlike the actual shutdown costs in "FOH_SD." Specifically, Commerce explained that it "continued to disallow CS Wind's downward cost adjustment reported under cost field 'COST_ADJ_SD,' which adjusts for the shutdown costs based on the difference between the POI and POR costs of manufacturing wind towers" and "instead {. . . .} excluded the actual post-shutdown costs incurred during the POR, which were reported under cost field 'FOH_SD.'" IDM at 5.

In coming to this determination, Commerce acknowledged CS Wind's argument that "all costs incurred after the shutdown should be excluded from the calculation of COP." *Id.* at 5. Commerce then explained that "the record supports" that CS Wind Malaysia was shutdown during the POR, as evidenced by notes in financial statements that said it ceased operations in 2022, and because CS Wind Malaysia's FY22 monthly trial balances "show no production *after* March 2022 and no costs other than depreciation on the remaining machinery *after* July 2022." *Id.* (citing CS Wind's Supp. DQR at Exhibit SD-5 and Appendix) (emphasis added).  Based on this evidence, Commerce <u>excluded</u> actual shut down costs (those reported in FOH_SD) from its calculations.

However, in light of Commerce's practice and the facts on the record, Commerce "continued to disallow CS Wind's downward cost adjustment reported under cost field "COST_ADJ_SD," which adjusts for the shutdown costs based on the difference between the POI and POR costs of manufacturing wind towers." *Id*. at 5.  That is, Commerce did not find that the conversion costs were shut down costs.  Rather, Commerce explained that the conversion cost

adjustment simply took the costs from the first three months of POR production (*i.e.*, when wind towers were coming off the line) and then adjusted it downward to match the POI costs when CS Wind was running at full production.  IDM at 6 ("CS Wind 'made a cost adjustment for the shut down by first comparing the conversion costs of the same or similar wind towers in the period of investigation (POI) versus the POR and then reports the difference of the conversion costs as the cost adjustment.'") (citing CS Wind's July 6 BDQR at D-14). Considering that the conversion cost adjustment did not relate to actual shutdown costs, Commerce lawfully

> continued to disallow CS Wind's downward cost adjustment reported under cost field "COST_ADJ_SD," which adjusts for the shutdown costs based on the difference between the POI and POR costs of manufacturing wind towers. Instead, we have excluded the actual post-shutdown costs incurred during the POR, which were reported under cost field "FOH_SD."

> *Id*.

Commerce's IDM provides a reasonable path for its decision as it explains that only actual shut down costs were excluded, and that the only costs that could be classified as such, were costs that were incurred when CS Wind ceased manufacturing. *Tian Ziyang Food Co. Ltd. v. United States*, 918 F.Supp.2d 1345,1354 (Ct. Int'l Trade 2013) (noting that while Commerce only must provide a path for its decision that is reasonably discernable) (citing NMB Singapore, 557 F.3d 1316,1319 (Fed. Cir. 2009) ("Finally, while Commerce must explain the bases for its decisions, 'its explanations do not have to be perfect . . . the path of Commerce's decision must be reasonably discernable,' to support judicial review). As discussed above, and as Commerce properly found the only shut down related costs on the record are those recorded in the cost field "FOH_SD". *Id*. at 4-6. Commerce thus properly deducted these costs from its calculation. *Id*. Conversion costs reported in cost field "COST_AD_SD" are not related to the shutdown, and thus Commerce properly declined to apply this downward adjustment in its calculation.  *Id*. at 5-6. That actual

apparent "shutdown" costs are recorded in Plaintiffs' books and records makes CS Wind's novel adjustment even more absurd.  CS Wind cannot reduce cost of production by an amount that is not reflected anywhere in CS Wind's books and records.

Specifically, the conversion cost adjustment was a *post hoc* calculation from CS Wind, which would have required Commerce to reduce the actual production costs of the merchandise being produced during the POR as recorded in CS Wind Malaysia's books and records, by the difference in conversion costs between the POR and the original period of investigation.  *See e.g.*, CS Wind's May 1 DQR at D-10 to D-14.  (explaining that CS Wind Malaysia "uses the SAP cost accounting module for recording its cost of manufacturing, which is linked to its financial accounting system."). Record evidence demonstrates that Plaintiffs conversion cost adjustment was a departure from its normal accounting system and cost allocation methodologies.  As explained by Plaintiffs,

> {b}ecause of the abnormal production status, the conversion costs of wind towers (i.e., labor costs plus manufacturing overhead) were much higher than those incurred in the original investigation period.  The COP for wind towers during the POR, therefore, was distorted.  As a result, CS Wind made a cost adjustment for the shut down by first comparing the conversion costs of the same or similar wind towers in the {period of investigation ("POI")} versus the POR and then reports the difference of the conversion costs as the cost adjustment.

