UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE:  THE HONORABLE GARY S. KATZMANN, JUDGE

| | |
|---|---|
| CS WIND MALAYSIA SDN. BHD. and CS WIND CORPORATION, | |
| Plaintiffs, | |
| v. | Court No.  24-00150 |
| UNITED STATES, | NON-CONFIDENTIAL VERSION |
| Defendant, | Confidential Business Information Has Been Deleted on Pages 9 and 10. |
| and, | |
| WIND TOWER TRADE COALITION, | |
| Defendant-Intervenor. | |

REPLY OF PLAINTIFFS, CS WIND MALAYSIA SDN. BHD. AND CS
WIND CORPORATION, TO DEFENDANT'S AND DEFENDANT-
INTERVENOR'S RESPONSES TO PLAINTIFFS' MOTION FOR
JUDGMENT UPON THE AGENCY RECORD

Jarrod M. Goldfeder
MacKensie R. Sugama
TRADE PACIFIC PLLC
700 Pennsylvania Avenue, SE, Suite 500
Washington, D.C.  20003
(202) 223-3760

Counsel to CS Wind Malaysia Sdn. Bhd.
and CS Wind Corporation, Plaintiffs

Dated:  July 7, 2025

NON-CONFIDENTIAL VERSION – BUSINESS PROPRIETARY INFORMATION HAS BEEN DELETED

## <u>TABLE OF CONTENTS</u>

TABLE OF CONTENTS ................................................................................................ i

TABLE OF AUTHORITIES ........................................................................................ ii

ARGUMENT ............................................................................................................... 3

I.  DEFENDANT HAS FAILED TO SHOW THAT COMMERCE'S DECISION TO REJECT CS WIND'S SHUTDOWN COST ADJUSTMENT WAS SUPPORTED BY SUBSTANTIAL EVIDENCE AND IN ACCORDANCE WITH LAW .......................... 3

    A.  Defendant Incorrectly Characterizes Commerce's Empowerment to Adjust a Respondent's Costs When Faced with Evidence of Potential Cost Distortions ................................................................................................. 3

    B.  Commerce's Treatment of Increased Costs as Production Costs Rather than Shutdown Costs Is Contrary to the Legal Requirements and Past Practice ....................................................................................................... 6

    C.  Commerce Did Not Provide a Reasonable Explanation for Denying CS Wind's Conversion Cost Adjustment ......................................................... 8

II.  COMMERCE'S METHODOLOGY FOR CALCULATING CV PROFIT WAS UNREASONABLE BECAUSE THE DATA USED DID NOT REFLECT THE PROFIT EXPERIENCE OF A COMPARABLE PRODUCER .................................................. 11

III.  CONCLUSION ............................................................................................... 17

## <u>TABLE OF AUTHORITIES</u>

### *<u>Statutes</u>*

19 U.S.C. § 1677b(f)(1)(A)...................................................................... 3-5, 7

19 U.S.C. § 1677b(e)(2)(B)(iii) ...............................................................11, 12, 16


### *<u>Court Precedent</u>*

Geum Poong Corp. v. U.S., 26 C.I.T. 991 (2002) .........................................................12

Mid Continent Steel & Wire, Inc. v. United States, 941 F.3d 530 (Fed. Cir. 2019) ....................15

Tian Ziyang Food Co. Ltd. v. United States, 918 F.Supp.2d 1345 (Ct. Int'l Trade 2013)..............8

Universal Camera Corp. v. NLRB, 340 U.S. 474 (1951) ............................................16


### *<u>Agency Determinations</u>*

Acrylonitrile-Butadiene Rubber from France, 87 Fed. Reg. 37,833 (Dep't Commerce June 24, 2022) (final determ.), and accompanying Issues and Decision Memorandum (June 17, 2022)......7

Certain Color Television Receivers from Malaysia, 69 Fed. Reg. 20,592 (Dep't of Commerce Apr. 16, 2004), and accompanying Issues and Decision Memorandum (Dep't Commerce Apr. 12, 2004) ...................................................................................12

Certain Softwood Lumber Products from Canada, 70 Fed. Reg. 73,437 (Dep't Commerce Dec. 12, 2005) (final admin. rev.), and accompanying Issues and Decision Memorandum (Dep't Commerce Dec. 5, 2005) ...............................................................5

Polyester Textured Yarn from Thailand, 86 Fed. Reg. 58,883 (Dep't Commerce Oct. 25, 2021) (final determ.), and accompanying Issues and Decision Memorandum (Dep't Commerce Oct. 18, 2021) ...........................................................................7

Pure Magnesium from Israel, 66 Fed. Reg. 49,349 (Dep't of Commerce Sept. 27, 2001) (final determ.), and accompanying Issues and Decision Memorandum (Dep't Commerce Sept. 14, 2024) ......................................................................... 11-12, 15

