**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**
**BEFORE: THE HONORABLE GARY S. KATZMANN JUDGE**

CS WIND MALAYSIA SDN. BHD. and CS WIND CORPORATION,

*Plaintiffs*,

v.

UNITED STATES,

*Defendant*,

and,

WIND TOWER TRADE COALITION,

*Defendant-Intervenor*.

Court No. 24-00150

**PLAINTIFFS' POST-ORAL ARGUMENT SUPPLEMENTAL BRIEF**

Jarrod M. Goldfeder
MacKensie R. Sugama
TRADE PACIFIC PLLC
700 Pennsylvania Avenue, SE
Suite 500
Washington, DC 20003
Tel: (202) 223-3760
jgoldfeder@tradepacificlaw.com

*Counsel to Plaintiffs CS Wind Malaysia Sdn. Bhd. and CS Wind Corporation*

Dated: July 29, 2025

CS Wind Malaysia Sdn. Bhd. and CS Wind Corporation (collectively, "CS Wind" or "Plaintiffs"), hereby submit this supplemental brief, as permitted by the Court (see ECF No. 49), in response to Defendant's and Defendant-Intervenors' arguments in advance of and during the July 22, 2025, oral argument (see ECF Nos. 45, 46).

**A. Commerce Unreasonably Determined Not to Adjust CS Wind's Costs to Mitigate Cost Distortions Caused by the Permanent Shutdown**

The parties agree that Commerce may adjust a respondent's actual per-unit costs. See ECF No. 45, at 1 ("Commerce . . . may also adjust any records that would distort the true costs of the merchandise."); ECF No. 46, at 2 (Commerce is "empower{ed} . . . to mitigate cost distortions related a respondent's actual costs incurred during the relevant period and the allocation of such costs.")

Two distinct adjustments arose from CS Wind's cessation of production four months into the period of review ("POR"). The first, which Commerce made and is not being appealed, was to exclude actual fixed depreciation costs incurred after the cessation of production (reported in the "FOH_SD" field). The second, which Commerce did not make and is on appeal, was calculated to normalize or mitigate the aberrationally high conversion costs that arose from the fact that CS Wind's production was diminishing to its final termination (reported in the "COST_ADJ_SD" field). Commerce's determination not to make the latter adjustment was unreasonable, unsupported by substantial evidence, and not in accordance with Commerce's legal obligations to ensure that a respondent's costs "reasonably reflect the costs associated with the production and sale of the merchandise" and to "consider all available evidence on the proper allocation of costs." 19 U.S.C. § 1677b(f)(1)(A).

Defendant and Defendant-Intervenor object that the proposed adjustment would have reduced CS Wind's overall costs of manufacturing and posit that Commerce's authority to make

cost adjustments is limited only to reallocating, but not changing, the overall pool of manufacturing costs—e.g., through "cost smoothing." Plaintiffs debunked this claim with reference to costs adjustments made under the "major input" or "transactions disregarded" rules, "particular market situation" adjustments, and "startup adjustments" that are permitted under the law and Commerce practice and which may increase or decrease the total manufacturing costs. See 19 U.S.C. §§ 1677b(e)(3), (f)(1)(C), (f)(2)-(3). The startup adjustment provisions evince Congressional recognition that, where "commercial production levels" are not realized, an adjustment could be warranted. Congress spoke specifically to the "startup phase," but nothing in the statute prohibits Commerce from making similar types of adjustments during the "shutdown phase" where costs incurred are outside the normal course of business because commercial production levels no longer exist, even though such "actual" costs derived from the company's normal books and records. Likewise, Commerce frequently makes adjustments that Congress did not explicitly address (e.g., "cost smoothing") but which, nevertheless, the courts agree that Commerce is empowered to make.

Moreover, Defendant and Defendant-Intervenor wrongly assert that this issue does not concern cost allocations. The cost distortions arose because Commerce required CS Wind to allocate its manufacturing costs by the POR production quantities—which were abnormally low and resulted in distortedly high unit conversion costs. The adjustment that Plaintiffs proposed relied upon a comparison of CS Wind's per-unit manufacturing costs in the first POR versus the investigation period because both data sets derived from CS Wind's own books and records, which Commerce examined and accepted. And, the methodology was grounded in the same rationale that Congress contemplated under 19 U.S.C. § 1677b(f)(1)(C) regarding the mitigation of abnormally high costs resulting from cost allocations over non-commercial production levels.

Commerce had a clear and relatively contemporaneous record of normal production costs from the investigation period to evaluate the distortions that arose from diminished production levels. This availability of objective cost data allowed CS Wind to present a precise and administrable adjustment to mitigate the cost distortions. But, Commerce did not address the adjustment except to say that it was not making it. Given Commerce's failure to articulate a reasonable basis for denying the specific adjustment to mitigate conversion cost distortions arising from the depressed production levels, remand is warranted.

Defendant and Defendant-Intervenor never appear to deny that something was amiss with CS Wind's costs but take the position that because these were CS Wind's actual costs they are inherently reasonable.[1] The law and agency practice authorizing cost adjustments confirm that just because costs are "actual"—i.e., they come from a company's books and records—does not mean they "reasonably reflect the actual production costs" where factors act to distort them. And even if the Court accepts Defendant-Intervenor's position that "extraordinary" circumstances must exist to make an adjustment beyond reallocations, Commerce never analyzed whether the shutdown was "extraordinary," although certainly a permanent plant shutdown is more extraordinary than a *force majeure* (e.g., flooding) that Defendant-Intervenor cited.

