Slip Op. 25-135

## UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| **CS WIND MALAYSIA SDN. BHD. and CS WIND CORPORATION,** | |
| **Plaintiffs,** | |
| v. | |
| **UNITED STATES,** | **Before: Gary S. Katzmann, Judge** |
| **Defendant,** | **Court No. 24-00150** |
| **and** | |
| **WIND TOWER TRADE COALITION,** | |
| **Defendant-Intervenor.** | |

### <u>OPINION</u>

[Plaintiffs' Motion for Judgment on the Agency Record is denied.]

Dated: _ October 9, 2025 _

<u>Jarrod M. Goldfeder</u>, Trade Pacific PLLC, of Washington, D.C., argued for Plaintiffs CS Wind Malaysia Sdn. Bhd. and CS Wind Corporation. With him on the brief was <u>MacKensie R. Sugama</u>.

<u>Tate N. Walker</u>, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, D.C., argued for Defendant United States. With him on the brief were <u>Brett A. Shumate</u>, Assistant Attorney General, <u>Yaakov M. Roth</u>, Acting Assistant Attorney General, <u>Patricia M. McCarthy</u>, Director, <u>Claudia Burke</u>, Deputy Director, and <u>Reginald T. Blades, Jr.</u>, Assistant Director. Of Counsel on the brief were <u>David Richardson</u> and <u>Samuil Agranovich</u>, Office of the Chief Counsel for Trade Enforcement and Compliance, U.S. Department of Commerce, of Washington D.C.

<u>Derick G. Holt,</u> Wiley Rein, LLP, argued for Defendant-Intervenor Wind Tower Trade Coalition. With him on the brief were <u>Alan H. Price</u>, <u>Robert E. DeFrancesco, III</u>, <u>Laura El-Sabaawi</u>, and <u>Kimberly A. Reynolds</u>.

Katzmann, Judge: This case involves a challenge to whether the U.S. Department of Commerce ("Commerce") successfully approximated the value of wind towers in its final

determination in the 2021–2022 administrative review of the antidumping duty order on utility scale wind towers from Malaysia. See Pls.' Motion for J. on the Agency R. at 2, Jan. 29, 2025, ECF No. 26 ("Pls.' Br."); Utility Scale Wind Towers from Malaysia: Final Results of Antidumping Duty Administrative Review; 2021-2022, 89 Fed. Reg. 56735 (Dep't Com. July 10, 2024), P.R. 177, as amended by Utility Scale Wind Towers from Malaysia: Amended Final Results of Antidumping Duty Administrative Review; 2021-2022, 89 Fed. Reg. 65848 (Dep't Com. Aug. 13, 2024), P.R. 186 ("Final Results"); Mem. from S. Fullerton to R. Majerus, re: Decision Memorandum for the Final Results of the Administrative Review of the Antidumping Order: Utility Scale Wind Towers from Malaysia; 2021-2022 (Dep't Com. July 2, 2024), P.R. 170 ("IDM").[1]  Plaintiffs, CS Wind Malaysia Sdn. Bhd. ("CS Wind Malaysia") and CS Wind Corporation ("CS Wind Korea") (collectively, "CS Wind") contest two aspects of Commerce's determination: (1) Commerce's rejection of an adjustment to the cost of production to account for production volume decreases before a shutdown, and (2) Commerce's selection of surrogate companies that produced purportedly incomparable goods to estimate CS Wind's profit.  Pls.' Br. at 2.  Arguing that neither determination was supported by substantial evidence and in accordance with law, CS Wind asks the court to remand the Final Results.  See Pls.' Br. at 12, 20.  Defendant the United States ("the Government") and Defendant-Intervenor Wind Tower Trade Coalition ("the Coalition") ask the court to sustain Commerce's Final Results in their entirety.  See Def.'s Resp. in Opp'n to Pls.' Mot. for J. on Agency R. at 16, 22, May 23, 2025, ECF No. 34 ("Gov't Br."); Def.-Inter.'s Resp. to Pls.' Mot. for J. on Agency R. at 23, June 9, 2025, ECF No. 36 ("Def.-Inter.'s Br.").  The court concludes that both of Commerce's determinations were supported

---

[1] A wind tower is the structure that supports the nacelle and rotor blades in a wind turbine. Producers roll multiple steel plates into cylindrical or conical shapes that are welded together to form a steel shell.  Wind towers typically consist of several sections.  See IDM at 2.

by substantial evidence and otherwise in accordance with law and sustains Commerce's <u>Final</u>
<u>Results</u>.

## BACKGROUND

### I.      *Legal Background*

#### A.      *Antidumping Duties*

"To ameliorate trade distortions caused by unfair economic practices, Congress enacted
the Tariff Act of 1930, which empowers Commerce to investigate potential dumping or subsidies,
and if appropriate, issue orders imposing duties on the subject merchandise." <u>Bebitz Flanges</u>
<u>Works Private Ltd. v. United States</u>, 44 CIT __, __, 433 F. Supp. 3d 1309, 1314 (2020) (citing
<u>Sioux Honey Ass'n v. Hartford Fire Ins. Co.</u>, 672 F.3d 1041, 1046–47 (Fed. Cir. 2012)).  The
Tariff Act of 1930 requires Commerce "to impose antidumping duties on imported merchandise
that is being sold, or is likely to be sold, in the United States at less than fair value to the detriment
of a domestic industry." <u>Dillinger France S.A. v. United States</u>, 981 F.3d 1318, 1320 (Fed. Cir.
2020) (citing 19 U.S.C. § 1673).  "Sales at less than fair value are those sales for which the 'normal
value' (the price a producer charges in its home market) exceeds the 'export price' (the price of
the product in the United States) or 'constructed export price.' " <u>U.S. Steel Corp. v. United States</u>,
621 F.3d 1351, 1354 (Fed. Cir. 2010) (quoting 19 U.S.C. § 1677(35)(A)).  Commerce conducts an
antidumping investigation to determine "whether the subject merchandise is being, or is likely to
be, sold in the United States at less than its fair value" based on the difference between the normal
value in the home market and the export price (or constructed export price) of selling the product
in the United States.  19 U.S.C. § 1673d(a)(1).  Where the normal value exceeds the export price
and where the International Trade Commission determines that the sale of merchandise at less than
fair value materially injures, threatens, or impedes the establishment of an industry in the United
States, Commerce imposes antidumping duties equal to the weighted average "amount by which