*Id.* at D-14.

Moreover, the "COST_ADJ_SD" adjustments are not reflected in Plaintiffs' books and records as shut down costs – in fact such no adjustment exists anywhere in Plaintiffs' cost accounting system.  Indeed, and contrary to Plaintiffs' suggestion, the reconciliation worksheets provided by Plaintiffs in support of the conversion cost adjustments do not back to its normal accounting practice.  *See, e.g.*, CS Wind's July 6 BDQR at Exhibit D-18, Appendix I.  Rather, the exhibit that Plaintiffs cite – Exhibit SD-5, only shows actual shutdown costs reported in FOH_SD.

Pls. Op. Br. at 12. This is not surprising given that this conversion cost adjustment was a *post hoc* calculation fabricated by Plaintiffs to artificially eliminate the antidumping duty margin. Indeed, CS Wind provides no reason why the POI was the somehow the gold standard for so called "normal" production costs for CS Wind, and should thus be used as the benchmark. In fact, CS Wind's production volume and utilization rates during the original investigation represent operating conditions when CS Wind was engaging in unfair trade practices by dumping products in the United States without the constraints of an anti-dumping order. Consequently, these figures do not accurately represent normal production levels and a conversion cost adjustment that simply equalizes costs and production volumes is unwarranted. Notwithstanding that there is no legal or factual basis for this adjustment, costs change from year to year and there is no single year that should be considered a benchmark.

It is all too obvious that Plaintiffs took Commerce's Section D questionnaire for German sales as an opportunity to resubmit its cost database with a completely novel and unjustified adjustment created only for the dumping analysis, which [          ] reduces its antidumping duty liability. For example, the margin calculated by Defendant-Intervenor during the preliminary phase of this review using the cost database in the initial Section D questionnaire generated a margin of at least [      ]. Letter from Wiley Rein LLP to Sec'y Commerce, re: *Petitioner's Rebuttal Brief* (Mar. 1, 2024) at 8, C.R 121, P.R. 162. It is not surprising that this [

        ] adjustment [              ] reduces the margin, to [          ]. CS Wind's July 6 BDQR at D-14. This suspicion is further supported by the fact that CS Wind accounted for shutdown-related costs in its normal books and records (*i.e.*, fixed asset and idle costs associated with the shutdown are reported "FOH_SD" and correspond to Plaintiffs' accounting system). *Id*. at D-15.

Ct. No. 24-00150                                      NON- CONFIDENTIAL VERSION

Based on record evidence Commerce correctly found that this conversion cost adjustment does not qualify as a shutdown cost adjustment consistent with Commerce's practice and the law.

## 2.    CS Wind Is Asking the Court to Reweigh Evidence

Finally, CS Wind is essentially asking the Court to reweigh the evidence. A plaintiff cannot ask the Court to re-weigh the evidence on the record and decide the case for Commerce. *See Matsushita Elec. Indus. Co. v. United States*, 750 F.2d 927, 936 (Fed. Cir. 1984). Factual findings by Commerce are afforded considerable deference. *See INS v. Elias Zacarias*, 502 U.S. 478, 483-84 (1992) (stating that in fact-intensive situations, agency conclusions should be reversed only if the record contains evidence "so compelling that no reasonable factfinder" could reach the same conclusion); *Carbon Activated Tianjin Co., Ltd. v. United States*, 633 F.Supp.3d 1329, 1335 (Ct. Int'l Trade 2023) (noting that "{c}onsistent with the court's standard of review and the discretionary, fact-specific nature of Commerce's determination, the role of the court is not to determine "whether the information Commerce used was the best available, but rather whether a reasonable mind could conclude that Commerce chose the best available information.") (citing *Jiaxing Bro. Fastener v. United States*, 822 F.3d 1289, 1300-01 (Fed. Cir. 2016). Indeed, Commerce is afforded "tremendous deference," which is "both greater than and distinct from that accorded the agency in interpreting the statutes it administers" when Commerce exercises its "technical expertise in identifying, selecting, and applying the methodologies to implement the dictates set forth in the governing statute." *Fujitsu Gen. Ltd. v. United States*, 88 F.3d 1034, 1039 (Fed. Cir. 1996); Jiangsu Senmao Bamboo and Wood Industry Co., Ltd. v. United States, 2025 WL 973023 *45 (finding that Commerce provided a sufficient explanation for its determination and stated that "due deference will be given to the expertise of the agency")(citing Carlisle Tire & Rubber Co. v. United States, 532, 622 F. Supp. 1071, 1082 (Ct. Int. Trade 1985) ("It is within the