Utility Scale Wind Towers from Malaysia:  Final Results of Antidumping Duty Administrative Review; 2021-2022, 89 Fed. Reg. 56,735 (Dep't Commerce July 10, 2024), and accompanying Issues and Decision Memorandum (Dep't Commerce July 2, 2024) .............................1, 8, 11, 13

NON-CONFIDENTIAL VERSION – BUSINESS PROPRIETARY INFORMATION HAS BEEN DELETED

Utility Scale Wind Towers from Malaysia:  Amended Final Results of Antidumping Duty Administrative Review; 2021-2022, 89 Fed. Reb. 65,848 (Dep't Commerce Aug. 13, 2024) .......1

**_Other Authorities_**

Statement of Administrative Action accompanying the Uruguay Round Agreements Act, H.R. Rep. No. 103-316 (1994), reprinted in 1994 U.S.C.C.A.N. 4040 (1994)......................................13

NON-CONFIDENTIAL VERSION – BUSINESS PROPRIETARY INFORMATION HAS BEEN DELETED

**REPLY OF PLAINTIFFS, CS WIND MALAYSIA SDN. BHD. AND CS WIND CORPORATION, TO DEFENDANT'S AND DEFENDANT-INTERVENOR'S RESPONSES TO PLAINTIFFS' MOTION FOR JUDGMENT UPON THE AGENCY RECORD**

Plaintiffs, CS Wind Malaysia Sdn. Bhd. ("CS Wind Malaysia") and CS Wind Corporation ("CS Wind Korea") (collectively, "CS Wind" or "Plaintiffs"), hereby submit this reply to the May 23, 2025, response of Defendant, the United States, and the June 6, 2025, response of Defendant-Intervenor, the Wind Tower Trade Coalition, to the challenges that Plaintiffs raised in their Rule 56.2 motion for judgment on the agency record. See Def.'s Resp. Pl.'s Mot. J. Upon Agency R. (May 23, 2025), ECF No. 33 ("Def. Resp."), Wind Tower Trade Coalition's Resp. Br. (June 6, 2025), ECF No. 34 ("Def-Intv. Resp.").

Plaintiffs contest various aspects of the U.S. Department of Commerce's final results in Utility Scale Wind Towers from Malaysia:  Final Results of Antidumping Duty Administrative Review; 2021-2022, 89 Fed. Reg. 56,735 (Dep't Commerce July 10, 2024) ("Final Results"), P.R. 177, and Memorandum to Ryan Majerus, Deputy Assistant Secretary for Policy and Negotiations, re: "Decision Memorandum for the Final Results of the Administrative Review of the Antidumping Duty Order:  Utility Scale Wind Towers from Malaysia; 2021-2022" (Dep't Commerce July 2, 2024) ("Final Decision Memo"), P.R. 170, amended by Utility Scale Wind Towers from Malaysia:  Amended Final Results of Antidumping Duty Administrative Review; 2021-2022, 89 Fed. Reb. 65,848 (Dep't Commerce Aug. 13, 2024), P.R. 186.[1]

For the reasons described below and in Plaintiffs' January 29, 2025, Rule 56.2 Memorandum, ECF No. 26 ("Pl. Br."), the Court should remand Commerce's determination not

---

[1] Documents contained in the administrative record are identified by the name and date of the documents, followed by the public ("P.R.") and confidential ("C.R.") index numbers assigned to these documents in the respective administrative record indices that Commerce filed with the Court.  See Admin. Rec. (Oct. 16, 2024), ECF No. 23.

to apply a conversion cost adjustment to CS Wind's high reported costs of manufacturing ("COM"). The Court also should remand Commerce's determination with instructions to calculate the constructed value ("CV") profit ratio using the surrogate financial data of producers of comparable merchandise rather than the financial data of companies whose operations bear no resemblance whatsoever to the production activities of CS Wind Malaysia.

In their respective response briefs, Defendant and Defendant-Intervenor fail to address that Commerce never took the additional and necessary step to adjust costs to eliminate the unmistakable distortions resulting from the fact that CS Wind had production operations for less than one-third of the period of review ("POR") such that its per-unit conversion costs were abnormally high despite Commerce's recognition of the abnormally low production volumes resulting from the permanent shutdown of CS Wind's Malaysian facility. Nor do Defendant or Defendant-Intervenor meaningfully address Commerce's failure to select a CV profit expense ratio that reasonably reflected the manufacturing and sales operations of a manufacturer of utility scale wind towers. With regard to both issues, Defendant and Defendant-Intervenor ignore relevant portions of the administrative record that significantly undermine Commerce's determinations and demonstrate that Commerce's determinations were unreasonable and unsupported by substantial record evidence. For the reasons below, remand is warranted.