**B. <u>Commerce Unreasonably Relied Upon CV Profit Surrogates That Did Not Approximate the Profit Experience of a Wind Tower Producer</u>**

Defendant acknowledges that Commerce "often uses foreign market sources when selecting a CV profit surrogate," ECF No. 45 at 8, so this aspect is not in dispute. Incidentally,

---

[1] At oral argument, Defendant-Intervenor claimed that CS Wind's POR production was at normal commercial levels, but it did so by dividing the total production only by four months even though the POR covered 13.5 months. Defendant-Intervenor also failed to acknowledge that, on an individual CONNUM basis, production quantities for the majority of the reported CONNUMs in the first POR were at diminished levels relative to the investigation.

in answering which authorities support their overall arguments, Defendant cites the *PT Zinus* case where the Court sustained Commerce's use of surrogate Indian financial data to calculate CV profit for an Indonesian mattress producer. Id., at 9.

Notwithstanding Commerce's statements that the goal is to approximate the "home market" profit experience, that requirement appears nowhere in the statute. 19 U.S.C. § 1677b(e)(2) (B)(iii), upon which Commerce relied, directs the agency to use "any other reasonable method" with a separate proviso regarding the profit cap to be determined based on sales in the "foreign country," i.e., not the "home market" or "exporting country." For normal value purposes, the foreign country can be the home market ("exporting country") or a third-country market. 19 U.S.C. §§ 1677b(a)(1)(B)-(C). Likewise, Congress placed no limitation on Commerce to base profit experience only on sources within the home market.

Commerce acted unreasonably when it gave preference to sources within Malaysia for two surrogates whose production operations and product lines bear no resemblance to those of a wind tower producer simply because they produced some "steel pipes" and were "home market" companies. Other than being made of steel, round, and hollow, Alpine's small-diameter hollow sections are not comparable whatsoever to wind towers, as these photos illustrate:

CS Wind



**Court No. 24-00150**

Alpine



Compare CS Wind's Section A QR Resp. (Apr. 6, 2023), at Exh. A-14, C.R. 7, 11, P.R. 27-28, with Petitioners' CV Profit Submission (Oct. 10, 2023), at Exhs. NFI-2, P.R. 127-131.

Mycron's financial statements related to the operations of three distinct companies—not a single manufacturer like CS Wind Malaysia—and indicated that nearly two-thirds of the combined financial data related to cold-rolled coils and trading sales, with the remainder relating to some unspecified "steel pipes" with no indication of whether they are comparable to wind towers. In contrast, substantial evidence showed that Vallourec and Arabian Pipes both produced large structural pipes that are comparable to wind towers. See CS Wind's CV Profit Submission (Oct. 10, 2023), at Exhs. CV-3 to CV-4, P.R. 120-126.

This Court has recognized that not all steel pipes are equivalent. For example, the Court sustained Commerce's determination that line pipe and standard pipe are not comparable to oil country tubular goods even though they all are types of steel pipes. See Husteel v. United States, 180 F.Supp.3d 1330, 1340-43 (Ct. Int'l Trade 2016) ("Based on the differences in function, use, and industry, Commerce's determination that non-OCTG pipe is not in the same general

category of products as OCTG is supported by substantial evidence.") Yet, Commerce undertook no similar analysis here, elevating surrogate producers with some production of small pipes as surrogates for large-scale wind tower producers because they were Malaysian entities, while ignoring the fact that its selected companies that produced different products with distinct processes, materials, etc.—and thus had different financial/profit structures—than CS Wind. Commerce's determination was unsupportable and contradicted its own practice.

Finally, Defendant-Intervenors focus on a non-issue concerning the profitability of the alternative surrogates that Plaintiffs proposed. Contrary to their characterizations, the record establishes that Plaintiffs advocated for the surrogate financial data of Vallourec and Arabian Pipe, which showed positive profits for periods contemporaneous with the POR.

* * * * *

For the reasons explained above and in Plaintiffs' previous written and oral arguments to this Court, remand of the two issues on appeal is warranted.

Respectfully submitted,

/s/ Jarrod M. Goldfeder

Jarrod M. Goldfeder
MacKensie R. Sugama

TRADE PACIFIC PLLC
700 Pennsylvania Avenue, SE
Suite 500
Washington, DC 20003
Tel: (202) 223-3760
jgoldfeder@tradepacificlaw.com

Dated: July 29, 2025

*Counsel to Plaintiffs*

| | | |
|---|---|---|
| CS WIND MALAYSIA SDN. BHD. and<br>CS WIND CORPORATION,<br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES,<br><br>Defendant,<br><br>and,<br><br>WIND TOWER TRADE COALITION,<br><br>Defendant-Intervenor. | : | Court No. 24-00150 |

**CERTIFICATE OF COMPLIANCE**

The undersigned counsel at Trade Pacific PLLC hereby certifies that the foregoing Plaintiffs' Post-Oral Argument Supplemental Brief, dated July 29, 2025, complies with the 1,500 word-count limitation described in the Court's July 22nd instructions. This supplemental brief contains 1,473 words according to the word-count function of the word-processing software used to prepare the supplemental brief, excluding counsel's signature block.

Respectfully submitted,

/s/ Jarrod M. Goldfeder
Jarrod M. Goldfeder
MacKensie R. Sugama
TRADE PACIFIC PLLC
700 Pennsylvania Avenue, SE
Suite 500
Washington, DC 20003
Tel: (202) 223-3760

*Counsel to Plaintiffs CS Wind Malaysia Sdn. Bhd. and CS Wind Corporation*

Dated: July 29, 2025