the normal value exceeds the export price . . . of the subject merchandise," or the weighted average dumping margin.  Id. § 1677(35)(A); see also id. § 1673.

Each year after the publication of an antidumping duty order, an interested party may request that Commerce conduct an administrative review.  See id. § 1675(a)(1).  In conducting an administrative review, Commerce is to determine anew "the normal value and export price (or constructed export price) of each entry of the subject merchandise, and . . . the dumping margin for each entry."  Id. § 1675(a)(2)(A).

### B.    Constructed Value

The normal value is "the price at which the foreign like product is first sold . . . for consumption in the exporting country."  Id. § 1677b(a)(1)(B).  If a manufacturer has no domestic market and no sales to third countries at fair value, "the normal value of the subject merchandise may be the constructed value of that merchandise."  Id. § 1677b(a)(4).

The constructed value is equal to the sum of (1) "the cost of materials and fabrication or other processing of any kind employed in producing the merchandise," (2) "the actual amounts incurred and realized by the specific exporter or producer being examined in the investigation or review for selling, general, and administrative expenses, and for profits, in connection with the production and sale of a foreign like product, in the ordinary course of trade, for consumption in the foreign country," and (3) "the cost of all containers and coverings of whatever nature, and all other expenses incidental to placing the subject merchandise in condition packed ready for shipment to the United States."  Id. § 1677b(e).

### C.    Costs of Production

To calculate "the cost of materials and fabrication or other processing of any kind employed in producing the merchandise," id. § 1677b(e), Commerce must calculate the costs of production as follows:

> Costs shall normally be calculated based on the records of the exporter or producer of the merchandise, if such records are kept in accordance with the generally accepted accounting principles of the exporting country (or producing country where appropriate) and reasonably reflect the costs associated with the production and sale of the merchandise.  The administering authority shall consider all available evidence on the proper allocation of costs . . . ."

Id. § 1677b(f)(1)(A).

### D.    Constructed Value Profit

In addition to costs of production, the constructed value also includes "profits, in connection with the production and sale of a foreign like product . . . for consumption in the foreign country."  Id. § 1677b(e)(2)(A).  If a producer has no domestic market for the subject merchandise, Commerce calculates a constructed value profit under § 1677b(e)(2)(B), which provides three alternative methods:

> (i) the actual amounts incurred and realized by the specific exporter or producer being examined in the investigation or review . . . for profits, in connection with the production and sale, for consumption in the foreign country, of merchandise that is in the same general category of products as the subject merchandise,

> (ii) the weighted average of the actual amounts incurred and realized by exporters or producers that are subject to the investigation or review (other than the exporter or producer described in clause (i)) . . . for profits, in connection with the production and sale of a foreign like product, in the ordinary course of trade, for consumption in the foreign country, or

> (iii) the amounts incurred and realized . . . for profits, based on any other reasonable method, except that the amount allowed for profit may not exceed the amount normally realized by exporters or producers (other than the exporter or producer described in clause (i)) in connection with the sale, for consumption in the foreign country, of merchandise that is in the same general category of products as the subject merchandise; (i.e., the "profit cap").

The Statement of Administrative Action accompanying the Uruguay Round Agreements Act (the "SAA") provides that § 1677b(e)(2)(B) "does not establish a hierarchy or preference among these alternative methods."  SAA, H.R. Doc. No. 103–316, vol. 1 (1994), reprinted in 1994

U.S.C.C.A.N. 4040, 4176.[2]  The SAA further provides that "no one approach is appropriate for use in all cases," and that "the selection of an alternative will be made on a case-by-case basis, and will depend, to an extent, on available data."  Id.

## II.    Factual Background

### A.    December 2021 Antidumping Duty Order

In February 2023, Commerce initiated an administrative review of its 2021 antidumping duty order on utility scale wind towers from India and Malaysia at the request of the Coalition and CS Wind with a period of review from October 13, 2021, to November 30, 2022.  See Initiation of Antidumping and Countervailing Duty Administrative Reviews, 88 Fed. Reg. 7060, 7062 (Dep't Com. Feb. 2, 2023), P.R. 12 ("Initiation"); Letter from A. Price to G. Raimondo, re: Coalition Request for Administrative Review (Dec. 30, 2022), P.R. 2; Letter from J. Goldfeder to G. Raimondo, re: CS Wind Request for Administrative Review (Jan. 3, 2023), P.R. 3.  CS Wind Malaysia and CS Wind Korea were the only companies for which a review was requested.  See Initiation, 88 Fed. Reg. at 7062.