discretion of Commerce to determine how to verify ..., and due deference will be given to the expertise of the agency.").Particularly regarding technical matters, it is not the role of the Court to "weigh the adequate quality or quantity of the evidence for sufficiency or to reject a finding on grounds of a differing interpretation of the record." *Timken Co. v. United States*, 12 CIT 955, 962, 699 F. Supp. 300, 306 (1988). As such, Commerce need only "articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Motor Vehicle M<sub>f</sub>rs. Ass'n v. State Farm Mut. Ins. Co.* 463 U.S. 29 (1983)at 43 (citation omitted).

Commerce determined that the cost field "COST_ADJ_SD" were conversion costs and not shut down costs. Specifically, as detailed above, Commerce cited to record evidence and discussed at length that costs will be excluded only if they are actual shut down costs. IDM at 4-5. Commerce examined both sets of alleged "shutdown costs" on the record, and decided that the costs reported in COST_ADJ_SD were conversion costs that were incurred while CS Wind was still manufacturing wind towers at its Malaysian facility, not shut down costs, and that costs in "FOH_SD" were actual shut down costs. IDM at 5.

Consistent with the Act at Section 773(f), Commerce is supposed to rely on the books and records of the respondent. Plaintiffs' conversion cost adjustment is clearly self-serving adjustment and was not warranted, or "extraordinary". Commerce's determination to reject Plaintiffs' self-serving adjustment to CS Wind's cost of production ("COP") in its final results is lawful and supported by substantial evidence because the adjustment is not consistent with CS Wind's normal accounting practices since actual fixed labor and overhead costs were incurred and recognized as normal production costs in the respondent's books and records. CS Wind's conversion cost adjustment are not actual shutdown costs, and as Commerce correctly found in both its preliminary and final results, CS Wind failed to substantiate its conversion cost methodology. Commerce

Ct. No. 24-00150                                    NON- CONFIDENTIAL VERSION

properly rejected CS Wind's cost adjustment that it reports under field "COST_ADJ_DS". This Court should uphold Commerce's determination as lawful and supported by substantial evidence.

>    **B.    Whether Commerce's Methodology for Calculating CV Profit and Selling Expenses Is Supported by Substantial Evidence and Is Otherwise in Accordance with the Law**

In the final results, Commerce correctly used financial statements from two Malaysian companies, Alpine Pipe and Mycron, when calculating CV profit and selling expenses. IDM at 6-11. As detailed by Defendant, Commerce's determination was lawful and supported by substantial evidence, because, after reviewing and analyzing other financial statements on the record, the financial statements of Alpine Pipe and Mycron were the most appropriate for purposes of 19 U.S.C. § 1677b(e)(2)(B). Def. Resp. Br. at 16; IDM at 10. We agree. For the reason detailed in Defendant's brief, and as further supported below, the Court should uphold Commerce's determination to use Alpine and Mycron's financial statements as supported by substantial evidence and in accordance with law.

CS Wind argues that Commerce's determination to use Alpine and Mycron's financial statements to calculate CV profit and selling expenses was unsupported by substantial evidence since the companies did not represent producers of subject merchandise or comparable products. Pls. Op. Br. at 12-20. The record does not support CS Wind's argument. While CS Wind may have *preferred* that Commerce use three of the financial statements that it submitted, as Defendant points out, record evidence does not support CS Wind's preference. Def. Resp. Br. at 16. And, as detailed by both Commerce and Defendant, record evidence demonstrates that none of the financial statements submitted by CS Wind were appropriate, and that Alpine and Mycron's financial statements were the best available information on the record. Def. Resp. Br. at 16-21;

IDM at 6-11. As detailed below and in Defendant's brief, Commerce properly weighed the record evidence to come to this reasoned conclusion.