## ARGUMENT

### I. DEFENDANT HAS FAILED TO SHOW THAT COMMERCE'S DECISION TO REJECT CS WIND'S SHUTDOWN COST ADJUSTMENT WAS SUPPORTED BY SUBSTANTIAL EVIDENCE AND IN ACCORDANCE WITH LAW

#### A. Defendant Incorrectly Characterizes Commerce's Empowerment to Adjust a Respondent's Costs When Faced with Evidence of Potential Cost Distortions

A fundamental aspect of the AD duty law is that:

> Costs shall normally be calculated based on the records of the exporter or producer of the merchandise, if such records are kept in accordance with the generally accepted accounting principles of the exporting country (or the producing country, where appropriate) and reasonably reflect the costs associated with the production and sale of the merchandise. The administering authority shall consider all available evidence on the proper allocation of costs, including that which is made available by the exporter or producer on a timely basis, if such allocations have been historically used by the exporter or producer . . . .

19 U.S.C. § 1677b(f)(1)(A) (emphasis added). Defendant and Defendant-Intervenor focus narrowly on the fact that CS Wind's reported manufacturing costs derived from the company's records that were maintained in accordance Malaysian generally accepted accounting principles—a fact not in dispute—but sidestep the actual crux of CS Wind's argument that pertains to the latter clause of the statute. That is to say, given the extraordinary circumstance associated with CS Wind's permanent shutdown of its Malaysian manufacturing facility four months into the 13.5-month POR, the actual manufacturing costs from CS Wind's accounting records did not "reasonably reflect" the costs associated with the production and sale of the subject merchandise, but rather, were distorted to such a degree that some type of adjustment was necessary to ensure the accuracy of the AD duty calculations.

Commerce has a well-established and longstanding practice of adjusting a respondent's actual manufacturing costs whenever it encounters evidence that some type of distortion exists. See, e.g., Dongkuk S&C Co., Ltd. v. United States, 134 F.4th 1320, 1328-29 (Fed. Cir. 2025)

NON-CONFIDENTIAL VERSION – BUSINESS PROPRIETARY INFORMATION HAS BEEN DELETED

(holding that Commerce is "empowered to mitigate this {cost} distortion under § 1677b(f)(1)(A) by averaging {the respondent's} per-unit steel plate costs" when calculating AD duty margins through a smoothing methodology and that "Commerce was not required to rely upon those distortive records and had the authority to adjust steel plate input costs to more accurately approximate DKSC's costs of production during the period of investigation.")  Commerce's "empowerment" to adjust a respondent's actual costs must be exercised in a manner that is not outcome-determinative, meaning that when Commerce is faced with evidence of cost distortions, they should be redressed even if the result is a reduction to the company's weighted-average dumping margin, as was the case in the underlying administrative review.

In that regard, CS Wind advised Commerce early in and consistently throughout the underlying administrative review that it had curtailed production and totally ceased production operations in March 2022, which was four months into the 13.5-month POR.  Because the costs covered only a four-month span—during which production was abnormally low given the winding down of operations—CS Wind's COM during this POR had been significantly distorted as a consequence.  See Letter from Trade Pacific PLLC, "CS Wind's Sections B and D Questionnaire Responses" (May 1, 2023) ("Initial Sec. D Resp."), at D-23, C.R. 25, P.R. 41; Letter from Trade Pacific PLLC, "CS Wind's Sections B and D Questionnaire Responses for Sales to Germany" (July 6, 2023) ("Germany Initial Resp."), at D-14–D-15, C.R. 60, P.R. 87; Letter from Trade Pacific PLLC, "CS Wind's Supplemental Section D Questionnaire Response" (Aug. 24, 2023) ("Supp. Sec. D Resp."), at SD-6 and Exhibit SD-5, C.R. 78-80, P.R. 106.  CS Wind repeatedly emphasized that, without an appropriate cost adjustment, the resulting costs— even though derived from CS Wind's actual books and records—would be so distorted that any resulting weighted-average dumping margin would be inaccurate.

NON-CONFIDENTIAL VERSION – BUSINESS PROPRIETARY INFORMATION HAS BEEN DELETED

The AD statute, quoted above, obligates Commerce to "consider all available evidence on the proper allocation of costs . . . ." 19 U.S.C. § 1677b(f)(1)(A). To that end, Commerce through decades of enforcement of the AD laws is aware that cost allocations, from time to time, require some type of reasonable cost adjustment to mitigate any factors that would serve to distort the respondent's actual COM. Commerce previously has contemplated the same scenario affecting CS Wind in which shutdown costs are incurred in a separate accounting period from the gain or loss from the sale of the production facility. See generally Pl. Br., at 9 ("if the Department included the shut-down costs as a component of the per-unit costs, not only would it result in a significant increase to the per-unit cost, but it would not reflect the offsetting revenues from the subsequent sale.") (citing Certain Softwood Lumber Products from Canada, 70 Fed. Reg. 73,437 (Dep't Commerce Dec. 12, 2005) (final admin. rev.), and accompanying Issues and Decision Memorandum (Dep't Commerce Dec. 5, 2005), at cmt. 8).