Commerce issued initial questionnaires to CS Wind on March 2, 2023 to "solicit[] information" on "sales, entries or shipments" during the period of review, so that it could "determine whether subject merchandise that [CS Wind] produced and/or exported was in fact sold in, or to, the United States and dumped prices."  Letter from Commerce to Trade Pacific PLLC, re: Request for Information at 1 (Dep't Com. Mar. 2, 2023), P.R. 15.  In response, CS Wind informed Commerce that it had shut down production at its Malaysia plant in March 2022.  See

---

[2] The SAA "shall be regarded as an authoritative expression by the United States concerning the interpretation and application of the Uruguay Round Agreements and this Act in any judicial proceeding in which a question arises concerning such interpretation or application."  19 U.S.C. § 3512(d).

Letter from Trade Pacific PLLC to G. Raimondo, re: CS Wind's Sections B and D Questionnaire Responses at D-23 (May 1, 2023), P.R. 41, C.R. 23–29.   CS Wind reported substantial post-shutdown fixed overhead costs captured by a variable titled "FOH_SD."  Id. at D-13, D-23.

CS Wind later updated its response to report a new shutdown-related cost, this time captured by a variable titled "COST_ADJ_SD."  Letter from Trade Pacific PLLC to G. Raimondo, re: CS Wind's Sections B and D Questionnaire Responses for Sales to Germany at D-14 to -15 (July 6, 2023), P.R. 86–87, C.R. 60.  CS Wind claimed that the conversion costs (i.e., labor cost plus manufacturing overhead) recorded in its books were "distorted" by the consequences of curtailed production and preparation for shutdown in the first four months of the period of review, necessitating an adjustment using the COST_ADJ_SD variable.  Id. at D-14.

In September 2023, after determining that CS Wind "does not appear to have a viable home or third country market," Commerce issued a letter to all interested parties to provide parties the opportunity to comment and submit information on constructed value profit.  Letter from H. Schriefer to All Interested Parties, re: Request for Constructed Value Profit and Selling Expense Comments and Information at 1 (Dep't Com. Sept. 26, 2023), P.R. 116.

In response, CS Wind submitted financial statements from four companies it argued Commerce should use as surrogates to calculate constructed value profit: Engtex Group Bhd. ("Engtex"), a Malaysian holding company with operations related to steel product manufacturing; Arabian Pipes Company ("APC"), a Saudi "leading producer of steel pipe and [hollow] section"; Vallourec Group ("Vallourec"), a French producer of steel pipes; and PAO TMK, a Russian pipe producer.  Letter from J. Goldfeder to G. Raimondo, re: CV Profit and Selling Expense Comments and Information at 4–5 (Oct. 10, 2023), P.R. 120–126, C.R. 91–97 ("CS Wind's CV Profit Letter").  The Coalition submitted financial statements from three potential surrogate companies: Pantech

Group Holdings Berhad, a Malaysian producer of steel pipes; Mycron Steel Berhad ("Mycron"), a Malaysian conglomerate of steel product manufacturers and traders; and Alpine Pipe Manufacturing Sdn. Bhd. ("Alpine"), a Malaysian producer of welded steel pipe, plates, and sheets.  Letter from D. Holt to G. Raimondo, re: CV Profit and Selling Expense Comments and Information at 2–4 (Oct. 10, 2023), P.R. 127–131 ("Coalition's CV Profit Letter").

### B.    *Preliminary Results*

On January 4, 2024, Commerce published its preliminary results, calculating a duty rate of 25.92 percent ad valorem.  See Utility Scale Wind Towers from Malaysia: Preliminary Results of Antidumping Duty Administrative Review; 2021-2022, 89 Fed. Reg. 461, 462 (Dep't Com. Jan. 4, 2024), P.R. 153; Letter from J. Maeder to A. Elouaradi, re: Decision Memorandum for the Preliminary Results of the Antidumping Duty Administrative Review of Utility Scale Wind Towers from Malaysia; 2021-2022 (Dep't Com. Dec. 28, 2023), P.R. 147 ("Prelim. IDM").  In determining costs of production, Commerce rejected CS Wind's requested adjustments, commenting that "CS Wind ha[d] failed to demonstrate or substantiate that the adjustments [were] appropriate."  Mem. from S. Shobowale to T. Slaughter, re: Cost of Production and Constructed Value Calculation Adjustments for the Preliminary Results at 3 (Dep't Com. Dec. 28, 2023), P.R. 152, C.R. 118 ("Prelim. Cost Calc. Mem."); see also Prelim. IDM at 12.  In selecting surrogate companies to calculate constructed value profit under 19 U.S.C. § 1677b(e)(2)(B)(iii), Commerce explained that it considers four factors:

> (1) [t]he similarity between a potential surrogate company's business operations and products and the respondent's business operations and products; (2) [t]he extent to which a potential surrogate company has sales in the United States and the home market; (3) [t]he contemporaneity of the surrogate data to the period of investigation or review; and (4) [t]he similarity of the customer base between a potential surrogate company and the respondent.

Prelim. IDM at 14.  Commerce determined that Mycron and Alpine were the best available

surrogates, because they are "Malaysian producers of steel pipes, products Commerce has found to be comparable to the subject merchandise," and "their financial statements are complete, legible, and contemporaneous."  Id. at 14–15.

CS Wind submitted a case brief to Commerce on February 15, 2024, arguing that Commerce, in accord with its past practice, should have accepted the reported cost adjustments to account for CS Wind's production shut down in March 2022 and to offset the abnormally high conversion costs that CS Wind incurred when it slowed production to shut down.  Letter from Trade Pacific PLLC to G. Raimondo, re: CS Wind's Case Brief at 3–8 (Feb. 15, 2024), P.R. 159, C.R. 120.  CS Wind again argued that, as an alternative to CS Wind Malaysia's own financial statements, Commerce should use the financial statements of APC or Vallourec, who CS Wind argued produce comparable products to wind towers.  Id. at 3.