All parties agree that when evaluating financial statements for purposes of calculating CV profit, Commerce will generally consider four criteria: (1) the similarity of the potential surrogate companies' business operations and products to the respondent's business operations and products; (2) the extent to which the financial data of the surrogate company reflect sales in the United States, as well as the home market; and (3) the contemporaneity of the surrogate data to the POR; and (4) the "extent to which the customer base of the surrogate company and the respondent are similar." *See e.g.* Issues and Decision Memorandum accompanying *Certain Steel Nails from the United Arab Emirates*, 81 Fed. Reg. 71,482 (Dep't Commerce Oct. 17, 2016) (final results of antidumping duty admin. rev.; 2014-2015) at cmt. 1 (citing Issues and Decision Memorandum accompanying *Pure Magnesium from Israel*, 66 Fed. Reg. 49,349 (Dep't Commerce Sept. 27, 2001) (notice of final deter. of sales at less than fair value) at cmt. 8); *Certain Color Television Receivers from Malaysia*, 69 Fed. Reg. 20,592 (Dep't Commerce Apr. 16, 2004) (notice of final deter. of sales at not less than fair value) at cmt. 26). Commerce also has a clear and long-standing practice to ignore the financial information of companies with non-profitable net results from the calculation of CV profit. *See* Issues and Decision Memorandum accompanying *Biodiesel from Indonesia*, 83 Fed. Reg. 8835 (Dep't Commerce Mar. 1, 2018) (final deter. of sales at less than fair value) ("Biodiesel from Indonesia") at cmt. 5 (citing Issues and Decision Memorandum accompanying *Certain Frozen Fish Fillets from the Socialist Republic of Vietnam*, 74 Fed. Reg. 11,349 (Dep't Commerce Mar. 17, 2009) (final results of the antidumping duty admin. rev. and new shipper revs.) at cmt. 1). Based on this framework, and as explained by Defendant, Commerce correctly used Mycron and Alpines' financial statements to calculate CV profit. Def. Resp. Br. at 18-21.

Ct. No. 24-00150                                                                 NON- CONFIDENTIAL VERSION

As Defendant and Commerce explain, Mycron and Alpine are suitable sources for CV profit information as the financial statements are contemporaneous with the POR and, consistent with the original investigation of wind towers from Malaysia, involve producers of comparable merchandise, and previously relied on Alpine's financial statements for a determination in the investigation.[1] Def. Resp. Br. at 9; IDM at 9-10; Issues and Decision Memorandum accompanying *Utility Scale Wind Towers from Malaysia*, 86 Fed. Reg. 27,828 (Dep't Commerce May 24, 2021) (prelim. deter. of sales at not less than fair value and postponement of final deter.) at cmt. 9. What is more, is that it was CS Wind that submitted Alpine's financial statement during the original investigation. Letter from Wiley Rein LLP to Sec'y Commerce, re: *Constructed Value Profit and Selling Expense Comments and Information* (Oct. 10. 2023) at Exhibit NFI-1 ("Petitioner's CV Profit Submission"), P.R. 127-132.

Ultimately, the purpose of Commerce's analysis is to select the source that would "represent the profit experience of a producer in Malaysia." IDM at 11. In addition Defendant's arguments concerning the usability of Alpine and Mycron's financial statements, Defendant-Intervenor would like to address additional record evidence that further shows why these two financial statements were "the best sources for determining CV profit." *Id.* In particular, financial statements from foreign producers of non-subject merchandise, cannot represent the best sources for determining CV profit because (1) they are located outside of Malaysia and thus cannot represent "sales of comparable merchandise in Malaysia" and (2) in this case were not or barely profitable, and thus could "not represent the profit experience of a producer in Malaysia." *Id.*

---

[1]     *Id.* at Exhibit NFI-1. In the final determination, the Department relied on the financials of CS Wind Taiwan, which were made available after the Department's preliminary determination. *See* Issues and Decision Memorandum accompanying *Utility Scale Wind Towers from Malaysia*, 86 Fed. Reg. 27,828 (Dep't Commerce May 24, 2021) (prelim. deter. of sales at not less than fair value and postponement of final deter.) at cmt. 9 ("Wind Towers from Malaysia Preliminary Determination").