Defendant and Defendant-Intervenor attempt to characterize the reasonable conversion cost adjustment to CS Wind's aberrational COM as unprecedented or "novel"—see, e.g., Def-Intv. Resp., at 1, 4, 7, 11, 15, and 16—but Commerce's practice of adjusting a respondent's costs—upward or downward, as the case may be—is not at all unique or "novel." And Defendant's claim that "Commerce does not have a practice of making adjustments to actual per-unit costs that reflect the actual cost of production of merchandise coming off an operating line," Def. Resp., at 14, simply is not accurate characterization of the agency's frequent practice of adjusting respondent's actual costs to mitigate any perceived type of distortion. Commerce evaluates each situation on a case-by-case basis because each respondent's business practice, circumstance, and cost datasets are unique, and in CS Wind's case, the circumstances associated with the total cessation of production one-third of the way into the POR are unlike almost every

NON-CONFIDENTIAL VERSION – BUSINESS PROPRIETARY INFORMATION HAS BEEN DELETED

other case that Commerce encounters.  Commerce's failure to recognize how the exceptional circumstances surrounding CS Wind's total production shutdown had on its reported costs during the POR, and to turn a blind eye toward the aberrational high reported COM simply because they were the "actual" production costs from CS Wind's books and records, was unreasonable, unsupported by substantial record evidence, and otherwise not in accordance with the law.

**B.    Commerce's Treatment of Increased Costs as Production Costs Rather than Shutdown Costs Is Contrary to the Legal Requirements and Past Practice**

Defendant and Defendant-Intervenor suggest that Commerce is not allowed to "deduct production-related costs incurred while the facility was actually still operating."  Def-Intv. Resp., at 8–9; see also Def. Resp., at 14.  However, Defendant and Defendant-Intervenor ignore the fact that, under normal circumstances, a production shutdown is a planned process that takes time and does not occur overnight; production typically decreases gradually until it terminates altogether. That is precisely what occurred with CS Wind's shutdown.  The four months preceding the shutdown involved the winding-down of production, not normal operations comparable to previous POR or that of the original period of investigation ("POI").  Therefore, the cost adjustment that CS Wind reported in its cost database (in the "COST_ADJ_SD" field) was not, as Defendant-Intervenor incorrectly claims, a "different set of alleged 'shutdown' costs."  Def-Intv. Resp., at 8.  Rather, the cost adjustment was necessary to eliminate the distortions introduced by the abnormally low production volumes during the winding-down period.

Contrary to Defendant and Defendant-Intervenor's assertions, a downward adjustment was necessary precisely because there is a stark contrast between the capacity utilization rate during normal operating times versus the rate during the winding-down period.  What Defendant-Intervenor refers to as a "year-to-year" fluctuation in a manufacturer's capacity utilization rate during normal operations is not analogous to the current situation.  Id., at 9.  In

that regard, Defendant-Intervenor cites multiple cases in an attempt to demonstrate that Commerce did not deviate from its practice in disallowing the reduction of actual reported costs. Id., at 10-12.  But the cases cited are inapposite as they pertain to routine maintenance or other short-term shutdowns.  See, e.g., Polyester Textured Yarn from Thailand, 86 Fed. Reg. 58,883 (Dep't Commerce Oct. 25, 2021) (final determ.), and accompanying Issues and Decision Memorandum (Dep't Commerce Oct. 18, 2021), at cmt. 15 (respondent requested a cost adjustment based on "temporary disruption in production caused by the COVID-19 pandemic"); Acrylonitrile-Butadiene Rubber from France, 87 Fed. Reg. 37,833 (Dep't Commerce June 24, 2022) (final determ.), and accompanying Issues and Decision Memorandum (June 17, 2022), at cmt. 4 (addressing "COVID-19" costs related to temporary shutdown of the production plant). Permanent shutdowns or prolonged suspensions are treated differently than a factory being taken offline temporarily for a few days or weeks for maintenance, health and safety reasons, etc., so the cases that Defendant-Intervenor cites have no probative value to the issue on appeal here.

        Additionally, the manner in which businesses record costs during temporary suspensions—such as those caused by a pandemic—differs significantly from businesses, like CS Wind, that are ceasing operations entirely.  The objective of a temporary suspension is to keep the business afloat, whereas a permanent shutdown involves winding down operations. Therefore, regardless of which events are deemed "significant" or which costs are considered "extraordinary," Commerce applies different standards to temporary shutdowns compared to permanent shutdowns.  In that regard, Defendant-Intervenor is incorrect when it asserts that a "conversion cost adjustment is not lawfully permitted."  Def-Intv. Resp., at 12.  On the contrary, the law requires Commerce to ensure that a respondent's COM "reasonably reflect the costs associated with the production and sale of the merchandise."  19 U.S.C. § 1677b(f)(1)(A).