### C.    *Final Results*

Commerce published its Final Results on July 10, 2024, accepting CS Wind's FOH_SD adjustment but again rejecting its COST_ADJ_SD adjustment.  See Final Results, 89 Fed. Reg. at 56735; IDM at 6, 11.  In allowing CS Wind's FOH_SD adjustment, Commerce explained that the value represented actual post-shutdown costs incurred during the period of review, which could now be excluded as Commerce had determined that production had ceased, not merely idled.  Id. at 4–6.  In contrast, Commerce rejected the COST_ADJ_SD adjustment, explaining that it represented "the difference between the [period of investigation] and [period of review] costs of manufacturing wind towers."  Id. at 6.

Commerce continued to use Alpine and Mycron to calculate constructed value profit, explaining that:

> The FY 2022 financial statements of Alpine and Mycron are the best sources for determining [constructed value] profit for CS Wind because they are significant

producers of merchandise comparable to wind tower sections and their profits are derived predominantly from sales of comparable merchandise in Malaysia.

Id. at 11.  Commerce determined a final weighted-average antidumping margin of 18.02 percent ad valorem.  See Final Results, 89 Fed. Reg. at 56735.

Commerce amended its Final Results on August 13, 2024, in response to CS Wind's allegations of a ministerial error, revising the weighted-average dumping margin to 17.97 percent ad valorem.  Utility Scale Wind Towers from Malaysia: Amended Final Results of Antidumping Duty Administrative Review; 2021–2022, 89 Fed. Reg. 65848, 65849 (Dep't Com. Aug. 13, 2024). That amendment is not at issue here.

### III.    Procedural History

CS Wind filed a complaint on September 6, 2024 in the U.S. Court of International Trade. See Compl. Sept. 6, 2024, ECF No. 13.  On January 29, 2025, CS Wind moved for Judgment on the Agency Record pursuant to Rule 56.2.  See Pls.' Br.  On May 23, 2025, the Government filed its Response to the Plaintiff's Motion for Judgment on the Agency Record.  See Gov't Br.  On June 9, 2025, the Coalition filed its Response Brief.  See Def.-Inter.'s Br.  On July 7, 2025, CS Wind filed its reply.  See Pls.' Reply to Gov't and Def.-Inter.'s Resp. to Pls.' Mot. for J. on the Agency R., July 7, 2025, ECF No. 40. ("Pls.' Reply").  In advance of oral argument, the court issued questions to the parties, to which the parties responded.  See Letter re: Qs. for Oral Arg., July 11, 2025, ECF No. 42; Pls.' Resp. to Ct.'s Qs. for Oral Arg., July 18, 2025, ECF No. 43 ("Pls.' OAQ Resp."); Def.'s Resp. to Ct.'s Qs. for Oral Arg., July 18, 2025, ECF No. 45 ("Gov't OAQ Resp."); Def.-Inter.'s Resp. to Ct.'s Qs. for Oral Arg., July 18, 2025, ECF No. 46 ("Def.-Inter.'s OAQ Resp.").  The court held oral argument as scheduled on July 22, 2022.  See Order, June 23, 2025, ECF No. 38.  As directed by the court, the parties filed supplemental briefs following oral

argument.  See Gov't Post-Arg. Br., July 29, 2025, ECF No. 50; Def.-Inter.'s Post-Arg. Br., July

30, 2025, ECF No. 53; Pls.' Post-Arg. Br., July 29, 2025, ECF No. 51.

## JURISDICTION AND STANDARD OF REVIEW

The court has jurisdiction over this action pursuant to 28 U.S.C. § 1581(c) and 19 U.S.C.

§ 1516a(a)(2)(B)(iii).  The court will "hold unlawful any determination, finding or conclusion

found . . . to be unsupported by substantial evidence on the record, or otherwise not in accordance

with law."  19 U.S.C. § 1516a(b)(1)(B)(i).  Substantial evidence is "such relevant evidence as a

reasonable mind might accept as adequate to support a conclusion."  Broadcom Corp. v. Int'l Trade

Comm'n, 28 F.4th 240, 249 (Fed. Cir. 2022) (internal quotation marks and citation omitted).

## DISCUSSION

CS Wind challenges two of Commerce's determinations in the Final Results as

unsupported by substantial evidence and otherwise not in accordance with law: (1) Commerce's

rejection of the COST_ADJ_SD adjustment; and (2) Commerce's selection of Alpine and Mycron

as surrogate companies.  See Pls.' Br. at 2.  The court holds that Commerce's determination to

disallow the COST_ADJ_SD adjustment because it did not capture actual post-shutdown costs is

supported by substantial evidence and in accordance with law.  The court also holds that

Commerce's choice of Alpine and Mycron—as Malaysian producers of comparable goods—to

calculate constructed value profit is supported by substantial evidence and in accordance with law.

The court therefore sustains Commerce's Final Results.

### I.    Commerce's Determination to Disallow CS Wind's COST_ADJ_SD Adjustment Is Supported by Substantial Evidence and in Accordance with Law

Recall that 19 U.S.C. § 1677b(f)(1)(A) provides that Commerce "shall normally" calculate

costs "based on the records of the exporter or producer of the merchandise, if such records are kept

in accordance with the with the generally accepted accounting principles of the exporting

country . . . and reasonably reflect the costs associated with the production and sale of the merchandise."  The SAA specifies that Commerce shall allocate costs to "reasonably reflect[] and accurately capture[] all of the actual costs incurred in producing and selling the product under investigation or review."  SAA at 4172.