In weighing record evidence, Commerce reviewed the financial statement of Arabian Pipes Company.  However, and as CS Wind failed to mention, Arabian Pipes Company's statements had several significant flaws that rendered them unusable.  First, Arabian Pipes Company was not profitable for the entire POR.  Specifically, the company was not profitable in 2021, and barely broke even in 2022. Letter from Trade Pacific PLLC to Sec'y Commerce, re: *Utility Scale Wind Towers from Malaysia – CV Profit and Selling Expense Comments and Information* (Oct. 10, 2023) at Exhibit CV-3 (Arabian Pipes Company, CV Profit and Selling Expenses Rates Calculation) ("CS Wind's CV Profit Submission"), C.R. 91-98, P.R. 120-126; Letter from Wiley Rein LLP to Sec'y Commerce, re: R*ebuttal Comments on CS Wind's Constructed Value Profit and Selling Expense Submission* (Oct. 24, 2023) at Exhibit 2 ("Petitioner's Rebuttal CV Profit Comments"), P.R. 137-138.  Second, Arabian Pipes Company had several significant outstanding loans, including loans from state-owned entities, and had special arrangements with these lenders indicating the loans were subsidies. *See* CS Wind's CV Profit Submission at Exhibit CV-3 (Arabian Pipes Company 2022 Financial Statement, pp. 28-29); *See also*, Petitioner's CV Profit Rebuttal Comments at 6-7. Third, the company was not in compliance with certain covenants of its financing agreements, indicating that the company was not in good financial standing during the relevant period. *Id*. Finally, and perhaps most important, Arabian Pipes was not a Malaysian company.  Consistent with the Commerce's practice, it will not use financial statements where the company is not profitable.  *Biodiesel from Indonesia* at cmt. 5 (citing Issues and Decision Memorandum accompanying *Certain Frozen Fish Fillets from the Socialist Republic of Vietnam*, 74 Fed. Reg. 11,349 (Dep't Commerce Mar. 17, 2009) (final results of the antidumping duty admin. rev. and new shipper revs.) at cmt. 1).  Record evidence demonstrates that Arabian Pipes Company was not

suitable, and as Commerce explained, did "not represent the *profit* experience of a producer in Malaysia." IDM at 11 (emphasis added).

Similarly, Vallourec Group's financial statements were flawed because, in addition to not being a Malaysian manufacturer, the 2021 statement only overlapped with two months of the POR, and the 2022 statement, which covered most of the POR, was not profitable. *See* CS Wind's CV Profit Submission at Exhibit CV-4 (Vallourec 2022 Annual Report, p. 198) (showing that Vallourec was at a net loss of 233,169 (thousand euros) in 2022)); *see also id.* at  (Vallourec 2022 Annual Report, p. 210) (showing that the tubes segment of the business was also at a 43,485 (thousands euros) loss in 2022). Again, consistent with the Department's practice, it will select the financial statements that have the most overlap with the POR and will not use financial statements where the company was not profitable. As Commerce explained, Vallourec's statements were not more appropriate than Alpine and Mycron's because they did "not represent the *profit* experience of a producer in *Malaysia*." IDM at 11 (emphasis added).

Consistent with the arguments made by Defendant, and as supported by Commerce's final results and record evidence, the Court should uphold Commerce's determination to use Alpine and Mycron's financial statements as the best sources for determining CV profit as lawful and supported by substantial evidence.

## V.    <u>CONCLUSION</u>

For the reasons detailed above, Defendant-Intervenor respectfully submits that this Court should affirm the final results of Commerce's countervailing duty administrative review consistent with the arguments herein.

**NON- CONFIDENTIAL VERSION**

Respectfully submitted,

*/s/ Derick G. Holt*
Alan H. Price, Esq.
Robert E, DeFrancesco III, Esq.
Laura El-Sabaawi, Esq.
Derick G. Holt, Esq.
Kimberly A. Reynolds, Esq.

**WILEY REIN LLP**
2050 M Street, NW
Washington, DC 20036
(202) 719-7000

*Counsel to Wind Tower Trade Coalition*

<u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Chamber Procedure 2(B)(1), the undersigned certifies that this brief complies with the word limitation requirement.  The word count for Defendant-Intervenor Wind Tower Trade Coalition's Response Brief, as computed by Wiley Rein LLP's word processing system (Microsoft Word 2025), is 7,244 words.

_/s/ Derick G. Holt_
(Signature of Attorney)

Derick G. Holt, Esq.
(Name of Attorney)

Wind Tower Trade Coalition
(Representative Of)

June 6, 2025
(Date)