### C.    Commerce Did Not Provide a Reasonable Explanation for Denying CS Wind's Conversion Cost Adjustment

Defendant posits that because Commerce excluded certain shutdown costs from the calculation of the general and administrative ("G&A") and net financial expense ratios, Commerce eliminated the distortions created by abnormally low production volumes during the POR.  See Def. Resp., at 11, 14.  It did not.  The key word that Commerce used to justify the denial of a cost adjustment was "instead."  Specifically, Commerce stated that "{i}nstead, we have excluded the actual post-shutdown costs incurred during the POR, which were reported under cost field 'FOH_SD.'"  Final Decision Memo, at 6.  This explanation is unreasonable and is not "reasonably discernable to support judicial review" as Defendant-Intervenor claims.  See Def.-Intv. Resp., at 14, citing Tian Ziyang Food Co. Ltd. v. United States, 918 F.Supp.2d 1345, 1354 (Ct. Int'l Trade 2013).

The complete shutdown of an entire production facility is a significant event that results in high fixed costs and overhead that cannot be assigned to any particular product because they also applied to a period in which no merchandise was being produced—in this case, approximately 10 out of 13.5 months of the POR.  Consequently, those high, abnormal conversion costs are allocated over the per-unit COM for a limited period when production did occur despite the fact that such costs do not represent actual costs of production.  Contrary to Defendant's and Defendant-Intervenor's respective claims, conversion costs did relate to actual shutdown costs.  The costs reported in "FOH_SD" and "COST_ADJ_SD" serve different purposes in eliminating distortions, but all arise out of the production shutdown.

CS Wind provided evidence on the record demonstrating that its books and records did not reflect normal production, where merchandise is continuously produced throughout the POR.  Under normal circumstances, conversion costs based on typical production volumes could be

calculated and applied to the overall COM. Here, however, when Commerce applied all recorded conversion costs—calculated from production volumes during only the first <u>four months</u> of the POR—to the entire <u>13.5-month</u> period, Commerce ultimately relied upon a wildly inflated and distorted per-unit COM that did not "reasonably reflect" the costs associated with the <u>production</u> and sale of merchandise. Accordingly, based on the statute and Commerce's practice, disallowing CS Wind's downward cost adjustment reported under cost field "COST_ADJ_SD" is unreasonable and not supported by substantial evidence.

Since this case involved a first administrative review, CS Wind considered the POI of the immediately preceding segment (i.e., the investigation) as the normal production costs since CS Wind had full and normal manufacturing operations during the period. There were no other available benchmark periods from which to choose, so it was logical to select the POI as reflective of normal production levels and representative costs. When comparing the processing costs in the original investigation POI versus the first administrative review POR, the difference ranged up to [    ] percent. <u>See</u>, <u>e.g.</u>, Germany Initial Resp., at Exhibit D-17, C.R. 60, P.R. 87. Defendant and Defendant-Intervenor do not dispute this stark calculated difference. This processing cost difference caused by the shutdown obviously was not normal, but rather, reflected the result of the sharp decrease in production volume.

Commerce never provided a reasonable explanation for denying CS Wind's conversion cost adjustment on the basis of the record evidence, not has Defendant even attempted to do so *post hoc*. During normal production times, CS Wind recorded manufacturing costs, including depreciation and fixed costs, in manufacturing accounts numbered from [            ]. <u>See</u> Supp. Sec. D Resp., at SD-6. These costs were then subsequently transferred to its COGS and inventory accounts, which are recorded in accounts [            ]. <u>Id.</u>

After its shutdown, these COGS and inventory accounts had no value.  Id.  However, the manufacturing cost accounts, ranging from accounts **[                    ]**, continued to accumulate costs related to depreciation due to the simple fact that CS Wind still owned the building, equipment, machinery, and vehicles to which depreciation applied even though all production had ceased.  Id., at Exhibit SD-5.  As shown by the monthly POR schedule of shutdown costs submitted in Exhibit SD-5, CS Wind **only** recorded **[                    ]** from August 2022 through December 2022.  Id.  It recorded **no** labor costs, material costs, or any other costs related to the production of the subject merchandise.  Id.

In other words, Defendant is wrong when it claims that CS Wind's "costs were *actual* production costs incurred and reported at the time of production . . . ."  Def. Resp., at 13.  In fact, the company continued to incur costs after the time of production, i.e., after the shutdown went into effect, because these costs are fixed in nature and continued to be incurred during the POR even though production had ceased.  Defendant later acknowledges that, even though the AD statute does not specifically contain a provision regarding cost adjustments for shutdowns—unlike the existing provision governing startup adjustments:

> {t}hat is not to say that Commerce cannot adjust for the costs associated with temporary suspensions of production lines or permanent shutdowns whereby there are no products being produced to bear the burden of the underlying costs—those costs would have nothing to do with the actual production of merchandise so they are by definition not production costs.