　　　　As has been noted, in calculating costs of production here, Commerce explained that it "relied on [cost of production] data submitted by CS Wind."  Prelim. IDM at 12.  In its <u>Final Results</u>, Commerce adjusted CS Wind's recorded costs using the FOH_SD variable provided by CS Wind but rejected CS Wind's separate COST_ADJ_SD adjustment.  <u>See</u> IDM at 6.

　　　　CS Wind argues that "Commerce's failure to apply [the COST_ADJ_SD] adjustment to CS Wind's aberrational [costs of manufacturing] significantly distorted, and thus did not 'reasonably reflect,' the costs associated with the production of wind towers."  Pls.' Br. at 3 (quoting 10 U.S.C. § 1677b(f)(1)(A)).  The Government counters that CS Wind's reported production costs were "<u>actual</u> production costs incurred and reported at the time of production and should not be artificially adjusted by subsequently-incurred costs."  Gov't Br. at 13 (emphasis in original).  CS Wind also argues that Commerce "inexplicably deviated from its past practice" of "disallow[ing] shutdown costs to be included in the [cost of manufacturing] where unreasonably high costs would result from applying such costs to the per-unit production costs of produced merchandise."  Pls.' Br. at 10, 9 (internal quotation marks and citation omitted).  CS Wind cites two examples to support this claim: <u>Certain Softwood Lumber Prods. from Canada</u>, 70 Fed. Reg. 73437 (Dep't Com. Dec. 12, 2005), and <u>NEXTEEL Co., Ltd. v. United States</u>, 47 CIT __, __, 648 F. Supp. 3d 1362, 1367 (2023).  <u>Id.</u> at 9, 10.

　　　　In determining whether to allow CS Wind's adjustments, Commerce noted that CS Wind calculated the COST_ADJ_SD variable "by first comparing the conversion costs of the same or

similar wind towers in the [July 1, 2019 through June 30, 2020] period of investigation . . . versus the [October 13, 2021 through November 30, 2022 period of review] and then [CS Wind] report[ed] the difference . . . as the cost adjustment." IDM at 6. CS Wind's costs during the earlier period of investigation were lower than during the period of review when production volume was lower as the facility approached shutdown. As a result, Commerce concluded that the COST_ADJ_SD variable represented "a downward adjustment to the costs from its normal books and records to eliminate distortions created by abnormally low production volumes during the [period of review]." Id. In contrast, Commerce concluded that the FOH_SD variable "included all overhead costs incurred after the March 2022 shutdown." Id. at 5. Commerce ultimately excluded the costs reported under the FOH_SD variable, reasoning that it captured "actual post-shutdown costs." Id. at 6. Commerce disallowed exclusion of the costs reported under the COST_ADJ_SD variable, reasoning that it was "based on the difference between the [period of investigation] and [period of review] costs of manufacturing wind towers." Id.

   In analyzing CS Wind's proffered adjustments, Commerce acknowledged its past practice of excluding shutdown costs from its calculations in various instances. See id. at 4. Commerce noted that, based on past practice, it "excludes the costs attributable to a permanent shutdown from the calculation of a respondent's cost of production" because "rather than supporting the general operations of a company, the sale is a removal of the production facilities and, thus, represents a significant change in operations." Id. Commerce explained that certain shutdown costs, like those associated with a shutdown for routine maintenance "are properly included in a respondent's cost of manufacturing because the associated costs pertain to ongoing production and support the general operations of the company." Id. In accordance with this past practice, Commerce applied the FOH_SD adjustment to prevent unreasonably high per-unit production costs not associated

with ongoing production.  Id. at 6.

In contrast, Commerce does not have, as CS Wind suggests, a past practice of reducing per-unit production costs to reflect a lower volume of production in anticipation of a shutdown. Neither of the examples CS Wind cites establishes such a practice.  In Certain Softwood Lumber, Commerce noted that "if [it] included the shut-down costs as a component of the per-unit costs, not only would it result in a significant increase to the per-unit cost, but it would not reflect the offsetting revenues from the subsequent sale."  Mem. from S. Claeys to J. Spetrini, re: Issues and Decisions Memorandum for the Final Results of the Antidumping Duty Administrative Review of Certain Softwood Lumber Products From Canada at 35, Case No. A-122-838, Bar Code: 4778474-01 (Dep't Com. Dec. 12, 2005).  In that case, Commerce considered whether to "assign the gain or loss on the disposition of a facility [that had already occurred] to the per-unit cost of manufacturing of the products that [were] still being produced at the respondent's other facilities." Id. at 34.  This is unlike the present case, where Commerce considered whether to reduce the per-unit cost of manufacturing of products being produced before—as opposed to after—a shut-down takes place.

Similarly, in NEXTEEL, the court sustained Commerce's determination to adjust per-unit production costs where certain production lines were shut down.  NEXTEEL, 648 F. Supp. 3d at 1365.  In that case, Commerce stated that "the per-unit production costs for such merchandise would be unreasonably high because the cost of the suspended lines would be added on top of the normal operating cost for those lines."  Id. at 1367.  The court thus approved of Commerce's adjustments to per-unit production values on certain production lines to reflect contemporaneous operating costs from a partial suspension of other production lines.  Id. at 1368.  NEXTEEL does not support CS Wind's proposition that Commerce has a practice of adjusting per unit production

values to reflect production volume changes in anticipation of a shutdown that has not yet occurred.