Id., at 15.  Differently stated, Defendant recognizes that Commerce is empowered to adjust costs related to permanent shutdowns where there is no production to "bear the burden of underlying costs"—which is precisely the point that Plaintiffs made to Commerce in the underlying review and in its arguments to this Court.  After the permanent production shutdown went into effect four months into the POR, for the remaining time (nearly 10 months), CS Wind continued to

incur conversion costs that were captured in the reported COM per Commerce's Section D Questionnaire reporting requirements but had nothing to do with actual production of the subject merchandise, thereby necessitating some type of cost adjustment.

Despite all the evidence on the record necessitating cost adjustments because CS Wind's reported COM did not reflect normal production, Commerce denied the adjustment without providing an explanation. In <u>Final Decision Memo</u>, Commerce merely summarized the background information surrounding the submission of "COST_ADJ_SD" and CS Wind's stated rationale for the cost adjustments. Since "FOH_SD" does not address the identified distortions, Commerce never offered a reasonable explanation for disallowing CS Wind's downward cost adjustment—and Defendant has not shown otherwise in its response.

For all these reasons, CS Wind respectfully requests that the Court remand Commerce's methodology for reconsideration to ensure that the conversion costs reasonably and accurately reflect the production of the merchandise during this POR so that Commerce calculates an accurate weighted-average dumping margin for CS Wind.

## II.    <u>COMMERCE'S METHODOLOGY FOR CALCULATING CV PROFIT WAS UNREASONABLE BECAUSE THE DATA USED DID NOT REFLECT THE PROFIT EXPERIENCE OF A COMPARABLE PRODUCER</u>

Defendant asserts that Commerce's selection of two Malaysian companies, Alpine Pipe and Mycron, was supported by substantial evidence because while not producers of the subject merchandise, they are significant producers of comparable steel products in Malaysia. <u>See</u> Def. Resp., at 19. Defendant's justification is inadequate and unreasonable.

When reviewing financial data for surrogate profit under the "any reasonable alternative method" of 19 U.S.C. § 1677b(e)(2)(B)(iii), Commerce is guided by the analysis provided in <u>Pure Magnesium from Israel</u>, 66 Fed. Reg. 49,349 (Dep't of Commerce Sept. 27, 2001) (final

determ.), and accompanying Issues and Decision Memorandum (Dep't Commerce Sept. 14, 2024) ("Israel Magnesium IDM"), at cmt. 8.  This analysis requires Commerce to consider:  (1) the similarity of the potential surrogate companies' business operations and products to that of the respondent; (2) the extent to which the financial data of the surrogate company reflect sales in the United States as well as the home market; and (3) the contemporaneity of the surrogate data to the POI.  Id.  Commerce subsequently added a fourth factor:  the extent to which the customer base of the surrogate and the respondent were similar.  See Certain Color Television Receivers from Malaysia, 69 Fed. Reg. 20,592 (Dep't of Commerce Apr. 16, 2004), and accompanying Issues and Decision Memorandum (Dep't Commerce Apr. 12, 2004) ("CTVs from Malaysia"), at cmt. 26.

In reviewing Commerce's selection of surrogate companies for calculating CV profit, "{t}he Court's proper role is to determine whether the methodology is in accordance with the law and supported by substantial evidence."  Geum Poong Corp. v. U.S., 26 C.I.T. 991, 995 (2002) ("{T}he court must review whether Commerce's choice of methodology is reasonable of itself and in accordance with the law.").  Here, Commerce selected the FY 2022 financial statements of Mycron, a Malaysian conglomerate and trading group of steel, and the FY 2022 financial statements of Alpine, a Malaysian producer of welded steel pipe, plates, and sheets. Contrary to Defendant's and Defendant-Intervenor's claims, substantial evidence demonstrated that both sources failed to meet Commerce's preferred selection criterion concerning the similarity of the potential surrogate companies' business operations and products to the respondent's business operations and products.