Softwood Lumber and NEXTEEL suggest that Commerce has, in the past, excluded overhead costs incurred in a past or contemporaneous shutdown of a different production line or facility from the per-unit costs of production on the relevant production line or facility. They do not support CS Wind's contention that Commerce must reduce per-unit production costs because production volume was low in anticipation of a shutdown. As indicated above, Commerce acted in accordance with its past practice by removing the actual post-shutdown costs captured by the FOH_SD variable. Commerce's determination not to apply the COST_ADJ_SD adjustment—effectively replacing the actual per-unit production costs during the period of review with per-unit production costs during a different period with a higher production volume—does not contradict any established past practice.

CS Wind also argues that Commerce "never provided any reasoning as to the basis for its decision" to disallow the downward cost adjustment. See Pls.' Br. at 8. As CS Wind notes, "where Commerce has . . . failed to provide an adequate basis for its conclusions," its determinations are not supported by substantial evidence. Pls.' Br. at 2 (quoting Rhone-Poulenc, Inc. v. United States, 20 CIT 573, 575, 927 F. Supp. 451, 454 (1996)). An explicit statement of reasoning is not required, however: the court may uphold an agency's action even where "the agency's decisional path" is merely "reasonably discernable." Wheatland Tube Co. v. United States, 161 F.3d 1365, 1369–70 (Fed. Cir. 1998). Commerce's explanation of its past practices, its conclusion that the COST_ADJ_SD variable represented the difference between costs during the period of review and a prior period of investigation, and its explanation that the FOH_SD variable—unlike the COST_ADJ_SD variable—captured "actual post-shutdown costs," together provide a reasonably discernable decisional path for its determination to disallow the COST_ADJ_SD adjustment. See

IDM at 6.

Finally, CS Wind argues that Commerce's ability to make adjustments for startup operations implies that "[t]he corollary, of course, is the same": Commerce must also make adjustments for shutdown operations. Pls.' Br. at 10. Section 1677b(f)(1)(C)(i) states that "[c]osts shall be adjusted appropriately for circumstances in which costs incurred during the time period covered by the investigation or review are affected by startup operations." 19 U.S.C. § 1677b(f)(1)(C)(i). The statute goes on to specify that "[a]djustments shall be made for startup operations only where—(I) a producer is using new production facilities or producing a new product that requires substantial additional investment, and (II) production levels are limited by technical factors associated with the initial phase of commercial production." Id. § 1677b(f)(1)(C)(ii). CS Wind invokes this startup adjustments provision to suggest that Commerce must make similar adjustments for shutdown operations, arguing that "if a company has ceased all production . . . then its unit production costs will be distorted and require some form of adjustment to avoid inaccuracies in the [antidumping] duty calculations." Pls.' Br. at 10.

The fact that Congress explicitly directed Commerce to adjust for startup operations does not mean that "[t]he corollary, of course, is the same" for shutdown operations. Id. The fact that Congress included a provision explicitly calling for adjustments of costs to account for startup operations demonstrates that Congress knows how to mandate that Commerce make adjustments to per-unit costs and chose to explicitly do so for startup operations. Congress did not do the same for shutdown operations. The existence of the startup operations adjustments provision suggests that the absence of an explicit shutdown operations adjustments provision was intentional. See Bittner v. United States, 598 U.S. 85, 94 (2023) ("expressio unius est exclusio alterius"). In the absence of such an explicit mandate regarding shutdown operations adjustments, Commerce is

only obligated to ensure that costs "reasonably reflect[] and accurately capture[] all of the actual costs incurred in producing and selling the product under investigation or review." SAA at 4172. Commerce did just that here.

> **II.    Commerce's Selection of Surrogate Companies Is Supported by Substantial Evidence and in Accordance with Law**

Recall that, where a producer has no domestic market for the subject merchandise, Commerce calculates a constructed value profit based on one of three methods including, as relevant here: "the amounts incurred and realized . . . for profits, based on any other reasonable method . . . ." 19 U.S.C. § 1677b(e)(2)(B)(iii). As Commerce noted, it generally analyzes proposed surrogates for constructed value profit using four factors: (1) the similarity between a potential surrogate company's business operations and products and the respondent's business operations and products; (2) the extent the potential surrogate has sales in the United States and the home market; (3) the contemporaneity of the surrogate data; and (4) the similarity of the potential surrogate's customer base. See Prelim. IDM at 14; see also Notice of Final Determination of Sales at Less Than Fair Value: Pure Magnesium from Israel, 66 Fed. Reg. 49349 (Dep't Com. Sept 27, 2001), & accompanying Issues and Decision Mem. at cmt. 7 (articulating factors for the first time); Dongkuk S&C Co. v. United States, 134 F.4th 1320, 1331 (Fed. Cir. 2025) (recognizing Commerce's four factors).

In selecting between potential constructed value surrogates, it is within "Commerce's purview to decide which . . . imperfect sources of data to use." Dongkuk, 134 F.4th at 1331. Here, "Commerce was tasked with comparing the options presented and their 'comparative deficiencies.'" PT. Zinus Global Indonesia v. United States, 47 CIT __, __, 628 F. Supp. 3d 1252, 1271 (2023) (quoting Mid Continent Steel & Wire, Inc. v. United States, 941 F.3d 530, 544 (Fed. Cir. 2019)). Given that constructed value surrogates cannot perfectly capture CS Wind's profit

experience, "[t]he language of the statute provides Commerce with discretion to weigh the individual factors and to identify the best available information." Id.