When calculating CV profit under the "any other reasonable method," 19 U.S.C. § 1677b(e)(2)(B)(iii), Commerce attempts to mirror the preferred method as closely as possible,

which is to say, it seeks to select surrogate financial data that most closely resemble the production and sales of the subject merchandise of the respondent. Defendant and Defendant-Intervenor place significance in Commerce's previous selection of the FY 2019 audited financial statements of Alpine in the original investigation to calculate CV profit and assert that such is a reason enough to validate Alpine's financial data selection in this administrative review. See Def. Resp., at 19; Def-Intv. Resp., at 21. However, just because Commerce has used a source once does not mean that the source will represent the best available information in all future segments of a proceeding. Congress intended that Commerce's selection of a source for CV profit is decided on a case-by-case basis depending on the available data. See generally Statement of Administrative Action ("SAA") accompanying the Uruguay Round Agreements Act, H.R. Rep. No. 103-316 (1994), at 840, reprinted in 1994 U.S.C.C.A.N. 4040 (1994). Therefore, Commerce's previous selection of Alpine does not constitute a valid justification for giving greater weight to Alpine's financial data when determining the most suitable source for CV profit. All financial statements on the record must be subjected to equal scrutiny and evaluation, with the selection determined on a case-by-case basis in light of the available data.

Defendant and Defendant-Intervenor do not provide a reasonable explanation as to how Commerce can support its finding that Alpine's financial data is usable whereas CS Wind Malaysia's financial data is not, despite suffering from the same supposed "flaws" and "imperfections" of selling their merchandise to an affiliated company. Commerce did not quantify the level of "acceptable" sales to an affiliated company. Commerce stated that "because all revenues on CS Wind Malaysia's financial statements reflect transactions between affiliated parties, we cannot confirm that they reflect arm's length values." Final Decision Memo, at 9. Yet, Commerce, without providing a reasonable explanation, selected Alpine's financial

NON-CONFIDENTIAL VERSION – BUSINESS PROPRIETARY INFORMATION HAS BEEN DELETED

statements, when a significant amount of Alpine's total revenue derived from sales to related parties—a fact that Defendant does not dispute or attempt to reconcile.  See Def. Resp., at 20.  Defendant also concedes that 57 percent of Alpine's revenue derives from small-diameter hollow sections, id.,[2] which is not comparable merchandise to utility scale wind towers that are massive in height, weight, and diameter.  Commerce's acceptance of Alpine's financial data, despite a preponderance of sales made to related parties and/or of merchandise that it is not comparable to the subject merchandise, was unreasonable and unsupported by substantial evidence.

Likewise, Defendant and Defendant-Intervenor fail to address the discrepancy in Commerce's reasoning in selecting Mycron over other available sources.  Defendant notes that Commerce rejected the financial data of Engtex Group Berhad because it is a conglomerate that principally engaged in investment holding and thus, not appropriate financial data.  See Def. Resp., at 10.  Yet, Mycron's consolidated financial statements represent a conglomerate similarly engaged in investment holdings.  See Letter from Wiley Rein LLP, "Constructed Value Profit and Selling Expense Comments and Information" (Oct. 10, 2023) ("Pet. CV Profit Letter"), at Exhibit NFI-8, P.R. 127-131.  However, Commerce focused on the fact that Mycron's consolidated statements included the data of subsidiary "steel producers" and refused to apply this same logic to Mycron and instead selected it as a source for CV Profit calculation.  The term "steel producers" in this context is an overbroad and misleading description of the subsidiaries.  As such, Defendant mistakenly argues that "all" three subsidiaries produced comparable merchandise.  See Def. Resp., at 20.  The three subsidiaries are (a) Mycron Steel CRC Sdn. Nhd., a cold-rolled coil company; (b) Melewar Steel Tube Sdn. Bhd., a steel tube and pipe

---

[2] Defendant refers to Alpine's sales of "cold-rolled coil," Def. Resp., at 20, which we assume was a drafting error because Alpine is a large-scale producer of hallow structural sections.

NON-CONFIDENTIAL VERSION – BUSINESS PROPRIETARY INFORMATION HAS BEEN DELETED

company; and (c) Silver victory Sdn. Bhd., a steel products trader.  See Pet. CV Profit Letter, at

Exhibit NFI-8.  The trader is not a producer, and cold-rolled coils are not comparable

merchandise.  Therefore, even if Mycron's financial data reflects the profitability of its three

subsidiaries, the selection of Mycron's financial data, which reports that a majority of its overall

revenue derives from sales of cold rolled coils, is not supported by substantial evidence.

Having not selected financial data of a company that had the same customer base of CS

Wind, Commerce thus chose a surrogate company for which three of the four criteria established

in Pure Magnesium from Israel/CTVs from Malaysia were not met.  Yet, Defendant-Intervenor

nonetheless asserts instead that it was appropriate for Commerce to conclude that

contemporaneity should outweigh these three other criteria.  See Def-Intv. Resp., at 21.  The

Court should not sustain Commerce's determination based on such an unreasonable contention.