Recall that during the 2021–2022 administrative review, interested parties placed the financial statements for seven companies on the record as potential sources for constructed value profit, including as relevant here: Engtex, APC, Vallourec, Alpine, and Mycron.  See CS Wind's CV Profit Letter at 4–5; Coalition's CV Profit Letter at 2–4.  In the Final Results, Commerce calculated CS Wind's constructed value profit using the 2022 financial statements of Mycron and Alpine, finding that they "are Malaysian producers of steel pipes, products that Commerce has found to be comparable to the subject merchandise and their financial statements are complete, legible, and contemporaneous with the [period of review]."  Prelim. IDM 14–15; see also IDM at 11.

CS Wind argues that Mycron and Alpine are not appropriate surrogates because they do not produce comparable merchandise, because Mycron acts primarily as a holding company, and because Alpine sold a portion of its merchandise to affiliated companies.  See Pls.' Br. at 12, 15–17.  CS Wind suggests that Commerce should have used two other potential surrogates—APC and Vallourec—because they "best reflect the profit experience of CS Wind."  Id. at 20.

None of the potential surrogates produce utility scale wind towers, leaving Commerce to consider the similarity between the potential surrogate companies' smaller steel pipe and hollow sections and the subject merchandise.  According to the information provided by the interested parties in the review, APC produces steel pipe and hollow section from Saudi Arabia, Vallourec produces steel pipe from France, Mycron produces steel pipe from Malaysia, and Alpine produces steel pipe from Malaysia.  See CS Wind's CV Profit Letter at 4–5; Coalition's CV Profit Letter at 2–3.

        In arguing that Alpine and Mycron do not produce comparable merchandise, CS Wind
suggests that APC and Vallourec "were producers of large steel pipes," making them better
potential surrogates because their merchandise was more comparable to utility scale wind towers.
Pls.' Br. at 20.  However, all the steel pipe produced by these companies appears to be of a much
smaller diameter than the utility scale wind towers produced by CS Wind.  For example, during
the review, CS Wind provided information from APC's website describing its pipes as ranging
from 6 inches to 48 inches in diameter.  <u>See</u> CS Wind's CV Profit Letter at CV-3.  During oral
argument, CS Wind noted that wind towers are "humongous things . . . so big that they are
produced in sections that have to be . . . assembled on site.  These are massive, massive items."
Oral Arg. at 25:27–42, <u>CS Wind Malaysia Sdn. Bhd. v. United States</u>, No. 24-cv-00150 (Ct. Int'l
Trade filed Aug. 9, 2024) (time stamp from the recording on file with the court).  CS Wind points
to the pictures of the potential surrogates' merchandise in the joint appendix, implying that the
difference between small steel pipe and utility scale wind towers is clear.  <u>See</u> <u>id.</u> at 25:50–26:15
("[T]hey're . . . long, they're kind of bundled up with steel bands, look like the type of pipe you
could go and buy at Home Depot.").  While the joint appendix does not appear to contain any
images of Mycron or Alpine's merchandise, the joint appendix does contain images depicting APC
and Vallourec's merchandise that suggest their "large" steel pipes and hollow sections are also
substantially smaller than the "massive, massive" wind towers that CS Wind produces:



CS Wind's CV Profit Letter at CV-3 (image of pipe from APC's website).



Id. at CV-4 (images of pipe from Vallourec's materials).  None of these images depict steel pipes anywhere near the size of utility scale wind towers.  Commerce found that neither APC nor Vallourec produce the subject merchandise, and that, "[w]hile Alpine and Mycron do not produce subject merchandise either, . . . both are significant producers of comparable steel products in Malaysia."  IDM at 9.

In comparing smaller diameter steel pipes and hollow sections to utility scale wind towers, Commerce has not mistaken windmills for giants.  See Miguel de Cervantes, Don Quixote, Ch. VIII (1615).  Having been presented with imperfect surrogate companies who all produce smaller diameter steel pipes and hollow sections than utility scale wind towers, Commerce's determination that Malaysian steel pipe is more similar to Malaysian wind towers than Saudi and French steel pipe is reasonable.  See Dongkuk, 134 F.4th at 1331 (It is within "Commerce's purview to decide which . . . imperfect sources of data to use.").

Additionally, in considering the similarity of Alpine's products, Commerce explained that it had already determined that Alpine's smaller diameter steel pipes from Malaysia were comparable to utility scale wind towers from Malaysia during the original less-than-fair-value investigation in 2021.  IDM at 9.  During that 2021 investigation, CS Wind itself argued in a letter to Commerce that "Alpine is a producer of comparable merchandise that also is located in Malaysia," using as evidence "information from Alpine's website regarding its production of

welded steel pipe, steel plates and sheets, and hollow sections." Letter from J. Goldfeder to Acting

Sec'y of Com., re: Utility Scale Wind Towers from Malaysia; CV Profit and Selling Expense

Comments and Information at 6, Case No. A-557-821, Bar Code: 4088155-01 (Feb. 12, 2021)

("CS Wind's 2021 CV Profit Comments"). Thus, Commerce preliminarily determined that

"Alpine is a Malaysian company that produces and sells welded steel pipe, steel plates and sheets,

and hollow sections, which we preliminarily find to be comparable products to [utility scale wind

towers]." See Mem. from C. Marsh to J. Maeder, re: Decision Memorandum for the Preliminary

Determination in the Less-Than-Fair-Value Investigation of Utility Scale Wind Towers from

Malaysia at 12, Case No. A-557-821, Bar Code: 4123943-02 (Dep't Com. May 18, 2021) ("2021

Prelim. IDM"). Though Commerce was able to use the financial statements of an actual producer

of utility scale wind towers to calculate constructed value profit in the final results of the 2021

investigation, it affirmed that "Alpine is a Malaysian producer of steel pipes, which we consider

to be comparable merchandise." Mem. to C. Marsh from J. Maeder, re: Issues and Decision

Memorandum for the Final Affirmative Determination in the Less-Than-Fair-Value Investigation

of Utility Scale Wind Towers from Malaysia at 29, Case No. A-557-821, Bar Code: 4169181-02

(Dep't Com. Oct. 6, 2021).