In Pure Magnesium from Israel, Commerce explained that "{t}he greater the similarity in

business operations and products, the more likely that there is a greater correlation in the profit

experience of the two companies."  See Israel Magnesium IDM, at cmt. 8.  Commerce's goal in

establishing these criteria was to select a surrogate with the most similar profit experience.  In

previous cases, Commerce has thoroughly assessed the comparability of a surrogate company to

the subject merchandise producer by analyzing the use of "the same or similar type of plant

facilities, machinery, and equipment" and whether both are "subject to similar levels of capital

expenditures and are also subject to similar market conditions."  Mid Continent Steel & Wire,

Inc. v. United States, 941 F.3d 530, 543 (Fed. Cir. 2019) (noting that Commerce's assessment of

CV profit is "tied to the goal of achieving accuracy.").

In this instance, however, Commerce did not adequately compare the financial statements

of surrogate companies placed on the record, did not consider the extent to which the financial

NON-CONFIDENTIAL VERSION – BUSINESS PROPRIETARY INFORMATION HAS BEEN DELETED

data reflected sales in the United States and home market, and did not assess the extent to which the customer bases of the surrogate and the respondent were similar.  Instead, Commerce selected Alpine, which has significant sales to its affiliates; and Mycron, which is a conglomerate engaged in investment holdings with revenue predominately reflecting numbers from a subsidiary that produces non-comparable merchandise.

Importantly, when there are no suitable producers of comparable merchandise in the home market and thus no suitable financial statements for CV profit calculations, Commerce is permitted and has used financial statements from producers in other countries.  See Pl. Br. at 19.  Given the critical deficiencies found in Alpine and Mycron's financial statements, Commerce has not provided sufficient and reasonable explanation in rejecting certain financial statements of companies that are producers of comparable merchandise that otherwise meet all or most of the factors listed in Pure Magnesium from Israel/CTVs from Malaysia.  Even though certain financial statements on the record were from outside of Malaysia, they otherwise met all four factors considered when reviewing financial data for surrogate profit under the "any reasonable alternative method" of 19 U.S.C. § 1677b(e)(2)(B)(iii).  Thus, contrary to Defendant's suggestions, Commerce was not prevented from using certain record sources as a basis for calculating CV profit because "they were not Malaysian companies."  Def. Resp., at 19.

It is well-settled that for agency action to be based on substantial evidence, the agency must explain why evidence that fairly detracts from the reasonableness of its determination is not outweighed by evidence that supports Commerce's determination.  See, e.g., Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951).  Defendant and Defendant-Intervenor address none of the record evidence highlighted by Plaintiffs that detracts from Commerce's conclusion that Alpine and Mycron's financial data represented an appropriate source for obtaining CV profit

information. Because Alpine and Mycron's financial statements do not reflect products similar to the subject merchandise and Commerce failed to provide a reasonable explanation for selecting flawed financial statements, Commerce's decision to use Alpine and Mycron's financial statements to calculate CV profit was unreasonable and unsupported by substantial evidence. Commerce's approach severely distorted the CV profit applied to CS Wind because Alpine's and Mycron's data did not approximate the operational experience of a wind tower producer. The Court, therefore, should remand this issue to Commerce with instructions to select surrogate financial data for calculating CV profit that are reflective of the experience of producers of comparable merchandise to that of a utility scale wind towers producer.

## III.    CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court grant its Motion for Judgment on the Agency Record and remand this case to Commerce with instructions consistent with the arguments set forth above and in Plaintiffs' January 29, 2025, Rule 56.2 Memorandum.

Respectfully submitted,

/s/ Jarrod M. Goldfeder
Jarrod M. Goldfeder
MacKensie R. Sugama

TRADE PACIFIC PLLC
700 Pennsylvania Avenue, SE, Suite 500
Washington, D.C.  20003
(202) 223-3760

*Counsel to CS Wind Malaysia Sdn. Bhd.*
*and CS Wind Corporation, Plaintiffs*

Dated:  July 7, 2025

UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE:  THE HONORABLE GARY S. KATZMANN JUDGE

| | |
|---|---|
| **CS WIND MALAYSIA SDN. BHD. and**<br>**CS WIND CORPORATION,**<br><br>       **Plaintiffs,**<br><br>     **v.**<br><br>**UNITED STATES,**<br><br>       **Defendant,**<br><br>     **and,**<br><br>**WIND TOWER TRADE COALITION,**<br><br>       **Defendant-Intervenor.** | **Court No.  24-00150** |

## CERTIFICATE OF COMPLIANCE

The undersigned counsel at Trade Pacific PLLC hereby certifies that the accompanying reply brief complies with the word-count limitation described at Section 2(B)(1) of the Court's Standard Chambers Procedures.  The memorandum of law contains 5,035 words according to the word-count function of the word-processing software used to prepare the brief.

Respectfully submitted,

/s/ Jarrod M. Goldfeder
Jarrod M. Goldfeder
TRADE PACIFIC PLLC
700 Pennsylvania Avenue, SE
Suite 500
Washington, D.C.  20003
(202) 223-3760

Dated:  July 7, 2025