 CS Wind now argues that Alpine's business and merchandise "bear[s] no relationship to

CS Wind's operations," but does not suggest that Alpine's merchandise or operation have changed

in any way since the 2021 review. Pls.' OAQ Resp. at 13. Absent such a change, Commerce's

determination that Alpine's steel pipes that were—based on CS Wind's own arguments and

information—comparable in 2021 are still comparable for the purpose of this investigation is

supported by substantial evidence and in accordance with law.

 CS Wind further argues that Mycron "is not a producer of comparable merchandise,"

because "the petitioner provided—and Commerce relied upon—the <u>consolidated</u> statements of a

<u>holding company</u>."  Pls.' Br. at 15 (emphasis in original).  CS Wind emphasizes that Commerce

rejected the financial statements of Engtex "because it is a conglomerate that principally engaged

in investment holding, . . . [but] did not extend this same logic to Mycron." Pls.' Br. at 16.[3]  While

Commerce did reject Engtex as a surrogate in part because "the company is a conglomerate

consisting of wholesale and distribution, manufacturing, property development, and hospitality

activities, [and is] principally engaged in investment holding," Prelim. IDM at 14, it found that

Mycron's financial statements "predominately reflect the results of Mycron's subsidiaries that

produce steel products and not the parent company's investment activities."  IDM at 11.

Commerce noted that the separate company financial statements for the investment holding and

management services "only recognized management fees, which were eliminated in the

consolidated results for the" subsidiaries.  <u>Id.</u>  Thus, Commerce did not, as CS Wind suggests, rely

on financial statements that principally reflect investment holding and the provision of

management services to subsidiaries.

   Finally, CS Wind argues that Alpine's customer base is dissimilar to CS Wind because it

"derived a significant portion of revenue from sales to two related companies." Pls.' Br. at 16.  CS

Wind highlights that "Commerce rejected CS Wind Malaysia's own FR 2021 financial statements

because CS Wind Malaysia sold the subject merchandise to an affiliated company, CS Wind

Korea."  <u>Id.</u> at 17 (citing IDM at 9).  While Commerce "agree[d] that a predominance of affiliated

---

[3] CS Wind also suggests that Mycron's subsidiaries "produced [cold rolled coils] that [are] not comparable to utility scale wind towers."  Pls.' Br. at 16.  Commerce recognized that Mycron's "subsidiaries engaged in the production of cold rolled steel, steel pipes and tubes, and steel product trading," not in the production of utility scale wind towers.  IDM at 11.  As indicated above, none of the potential surrogate companies produced utility scale wind towers, and Commerce reasonably selected companies that produce smaller steel pipe products from Malaysia as the best alternative available.

transactions in a potential source's financial statements may be distortive to the calculation of [constructed value] profit," IDM at 10, it did not find such a predominance in Alpine's financial statements. Unlike CS Wind Malaysia, whose financial statements "reflect revenues that are 100 percent generated from transactions with an affiliated company," only "[twenty-one] percent of [Alpine's] revenues are from transactions with affiliated parties." Id. Therefore, Commerce's choice of Alpine as a surrogate company was not inconsistent with its rejection of CS Wind Malaysia's financial records.

"The [c]ourt does not review whether Commerce used the best available information, but rather whether Commerce's determination of the best available information was reasonable." PT. Zinus, 628 F. Supp. at 1273 (citing Zhejiang DunAn Hetian Metal Co. v. United States, 652 F.3d 1333, 1341 (Fed. Cir. 2011)). Commerce reasonably found that, in selecting between imperfect potential surrogates that produce steel pipes smaller than utility scale wind towers, two companies producing steel pipe in Malaysia were better estimates for CS Wind's profit experience than companies producing steel pipe outside of Malaysia. "Where we are faced with two opposing views of the record, it is the function of the court to uphold Commerce's determination if it is supported by substantial evidence and is otherwise in accordance with law." Am. Silicon Techs. v. United States, 261 F.3d 1371, 1381 (Fed. Cir. 2001). Here, Commerce considered the financial statements of seven different potential surrogates and noted the various deficiencies of each option. Commerce's determination that two producers of Malaysian steel pipe are the best available surrogates to estimate CS Wind's profit experience is supported by substantial evidence and in accordance with law.

## CONCLUSION

For the reasons above, the court holds that (1) Commerce's determination not to apply the COST_ADJ_SD adjustment is supported by substantial evidence and in accordance with law and

(2) Commerce's selection of Alpine and Mycron as surrogate companies for the calculation of constructed value profit is likewise supported by substantial evidence and in accordance with law. Commerce's <u>Final Results</u> are sustained.

      **SO ORDERED.**

*/s/ Gary S. Katzmann*
Gary S. Katzmann, Judge

Dated: <u>October 9, 2025</u>
        New York, New York